UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS LOGAN,

              Plaintiff,

    -v-

IRINA MATVEEVSKII, JEFF ZUCKERMAN,
MARK KAMENSKY, TUCKAHOE HOUSING
AUTHORITY, ADOLFO CARRIÓN, and MIRZA
ORRIOLS,

              Defendants.

Case No. 10-CV-9247 (KMK)

OPINION AND ORDER

Appearances:

Thomas Logan
Tuckahoe, N.Y.
*Pro Se Plaintiff*

Joan M. Gilbride, Esq.
Kaufman, Borgeest & Ryan, L.L.P.
New York, N.Y.
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

      Plaintiff Thomas Logan ("Logan"), proceeding pro se, brings this Action against

Defendants Irina Matveevskii ("Matveevskii"), Jeff Zuckerman ("Zuckerman"), Mark

Kamensky ("Kamensky"), Tuckahoe Housing Authority ("THA"), Adolfo Carrión ("Carrión"),

and Mirza Orriols ("Orriols").[1]  Matveevskii, Zuckerman, Kamensky, and THA (collectively,

---

[1] Defendant Mark Kamensky was improperly named on the docket as "Mary Kamensky," and Defendant Mirza Orriols was improperly named as "Mirzal Negron Morales" in Plaintiff's Amended Complaint.  (*See* HUD Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("HUD Defs.' Mem.") 1.)  The Court will refer to these individuals by their correct names throughout this Opinion.

"the THA Defendants") move for summary judgment, while Carrión and Morales (collectively, "the HUD Defendants") move to dismiss the claims asserted against them.  For the following reasons, the THA Defendants' Motion for Summary Judgment is granted, as is the HUD Defendants' Motion to Dismiss.

I.  BACKGROUND

A.  Factual Background

Plaintiff is a resident of 31 Midland Place in Tuckahoe, New York, where he has lived for "[a]pproximately 27 to 30 years."  (Thomas Logan Dep. Tr. 8, Apr. 22, 2013 ("Logan Dep. Tr."); *see also* THA Defs.' Statement of Material Facts Pursuant to Local R. 56.1 ("THA Defs.' Rule 56.1 Statement") ¶ 1 ("Plaintiff . . . has been a resident of 31 Midland Place . . . for approximately twenty-seven to thirty years.").)  Plaintiff lives in a third-floor apartment at 31 Midland Place with his mother, Anne Gunther, and his brother, John Gunther.  (THA Defs.' Rule 56.1 Statement ¶¶ 1–2.)  31 Midland Place is one of "nine residential buildings containing approximately 149 units" that THA "owns and operates" as "federal subsidized housing for the Tuckahoe community."  (THA Defs.' Rule 56.1 Statement ¶ 3; *see also* Logan Dep. Tr. 18 ("Q: And you're familiar with Tuckahoe Housing Authority?  A: Yes.  Q:  And can you explain what it is?  A: It's a low to middle income housing development, HUD.").)  Matveevskii is THA's Executive Director, which position she assumed on January 1, 2008, while Zuckerman is Chairman of the THA Board of Commissioners.  (*See* THA Defs.' Rule 56.1 Statement ¶¶ 4–6.)  Kamensky is THA's General Counsel, and Adalgisa Jones ("Jones"), not named as a defendant in this Action, is a THA Office Assistant.  (*See id.* ¶¶ 7–8, 10.)

Plaintiff claims that he has been diagnosed with multiple disabilities, the first of which relates to a heart condition for which he underwent quadruple bypass surgery.  (Logan Dep. Tr.

2

17.)  At some point, he also "fell down a flight of stairs," which accident required him to undergo a knee-replacement operation.  (*Id.*)  "The combination of [these] two things left [Plaintiff] very disabled."  (*Id.*)  For the purposes of their Motions, Defendants do not dispute that Plaintiff is currently disabled, nor do they dispute that Plaintiff was disabled at all times relevant to the instant Action.

In his deposition, Plaintiff stated that at some point, in order to accommodate his disabilities, he "request[ed] a lower floor apartment" in correspondence with Eric De Esso ("De Esso"), who preceded Matveevskii as THA Executive Director.  (*Id.* at 20.)  Plaintiff included this correspondence in his Amended Complaint.  In a March 27, 1996 letter to Plaintiff, De Esso wrote that, "[i]n review of [Plaintiff's] file and current family composition, [Plaintiff's] family require[d] a one bedroom apartment unit," but at the time that the letter was written, Plaintiff's family "occup[ied] a two bedroom apartment unit."  (Pl.'s Ex. 7, at 5.)[2]  Because "Federal Regulations for Public Housing provide that Family Composition must be commensurate with size of dwelling unit," De Esso "advised [Plaintiff] that [he] [would] be relocated to the first available one bedroom apartment unit to accommodate [his] family status."  (*Id.*)

---

[2] Plaintiff's Amended Complaint is a long compilation of allegations, sections of various federal and state statutes, medical records, filings in related lawsuits, and other documents of questionable relevance.  Plaintiff's Amended Complaint is also unpaginated, and it is unclear which pages of his filing are intended to be the Amended Complaint itself, and which are intended to make up any exhibits that he might have sought to attach thereto.  All told, Plaintiff's Amended Complaint runs to 330 pages in length.  For ease of reference, and in accordance with the manner in which the Clerk's Office docketed Plaintiff's submission upon its receipt, the Court will refer to the first 33 pages of Plaintiff's submission as his Amended Complaint, and will refer to the subsequent parts of his submission as numbered exhibits, such that what the Court refers to as "Exhibit 7" is titled "Part 7" on the docket.  (*See* Dkt. No. 21.)

3

Plaintiff appears to have responded on the same day, in a letter in which he referenced the fall that led to his knee injury, and the existence of a civil suit against THA based on that fall. (*Id.* at 6.)  Plaintiff then wrote the following:

> Under the tenants' right guide, Landlord are required to provide reasonable accommodation for tenants with a disabilities so they may enjoy equal access to and use of housing accommodations.  Under the disability Act of 1987; 24 CFR (Code of Federal Regulations), part 8 relating to public housing authority responsibility to make facilities handicapped accessible.  I am putting your office on notices at THA.

> Last and far from less my senior mother is come to live with me and her name will be add to my lease.  If there any problems please feel free to contact me, and then our lawyers can go in front of a federal Judge to discuss the matter at hand.

(*Id.*)

In his deposition, Plaintiff characterized this letter as follows:

> I had sent documentations . . . requesting a lower floor apartment with the prior director, Mr. De Esso.  He informed me that I needed . . . a one-bedroom apartment, and I informed him that just prior to that, I added my mother to the lease, so we kept the two-bedroom, but because of my disability, I asked him, requested for a lower floor apartment.  And I was the next person on the list.

(Logan Dep. Tr. 20.)

The next document in Plaintiff's submissions that could potentially be construed as a communication between Plaintiff and THA is what appears to be a letter from Plaintiff addressed to Matveevskii and dated August 7, 2008, more than 12 years after Plaintiff's communication with De Esso:

> Please be advised that I writing you about my concerns of being a disable tenant with a heart condition and about to have a left knee replacement in this month, which came about from a fall in your hallway somewhere between the late 80's and the early 90's and my MOTHER, who is now 83 years old and is using a walker after she had her total knee replacement and we are living on the 3rd floor of 31 Midland Place.

> Since 1997 in my file you have many letter copies of my SSD and SSI information on my disability and copies of my Coronary Artery bypass grafts.  The total my

4

mother knee replacement and mines soon come these stairs will become too much for us . . .  I should be placed on the first floor apartments.  In 31 Midland and 25 Midland, for these two building have the fewest amount of steps of all the Housing building.  In view of the facts that whenever an apartment becomes available in one of these building we are never asked if we would like a lower floor apartment. Effective January 26, 1992, Title II of the ADA required PHAs to have a minimum of 5 percent of the total dwelling units, or at least one unit (whichever is greater), must be made accessible for persons with mobility impairments.  And I am wondering why THA has not tried to give us Reasonable Accommodations.

(Pl.'s Ex. 7, at 22 (alteration in original).)

Plaintiff submitted a similar document addressed to Matveevskii dated March 7, 2010:

Please be notify that a letter was written back in March 27, 1996 by Mr. De Esso the formal director of THA and my response was that I was putting THA on notices that I would be needing apartment for the disable.

Effective 1-26-1992, the federal court has mandated that a minimum of the total dwelling unit at THA.  There have been at least 4 first floor apartments between 31 Midland Place and 25 Midland Place.  I writing to asked you why has my request for a lower apartment on this side; which has the fewest steps than all other building units in THA.

I have submitted Doctor notes that go back to the late 80's to the present time that should be in my files, which states my heart condition, to 5 knee operation and finally a total left knee replacement.

(Pl.'s Ex. 8, at 1.)

Plaintiff further submitted another such letter, also dated March 7, 2010, but this time

addressed to the "THA Broad [sic] of Commissioner," in which he repeated much of what he

wrote in the preceding documents:

Please be advised that I writing you and the Broad of Commissioners about my concerns of being a disable tenant with a heart condition and a replace left knee, which came about from a follow in your hallway and my MOTHER, who is now 84 years old and is using a walker living on the 3rd floor of 31 Midland Place.

Since 1997 in my file you have many letter copies of my SSD and SSI information on my disability and Now that my mother has had a total knee replacement like myself these stairs are become too much for us . . . If needed Ms. Irina Matveevskii, I will get another note from my Doctor stating that I should be placed on the first

floor.  Since 31 Midland and 32 Midland are the only two building with the fewest amount of steps . . .  In view of the facts that whenever an apartment becomes available in one of these buildings we are never asked if we would like a lower floor apartment.

So I am now requesting a form hearing to discuss with you and the broad of commissions what seems to be the problem . . .  Because under the APPLICABILITY: This Notice applies to all public housing programs and activities receiving Federal financial assistance either directly or indirectly from the Office of Public and Indian Housing.  Federal financial assistance and programs or activities are both defined very broadly.  See 24 CFR 8.3 for the regulatory definitions.

Effective January 26, 1992, Title II of the ADA required PHAs to conduct a self-evaluation of their current services, policies and practices.  *See* 28 CFR §§ 35.105 and 35.150 (d).  It is time for another evaluation by FHEO look at THA Policies New Construction [see 24 CFR § 8.22 (a) and (b)].  A minimum of 5 percent of the total dwelling units, or at least one unit (whichever is greater), must be made accessible for persons with mobility impairments.  And additional minimum of 2 percent of the units, or at least one unit (whichever is greater) must be made accessible for persons with hearing or vision impairments.  In circumstances where greater need is shown, HUD may prescribe higher percentages than those listed above.  [See 24 CFR 8.22(c).]  Accessible units must be on an accessible route from site arrival points and connected by an accessible route from site arrival points and connected by an accessible route to public and common use facilities located elsewhere on the site.  Also, see visit ability recommendations in Section I. of this Notice.  In my case THA has not complied . . .  And I am wondering why THA has not tried to give us Reasonable Accommodations.

(Pl.'s Ex. 7, at 21 (alterations in original).)[3]

Plaintiff submitted another similar letter, also dated March 7, 2010 and addressed to the

"Broad [sic] of Commissioner (Correction Board)":

Please advised that I writing your and the Board of Commissioner about my concerns of being a disable tenant with a heart condition and replace left knee, which came about form falling you hallway.

---

[3] There are several handwritten notes included in the version of the document that Plaintiff submitted.  The author of the notes crossed out "Broad," substituting "Board," and added "al" to the word "form," such that it reads "formal" instead of "form."

> My MOTHER, who is 84 years old and using a walker needs to be on the first floor and not the 3rd floor of 31 Midland Place.  My mother also has had a total knee replacement.
>
> Since the late 80's to the present, your office have letter from Society Security, to letters from doctors and hospital.  Ms Matveevskii, since I can't get your attention, I am requesting a formal hearing with HUD to discuss what seems to be a problem with ADA tenants; in view of the facts that whenever an apartment becomes available in one of these building we are never asked if we would like a lower floor apartment.  Effective January 26, 1992, Title II of the ADA required PHAs to have a minimum of 5 percent of the total dwelling units, or at least one unit (whichever is greater), must be made accessible for persons with mobility impairments.  And I am wondering why THA has not tried to give us Reasonable Accommodations.

(Pl.'s Ex. 8, at 2.)

It appears as though THA's first response to these communications came on July 15, 2010, in a letter written by Jones:

> In review of your file and your initial letter submitted to Tuckahoe Housing Authority with reference to your current family composition and medical needs, your family requires a larger apartment.  You have been placed in a waiting list to be moved to an apartment that better accommodates the needs of your family and yourself.  As soon as something becomes available we will contact you.

(Pl.'s Ex. 7, at 7.)

It is unclear which of Plaintiff's letters Jones was characterizing as "initial."  Regardless, less than a month later, on August 5, 2010, Jones wrote Plaintiff again:

> In response to your request for a lower level apartment, we would like to offer you a two bedroom apartment at the Tuckahoe Housing Authority.  The vacant apartment is located in 12 Washington Street.  Please inform the THA immediately if you would like to take this apartment.  If the apartment is not suitable for your family's needs, please inform the THA in writing as soon as possible.

(THA Defs.' Ex. D, at 11.)

Apparently not having heard from Plaintiff, Jones followed up with another letter approximately two weeks later, on August 20, 2010:

> On August 5, 2010 you were sent a letter with reference to an available apartment that meets your needs, located in 12 Washington Street.  To date you have yet to notify the Tuckahoe Housing Authority if you are interested.
>
> If you are interested please inform the THA office.  If you are not interested in this apartment, please notify the office in writing as soon as possible.
>
> If we do not hear from you within 5 days of receiving this letter, we shall assume you are not interested in this apartment.

(*Id.* at 13.)

Six days later, Jones wrote a letter to Matveevskii, explaining the status of the offer that

she made to Plaintiff:

> Mr. Logan called the office on August 26, 2010 at 2:30 PM, to notify THA that he is not interested in the available apartment on 12WS due to it not being located on 25 Midland Place or 31 Midland Place.  I asked him to write a letter stating so, and he cordially agreed to do so.
>
> He stated that he prefers an apartment in either of those buildings (25Md or 31Md) because they have shorter steps for his elderly mother to use.

(*Id.* at 15.)

As promised, following his telephone call, Plaintiff submitted a letter to THA regarding

the apartment at 12 Washington Street on August 27, 2010:

> As per our conversation 8-26-2010 with you in reference to the available apartment on 12 Washington Street in Tuckahoe Housing, because of the step factor and my mother age and condition the only location suitable would be in the area of 31 Midland Place or 25 Midland Place.
>
> For this location have the fewest amount of steps for us to go down.  So when the next available apartment becomes we would like first consideration on a 2 bedroom apartment in this location . . .

(*Id.* at 16.)

In his deposition, Plaintiff explained his reasons for rejecting the apartment at 12

Washington Street in greater detail:

I told her it was—because of the step arrangement in the building, at the bottom of the steps my mother had to still come down with the walker, it was not accessible, It was not good. She had to walk down two steps, come out the building, walk down three steps. You have a level courtyard where there's benches and things, and then you got to walk down four more steps to get to the street. And at 12 Washington Street, that particular dead end, it's called a dead end, it's flooded. The flood goes as high as—over the embankment and into the hallways when it heavy rains and what have you. There's a drainage problem in that facility. And you can go to the village and look up the records of how many times the fire department had to come down there to help people out of there that was disabled, because of the height of the water. The water was up to three or four feet high. And I was not placing my mother in that type of danger.

(Logan Dep. Tr. 42.)

In his Amended Complaint, Plaintiff also included a letter from Dr. Robert Rozbruch, addressed to Matveevskii and dated October 25, 2010, in which Dr. Rozbruch wrote that Plaintiff was "under [his] medical and surgical care"; that Plaintiff "had total knee replacement on August 13, 2007"; that Plaintiff "live[d] with his mother who is 84 years old and also had total knee replacement," and "use[d] a walker to help her walk"; and that "[i]t would be most helpful if [Matveevskii] could move [Plaintiff and his mother] from the 3rd floor apartment which they live[d] in . . . to a ground floor apartment." (Pl.'s Ex. 3, at 9.)[4]

Jones responded to Plaintiff's August 27, 2010 letter on November 8, 2010, confirming his rejection of the apartment at 12 Washington Street:

On August 5, 2010, the Tuckahoe Housing Authority offered you a two bedroom apartment on the first floor, located in 12 Washington Street. However you refused this apartment on August 27, 2010 because it was not located in 31 Midland Place nor 25 Midland Place. Unfortunately, we currently do not have any vacant

---

[4] Plaintiff also submitted additional letters from other doctors in his Amended Complaint, including two from Dr. Stephen Warshafsky, dated August 7, 2009, and June 16, 2011, in which Dr. Warshafsky wrote that, due to Plaintiff's medical condition, it would be "most helpful" if he could be moved to a ground-floor apartment. (Pl.'s Ex. 3, at 6–8.) However, these letters are addressed, "To whom it may concern," and give no indication of having ever been sent to, or received by, Matveevskii or any other THA employees. (*See id.*)

9

apartments located in either of those buildings.  As soon as an apartment becomes available we will offer you the apartment as you are first in our transfer list.

(THA Defs.' Ex. D, at 17.)

On November 10, 2010, Plaintiff responded to Jones' latest letter:

As per your letter written on 11-8-10 . . . AND IN RESPONSE TO YOUR STATEMENT ABOUT WHAT YOU OFFERED BACK IN 8-27-10 . . . In all of the building units in THA complex there are only two building that have only two steps to come in and two go out the building and these are 31 and 25 Midland Place . . .

Again I will state this for your ATTENTION . . . My Mother is 84 and is using a walker after having a total knee replacement.  Not to forget my knee replacement that was cause by this building and my heart condition . . .

(Pl.'s Ex. 7, at 9 (alterations in original).)

The Parties' submissions do not contain any further communications between THA and

Plaintiff until June 22, 2011, although the letter that Matveevskii wrote to Plaintiff on that date

references earlier correspondence:

Yesterday I received a letter from Dr. Warshafsky in which he wrote that " . . . *it would be most helpful if he* (i.e., you) *could be moved to a ground floor apartment*."

As a response I must say that we have endeavored, to the best of our ability, to accommodate your needs and provide you with a two-bedroom ground floor apartment.  And we have done this since the very first letter from Dr. Washafsky was delivered to the THA on July 11, 2010.

Four days later, on July 15, 2010, we wrote to you that we were placing you on a waiting list for an apartment on a ground floor.

On August 5, 2010, we wrote to you offering you a two-bedroom apartment on the ground floor of one of our THA buildings.

On August 20, 2010, not having heard from you, we wrote to you again offering you the same apartment and sought to find out if you were, in fact, interested in moving.

On August 26, 2011, you called the THA office and informed us that you were not interested in the apartment and would only accept a ground floor apartment in either 25 or 31 Midland Place.  You were asked to tell us this in writing.

On August 27, 2011, you did, in fact, deliver to our office a note reiterating what you spoke about on the phone the day before.

On November 5, 2010, you presented us with a letter from a Dr. Rozbruch in which he also said it was desirable for you to be moved to a ground-floor apartment.

On November 8, 2010, we wrote to you informing you that we did not, as yet, have any two-bedroom ground floor apartments available in either 25 or 31 Midland Place, but that you were *first* on our waiting list for said apartment.

Some time after this, despite our carefully documented and well-meaning efforts to secure an apartment for you of your choice, you chose to make some of the most unfortunate statements to the Westchester County Human Rights Commission, and actually accused us of discriminatory conduct or practices.

Continuing to have no ground floor two-bedroom apartments available in either 25 or 31 Midland Place we offered, in March of 2011, to move a family out of a two-bedroom, handicapped accessible unit in 4 Union Place in order to accommodate your needs. Access to that apartment doesn't require even a single step, which makes it easier for you and your mother than any building in Sanford Gardens. This offer was communicated to you as well as to Joshua Levin, the Director of Fair Housing in White Plains, by our attorney's letter to Mr. Levin on March 29, 2011. We were once again informed that you did not want the apartment we were offering; this time the one at 4 Union Place.

In conclusion, please know that there is absolutely no need to keep sending us statements from doctors regarding your health or your needs. It is now just about one year since we placed you on a waiting list for a two-bedroom ground floor apartment. The apartment we found in just 20 days you declined to accept. Since that time we have made a commitment to place you in the very first two-bedroom ground floor apartment available in either of the two buildings you insist on residing in. Nothing has changed in our commitment to do this. We were even prepared to ask a family to vacate their apartment in 4 Union so that you could move in to what appeared to be a perfect solution to the situation. You should know that that offer still stands to this day, and as soon as we hear from you we will have that same family move out so you can take over the ground floor handicapped accessible apartment at 4 Union Place. If not, then per your instructions to us, we will simply have to continue to wait for the next available ground floor two-bedroom apartment in either 25 or 31 Midland Place.

(Pl.'s Ex. 9, at 2–3; *see also* THA Defs.' Ex. F, at 3–4.)[5]

---

[5] Matveevskii's description of Plaintiff's telephone call and subsequent letter confirming his lack of interest in the apartment as having occurred on "August 6, 2011" and "August 27,

Matveevskii wrote Plaintiff another letter less than a month later, on July 14, 2011, in

which she repeated much of what she wrote in her June 22, 2011 letter, adding the following:

> On June 22, 2011, after receiving yet another doctor's letter regarding your need of a ground floor apartment, we offered you the same apartment on a ground floor at 4 Union Place. You were advised to contact the office and inform us if you were interesting in taking said apartment.
>
> You did not contact the office to this date.
>
> On July 11, 2011, another doctor'[s] letter was delivered to the THA with the same request of a ground floor apartment.
>
> THA is hereby offering you for <u>the fourth time</u> a ground floor apartment at 4 Union Place that is handicapped accessible and requires NO steps of any kind to access. Please advise the office immediately when you are planning to move.

(THA Defs.' Ex. F, at 1–2.)

The next correspondence between the Parties that appears in their submissions is a

December 8, 2011 letter from Matveevskii to Plaintiff:

> In response to your letter dated November 6, 2011, please be advised that:
>
> 1. The THA is acknowledging that you are still interested in taking an apartment on a first floor
>
> 2. Your statement that you have been waiting for a first floor apartment for over 16 years is unjustified and simply untrue. There are no records of your requesting an apartment prior to 2010 when an apartment was offered to you less than a month after you placed your original request.
>
> 3. At this time we are offering you two apartments on a first floor: one apartment is fully ADA accessible and has no steps of any kind. It is located at 4 Union Place. The second apartment is located at 31 Midland Place and is NOT ADA accessible. The THA does not intend to make it accessible since the structure of the building and

---

2011" appears to have been due to typographical errors. The dates should most likely read August 6, 2010 and August 27, 2010, given their placement in Matveevskii's chronology, and given that Matveevskii wrote the letter in which she lists those dates on June 22, 2011, before the dates that she listed had occurred.

the year the building was built renders it unfeasible, thus qualifying the building for
an exemption.

4. Should you choose to take the apartment that is not handicap accessible, you will
agree in writing to accept it AS IS and will not be requesting any modifications to
the apartment in the future.

You will also agree that should you require an accessible apartment in the future, you
will be willing to move to 4 Union Place when a handicapped accessible apartment
becomes available, or to another ADA accessible unit that may be available at that
time

5. You will be responsible to pay for your move

6. This is . . . the sixth time you have been offered an apartment on a first floor in
the past two years.

(THA Defs.' Ex. H, at 1.)[6]

The following month, on January 18, 2012, Matveevskii wrote to Plaintiff again,

apparently prompted by a letter that THA received from one of Plaintiff's doctors "regarding

[his] need for a walk-in shower":

Please be advised that the [THA] repeatedly offered you an apartment located at 4
Union Place on a first floor.  Said apartment is fully ADA-compliant and
handicapped-accessible.  At this time we are offering it to you again.  The apartment
at 4 Union Place is designed to accommodate elderly and disabled residents of the
THA who are in need of an accessible unit.

Your current apartment at 31 Midland Place and the one we also offered you in the
same building on a first floor are NOT ADA accessible; the THA does not intend to
make them accessible since the structure of the building and the year the building
was built renders it unfeasible, thus qualifying the building for an exemption.

---

[6] No party has provided a copy of the November 6, 2011 letter from Plaintiff to which
Matveevskii refers.

> Should you decide to forego this opportunity again and stay at 31 Midland Place, whether in your current unit or the unit 1A on the first floor of the same building, you will agree in writing that the THA has fulfilled its obligation for reasonable accommodation and offered you an accessible unit that you chose to decline.

(THA Defs.' Ex. I, at 1.)

At the bottom of Matveevskii's letter, she provided Plaintiff with two numbered options from which to choose.  The first read, "I, Thomas Logan, have chosen to stay at 31 Midland Place and decline the offer of a handicap accessible unit."  (*Id.*)  The second read, "I, Thomas Logan, have chosen to accept the offer of a handicap accessible unit located at 4 Union Place."  (*Id.*)

Matveevskii sent Plaintiff another letter, also on January 18, 2012, which contained much of the same information as did her December 8, 2011 letter, apparently because Plaintiff had sent her a letter stating that he had not heard from her since November 2011.  (*See* THA Defs.' Ex. J, at 1, ¶ 2 ("Contrary to your statement that you have not had any further notice from me since November 2011, attached find a copy of the letter mailed to you on December 8, 2011.").)  Approximately two-and-a-half months later, on April 3, 2012, THA's counsel, Nicholas Leo ("Leo"), wrote to Plaintiff that he had "received [Plaintiff's] notice that [Plaintiff] [was] accepting the [THA's] offer to move [Plaintiff] to an apartment that is more acceptable, i.e. lacks steps," but that while the apartment that Plaintiff had chosen, "1A in building 31, lacks steps, it is <u>not</u> handicap acceptable, ADA compliant and will not be converted to same," so "[i]f [Plaintiff] [was] seeking a handicap accessible/ADA Compliant apartment," then the apartment that Plaintiff had selected was "<u>not</u> the apartment for [him]."  (THA Def.'s Ex. L, at 1.)  Leo continued by noting that, "[a]s previously advised, [THA] [did] have a handicap accessible/ADA Compliant apartment available but [Plaintiff] [was] rejecting same."  (*Id.*)  Leo then wrote that

14

"[w]hen [Plaintiff] acknowledge[d] the aforementioned by signing" the bottom of the letter, THA would "advise [Plaintiff] when [Plaintiff] [could] move at [his] expense." (*Id.*) The portion of the letter that Leo requested that Plaintiff sign read, "The undersigned acknowledge and expressly agree that they are waiving any request for a handicap access/ADA Complaint apartment and request apartment 1A, in Building 31." (*Id.*) The letter continued, "Parties further acknowledge and agree that apartment 1A, in Building 31 is not and will never be made handicap access/ADA Compliant." (*Id.*) The letter provided signature lines for Plaintiff, Plaintiff's mother, and Plaintiff's brother. (*Id.*)

Plaintiff returned Leo's letter back to him on April 18, 2012, with the line beginning, "The undersigned acknowledge," crossed out in pen, and with handwritten margin notes that read, *inter alia*, "I do not waive my rights to a handicap access/ADA compliant apartment." (THA Defs.' Ex. M, at 1.) Leo responded on April 30, 2012, writing that he was in receipt of Plaintiff's "authorization to move to apartment 1A," but that "[u]nfortunately, as [Plaintiff] [did] not waive [his] right to a handicap apartment," and had "rejected the [THA's] offer to move [Plaintiff] to an ADA compliant apartment, the [THA] [could not] move [Plaintiff] to apartment 1A." (THA Defs.' Ex. N, at 1.) Leo asked, "What happens if the [THA] moves you and then you decide you want an ADA apartment, do we move you again?" (*Id.*) He also stated that THA could "no longer hold apartments for [Plaintiff]; unless [Plaintiff] [were to] sign an unequivocal waiver or select the ADA apartment by Friday, May 4, 2012, the [THA] [would] withdraw its offer to allow [Plaintiff] to move to any apartment." (*Id.*)

It appears as though Plaintiff never accepted THA's offer of the first-floor apartment at 31 Midland Place, just as he never accepted THA's offer of the first-floor apartments at 4 Union Place and 12 Washington Street.   In his deposition, Plaintiff explained why he rejected the

15

apartment at 4 Union Place, in which a number of senior citizens were apparently housed:

> I feel that I wasn't asking for them to lasso the moon and bring it down in front of me. All I asked them to do was to be in compliance with federal law. So if I'm a bad guy for asking for my rights—me, I can't be around seniors on a constant basis. I can go and visit them and what have you, but I get claustrophobic. I get very antsy about that. And my Dr. Warshafsky wrote in his letter to them explaining that to them. As part of my rehab thing and what you have at the second phase of it, for the last ten days they put me in the senior citizen—I got very depressed, very, very depressed, to the point that it was affecting my rehab.

> So I had to sign myself out and come home. And then my doctor signed me into [a rehabilitation facility] immediately to continue my rehab and what you have, because it was deteriorating me. I was losing weight, couldn't eat. I would go to bed one day, and the person next to me, I say good night to him, I'm waking up and they're taking a body bag and they're bringing him out of the room. That happened to me three times while I was in the nursing home . . . . It begins to work on your mind. Psychologically, it begins to work on your mind and what you have. And if you want to go and check those records and see if you want to see about that, the psychiatrist said I was very depressed.

(Logan Dep. Tr. 69–71.)

In response to questioning from counsel, Plaintiff also stated the following:

> [Matveevskii] can do what she wants to do. She has made no attempts to try to accommodate me on my simple request. All I asked to do is to stay in the building that I've been in for close to 30 years and—because that's the comfort level, for A. B, it has the fewest amount of steps that I have to deal with and what have you. And none of that has been addressed, as far as I'm concerned.

(*Id.* at 57.)

Plaintiff also described several first-floor apartments that he claims Matveevskii

converted from two-bedroom to three-bedroom residences:

> I don't understand. And, again, I was on the waiting list, disabled, and it wasn't being offered to—being offered, understand what I'm saying. I mean maybe it's absence of malice. I don't know. I can't justify what goes on in her head. I just know that she shows hostility.

(*Id.* at 119.)

During his deposition, counsel asked Plaintiff, "And you're looking for a three-bedroom

16

apartment on the first floor; is that correct?" (*Id.* at 117.)  Plaintiff replied that he was.  (*Id.*)

Counsel then asked, "Do you have any requirement that the unit for your family be handicapped-

accessible?" (*Id.*)  Plaintiff explained that, as of April 22, 2013, the date on which the deposition

took place, he, his mother, and his brother would all be willing to waive that requirement, and

that they would also be willing to waive "ADA compliance":

> [I]f my mother needs a rail, then I'll put a railing up for my mother.  It's no biggy
> wiggy to go and get railing and attach it to the hallway so she can hang onto it if she
> feels faint and what have you.  I told Leo . . . that I would do that anyhow.  But since
> nobody wanted to explain nothing to me, you understand what I'm saying, I got my
> hind legs up and became a little stubborn about the situation, and I fall back on what
> it is, that I ask questions, you know.

(*Id.* at 119–120.)

### B.  Procedural Background

Plaintiff filed a Complaint on December 2, 2010, in which he named Matveevskii and

THA as Defendants.  (*See* Dkt. No. 1.)  On April 7, 2011, Plaintiff voluntarily dismissed the

causes of action that he had asserted against Matveevskii without prejudice, leaving only the

causes of action that he had asserted against THA.  (*See* Dkt. No. 9.)  Plaintiff then voluntarily

dismissed the causes of action that he had asserted against THA as well, again without prejudice,

on May 13, 2011.  (*See* Dkt. No. 11.)  Approximately two months later, on July 11, 2011,

Plaintiff moved to reopen the case and file an Amended Complaint.  (*See* Dkt. No. 12.)  On

December 14, 2011, Plaintiff's case was reassigned to this Court.  (*See* Dkt. No. 17.)  The Court

granted Plaintiff's request to reopen the case and file an Amended Complaint on January 12,

2012.  (*See* Dkt. No. 19.)  On January 31, 2012, Plaintiff filed an Amended Complaint, asserting

causes of action against all of the named Defendants.  (*See* Dkt. No. 21.)  The THA Defendants

filed an Answer in response to Plaintiff's Amended Complaint on June 6, 2012.  (*See* Dkt. No.

32.)  On March 7, 2013, Plaintiff submitted an application for pro bono counsel, which request the Court denied.  (*See* Dkt. Nos. 48, 49.)

On August 9, 2013, the THA Defendants filed their Motion for Summary Judgment, (*see* Dkt. Nos. 61–69), and the HUD Defendants filed their Motion to Dismiss,  (*see* Dkt. Nos. 56–58).  On September 25, 2013, Plaintiff requested an extension of time to respond to Defendants' Motions, which request the Court granted.  (*See* Dkt. No. 72.)  On October 28, 2013, Plaintiff submitted his Opposition to Defendants' Motions.  (*See* Dkt. No. 89.)  The THA Defendants then submitted their Reply Memorandum on November 14, 2013, (*see* Dkt. No. 73), and the HUD Defendants submitted their Reply Memorandum the next day, (*see* Dkt. No. 75).  On May 14, 2014, in an attempt to clarify certain aspects of Plaintiff's allegations, the Court directed Plaintiff and the THA Defendants to submit Supplemental Memoranda of Law.  (*See* Dkt. No. 86.)  The THA Defendants thereafter submitted their Supplemental Reply Memorandum of Law on May 28, 2014.  (*See* Dkt. No. 87.)  On May 21, June 2, June 8, June 13, and June 25, 2014, Plaintiff submitted various documents and photographs to the Court, none of which were responsive to the Court's May 14 Order.  (*See* Dkt. Nos. 90–92.)

## II.  DISCUSSION

### A.  The THA Defendants' Motion for Summary Judgment

#### 1.  Construing Plaintiff's Claims

Before the Court can describe the legal framework applicable to Defendants' Motions, it must first determine which federal causes of action Plaintiff is attempting to assert.  Given that Plaintiff's Amended Complaint is a 330-page compilation of allegations, sections of various federal and state statutes, medical records, filings in related lawsuits, and other documents of questionable relevance, and that Plaintiffs' Opposition to Defendants' Motions is just as

18

complicated, the task of interpreting Plaintiff's submissions is a difficult one.

Toward the beginning of Plaintiff's Amended Complaint, he generally references "Discrimination of a Disability person." (Am. Compl. 5.) In the Southern District of New York pro se complaint form that Plaintiff included in his Amended Complaint, Plaintiff wrote that the basis for this Court's jurisdiction over his case is the "Civil Rights Act of 1973, That deals with discrimination." (Am. Compl. 11.) At various points throughout his Amended Complaint, Plaintiff also makes reference to, *inter alia*, "Section 504 of the Rehabilitation Act of 1973" and "Title II of the Americans with Disabilities Act of 1990." (*See, e.g.*, Am. Compl. 5–7.) After describing complaints that other people have allegedly filed against THA, Plaintiff also writes the following:

> My question to you're honor is where that list that should have my name on it. Because, on 7-15-2010 some 14 years later *Ms. Irene Matveevskii, and Tuckahoe Housing Authority* are talking about putting me on a waiting list for the handicap.
>
> Well if this is not *discrimination*, it sure smells like a form of *discrimination. My question; is why did it take THA until 7-15-2010, before I was being place on a disability list. It took THA 14 years for Mr. Jeff Zuckerman, board of commissioner chair and Ms. Matveevskii, to recognize me as a human being with handicap needs.*

(Am. Compl. 4.)[7]

In a section of his Amended Complaint discussing "[t]he Americans with Disabilities Act (ADA)," Plaintiff makes reference to "Reasonable Accommodations," writing that "[i]t is unlawful to refuse to make such reasonable changes in rules, policies, practices, and services which may be necessary to afford a person with a disability an equal opportunity to enjoy and

---

[7] Throughout Plaintiff's Amended Complaint, Plaintiff often makes the same allegations multiple times, frequently employing the same language that he has earlier used. For example, the passage described above also appears at pages 24 and 32 of Plaintiff's Amended Complaint. (*See* Am. Compl. 24, 32.) Generally, the Court will cite to only the first time that a given allegation appears in Plaintiff's submissions.

use a dwelling." (*Id.* at 7.)  Later in his Amended Complaint, Plaintiff writes, "If there was an

emergency due to a fire or any other reason, Mr. Logan would not be physically capable of

handling himself or his mother in departing from the 3rd floor walk up building.  SAFETY!!"

(*Id.* at 20.)  Plaintiff also submitted a March 17, 2011 complaint that he filed against THA and

Matveevskii with the Westchester County Human Rights Commission, which reads in relevant

part as follows:

> 4.  I have a physical disability.

> 5.  I live with my elderly and physically disabled mother, who requires the use of a walker.

> 6.  As a result of our disabilities, we require an apartment located on the ground floor.

> 7.  Beginning on or about August 7, 2008, I submitted a written request to Matveevskii, seeking a move from our third floor apartment to a ground floor unit, in order to accommodate our physical disabilities.

> 8.  Respondents did not respond to our request.

> 9.  I continued to make requests to the Respondents for the same reasonable accommodation, but my requests were ignored.

> 10.  On or about March 7, 2010, I sent another letter to Respondent THA, regarding our need to be relocated to a first floor apartment because of our disabilities.

> 11.  On or about July 12, 2010, I submitted a medical letter to the Respondents regarding my physical disability and the need for a ground floor unit.

> 12.  The Respondents sent me a letter stating "in reference to your current medical needs, we have taken into consideration that you need an apartment in a lower level. You have been placed on a waiting list . . ."

> 13.  To date, my request has not been granted.

> 14.  As a result of the Respondents' actions, my mother and I continue to reside on the third floor, while an available first floor unit in the THA was given to another family.

> 15.  Respondents have continuously delayed granting my request for a reasonable accommodation.
>
> 16.   Such failure to provide a reasonable accommodation is an unlawful discriminatory real estate practice under Westchester County Fair Housing Law, Sec. 700.21(A)(9)(c)(ii).

(Pl.'s Ex. 2, at 8.)

Additionally, Plaintiff writes in his Amended Complaint, "The question of why her Ms. Adalgisa Jones finally look in my files 14 years later before discover it in should had been put on a disable list for the handicap; even do [sic] for the pass 31 I been showing THA my SSD earning?"  (Pl.'s Ex. 3, at 20.)  Plaintiff later alleges, "As for me at this time, I included to your office my corresponding documents asking for a handicap apartment, I was told that I needed doctor letters which, were supplied to THA Office.  After receiving all need documents it THA 14 years before I was put on a handicap list for an apartment.  My mother and I live on a third floor apartment."  (Pl.'s Ex. 9, at 14.)

In his Opposition to Defendants' Motion for Summary Judgment and Motion To Dismiss, which Opposition is almost as lengthy as his Amended Complaint, Plaintiff describes his "First Claim for Relief"—the only claim for relief so described—as "Violation of the ADA." (Pl.'s Opp. to Defs.' Mot. for Summ. J. and Mot. to Dismiss ("Pl.'s Opp.") Ex. E.)[8]  Plaintiff also writes in his Opposition that "Defendant Thomas Logan has been and continues to be denied equal and meaningful access to his apartment by reason of his disability"; "The THA failure to comply with federal disability and housing law to meet the defendant needs violates 29 U.S.A

---

[8] Plaintiff submitted his Opposition in binder form, with its various sections separated by lettered tabs.  For the sake of convenience, and in keeping with the manner in which the Court has been referring to Plaintiff's Amended Complaint, the Court will refer to these tabs as exhibits, such that the Court will refer to "Tab E" as "Exhibit E."  (*See* Dkt. No. 89.)

[sic] 794 of the Rehabilitation Act.  And its implements regulations"; "Violation of the fair

housing act"; "Accommodation of the Defendant Thomas Logan handicap is necessary to afford

Defendant the opportunity to use and enjoy their dwelling"; "The Plaintiffs refuse to make such

accommodation.  Defendant Thomas Logan thus denied equal and meaningful access to his

apartment with other family member who are also disable"; and "THA Failure to comply with

federal disability and housing law to meet the needs of the Defendant Thomas Logan violates 42

U.S.A 3604, the Fair Housing Act, and its implementing regulations."  (*Id.*)

Taking all of the foregoing into consideration, liberally construing Plaintiff's

submissions, and interpreting those submissions to raise the strongest arguments that they

suggest, the Court finds that Plaintiff is most likely attempting to assert a reasonable

accommodation claim under Title VIII of the Civil Rights Act of 1968, also known as the Fair

Housing Act, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et

seq.* ("the FHA"); Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C.

§ 12131 *et seq*. ("the ADA"); and Section 504 of the Rehabilitation Act of 1973, as amended, 29

U.S.C. § 794 ("the Rehabilitation Act").  To the extent that Plaintiff is attempting to assert

claims under other federal statutes and regulations, the Court will address the sufficiency of

Plaintiff's pleadings in regard to those claims after analyzing Plaintiff's FHA, ADA, and

Rehabilitation Act claims.

### 2.  Standard of Review

#### a.  Rule 56 of the Federal Rules of Civil Procedure

The THA Defendants move for summary judgment.  Summary judgment shall be granted

where the movant shows that there is "no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John*

*Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "On a motion for summary

judgment, a fact is material if it might affect the outcome of the suit under the governing law."

*Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538,

544 (2d Cir. 2014) (internal quotation marks omitted).  At summary judgment, "[t]he role of the

court is not to resolve disputed issues of fact but to assess whether there are any factual issues to

be tried."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks

omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No.

1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's goal

should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp.

v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)); *see also Schatzki v. Weiser Capital

Mgmt., LLC*, No. 10-CV-4685, 2013 WL 6189465, at *14 (S.D.N.Y. Nov. 26, 2013) (same).

  "In determining whether summary judgment is appropriate," a court must "construe the

facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and

draw all reasonable inferences against the movant."  *Brod*, 653 F.3d at 164 (internal quotation

marks omitted); *see also Borough of Upper Saddle River, N.J. v. Rockland Cnty. Sewer Dist. No.

1*, — F. Supp. 2d —, 2014 WL 1621292, at *12 (S.D.N.Y. Apr. 22, 2014) (same).  Additionally,

"[i]t is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co.

v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v.

Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014)

(same).  "However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a genuine issue for trial," *Wrobel v. Cnty. of Erie,* 692 F.3d 22, 30 (2d Cir. 2012) (internal quotation marks and emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, *inter alia*, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

Because Plaintiff proceeds pro se, the Court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted); *see also Farzan v. Wells Fargo Bank, N.A.*, No. 12-CV-1217, 2013 WL 6231615, at *12 (S.D.N.Y. Dec. 2, 2013) (same). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (emphasis and internal quotation marks removed)).

24

b.  Reasonable Accommodation Under the FHA, the ADA, and the
Rehabilitation Act

The FHA states that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601. "The FHA originally prohibited discrimination on the basis of race, color, religion, or national origin," but "[t]he Fair Housing Amendments Act of 1988 extended the Fair Housing Act's principle of equal opportunity in housing to individuals with handicaps," by "making it unlawful to 'discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services o[r] facilities in connection with such dwelling, because of a handicap of that person.'"  *Bentley v. Peace & Quiet Realty 2 LLC*, 367 F. Supp. 2d 341, 344 (E.D.N.Y. 2005) (quoting 42 U.S.C. § 3604(f)(2)(A)); *see also City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 n.1 (1995) ("The FHA, as originally enacted in 1968, prohibited discrimination based on race, color, religion, or national origin. . . .  In 1988, Congress extended coverage to persons with handicaps . . . .").  "Among the discriminatory practices prohibited by the FHAA is 'a refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford [the handicapped individual] an equal opportunity to use and enjoy a dwelling.'"  *Bentley*, 367 F. Supp. 2d at 344 (alteration in original) (quoting 42 U.S.C. § 3604(f)(3)(B)); *see also Oxford House*, 514 U.S. at 729 ("Discrimination covered by the FHA includes 'a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [handicapped] person[s] equal opportunity to use and enjoy a dwelling.'" (alteration in original) (quoting 42 U.S.C. § 3604(f)(3)(B)); *Dinapoli v. DPA Wallace Ave II, LLC*, No. 07-CV-1409, 2009 WL 755354, at *4 (S.D.N.Y. Mar. 23, 2009) (same).

Similarly, "[t]he ADA and the Rehabilitation Act also prohibit all discrimination based

on disability by public entities," and both statutes "require[] that covered entities make

reasonable accommodations in order to provide qualified individuals with an equal opportunity

to receive benefits from or to participate in programs run by such entities." *Reg'l Econ. Cmty.*

*Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002), *superseded by*

*statute on other grounds*, ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553,

*as recognized in McCulloch v. Town of Milan*, 559 F. App'x 96, 98 (2d Cir. 2014).  Specifically,

"[t]he ADA provides that 'no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity.'" *Ayyad-*

*Ramallo v. Marine Terrace Assocs., LLC*, No. 13-CV-7038, 2014 WL 2993448, at *5 n.9

(E.D.N.Y. July 2, 2014) (quoting 42 U.S.C. § 12132).  For its part, "the Rehabilitation Act states

that '[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance.'" *City of*

*Middletown*, 294 F.3d at 45 (alterations in original) (quoting 29 U.S.C. § 794(a)).

Because "[t]he relevant portions of the FHA, ADA, and Section 504 of the Rehabilitation

Act offer the same guarantee that a covered entity, such as a public housing authority, must

provide reasonable accommodations in order to make the entity's benefits and programs

accessible to people with disabilities," "analysis of a reasonable accommodation claim under the

three statutes is treated the same." *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307,

337 (E.D.N.Y. 2012) (alterations, citations, and internal quotation marks omitted); *see also*

*Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 n.4 (2d Cir. 2003) (noting that, "[d]ue

to the similarities between" the ADA and the FHA, the Second Circuit "interpret[s] them in tandem" for the purposes of a reasonable accommodation claim); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003) ("As a preliminary matter the requirements for showing failure to reasonably accommodate are the same under the ADA and the FHAA so we can treat these issues as one."); *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002) ("[T]here is no significant difference in the analysis of rights and obligations created by the [ADA and Section 504 of the Rehabilitation Act]."); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 334 (2d Cir. 1995) ("We believe that in enacting the anti-discrimination provisions of the FHAA, Congress relied on the standard of reasonable accommodation developed under section 504 of the Rehabilitation Act of 1973 . . . ."); *Simon v. City of New York*, No. 12-CV-1596, 2012 WL 4863368, at *6 (E.D.N.Y. Oct. 11, 2012) ("For the purposes of the instant complaint, the FHA, ADA, and Rehabilitation Act impose similar standards with respect to disability discrimination, and so the Court will analyze them in tandem.").

However, the statutes are not identical, but "nearly identical," *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012), and there are "subtle differences" between them, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). Therefore, before interpreting and applying the statutes in conjunction with one another, as the Second Circuit has suggested will usually be appropriate, *see McElwee*, 700 F.3d at 640; *Tsombanidis*, 352 F.3d at 573 n.4; *Henrietta D.*, 331 F.3d at 272, the Court must first briefly examine these "subtle differences" to ensure that they do not impact the Court's analysis in this Action.

In regard to the ADA and the Rehabilitation Act, "[o]ne of the primary differences between [them] is that the Rehabilitation Act only applies to federally-funded programs." *Cardona v. Cmty. Access, Inc.*, No. 11-CV-4129, 2013 WL 304519, at *6 n.5 (E.D.N.Y. Jan. 25,

2013) (citing *Bryant v. N.Y. Educ. Dep't*, 692 F.3d 202, 216 (2d Cir. 2012)); *see also Ali v. Hogan*, No. 12-CV-104, 2013 WL 5466302, at *6 (N.D.N.Y. Sept. 30, 2013) ("The main difference between the statutes is that coverage under the Rehabilitation Act is limited to entities receiving federal financial assistance, while ADA's reach extends to private entities." (internal quotation marks omitted)).  This difference is immaterial here, as THA is a recipient of federal funding.  (*See* THA Defs.' Rule 56.1 Statement ¶ 3 ("[THA] provides federal subsidized housing for the Tuckahoe community . . . .").)

Another difference between the two statutes is that the reach of the Rehabilitation Act is limited to denials of benefits "*solely* by reason of . . . disability," 29 U.S.C. § 794(a) (emphasis added), while the ADA applies more broadly to such denials "by reason of . . . disability," 42 U.S.C. § 12132.  *See Cercpac v. Health & Hosps. Corp.*, 147 F.3d 165, 167 (2d Cir. 1998) (noting the presence of the word "solely" in the Rehabilitation Act, but not the ADA); *see also Alfano v. Bridgeport Airport Servs., Inc.*, No. 04-CV-1406, 2006 WL 1933275, at *3 (D. Conn. July 12, 2006) ("[O]ne of the few differences between the Rehabilitation Act and the [ADA] is the Rehabilitation Act's limitation to denial of benefits 'solely' by reason of disability, whereas the ADA covers situations in which discrimination on the basis of disability is one factor, but not the only factor, motivating an adverse employment action." (internal quotation marks omitted)).  Here, as described above in the section of this Opinion regarding the Court's construction of Plaintiff's claims, Plaintiff does not appear to be claiming that he was denied a reasonable accommodation for any reason other than his disability.[9]

---

[9] To the extent that Plaintiff makes reference to racial discrimination in his submissions, the Court will address the import of those references in a subsequent section of this Opinion.

These appear to be the only two significant differences between the ADA and the

Rehabilitation Act.  *See Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 146 n.6 (2d

Cir. 2002) ("Apart from the Rehabilitation Act's limitation to denials of benefits 'solely' by

reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the

reach and requirements of both statutes are precisely the same."); *Brooklyn Ctr. for*

*Independence of Disabled v. Bloomberg*, No. 11-CV-6690, 2013 WL 5943995, at *46 (S.D.N.Y.

Nov. 7, 2013) (same).  In regard to the ADA and Rehabilitation Act on one hand, and the FHA

on the other, one court recently explained one of the most significant differences between them:

> The ADA Amendments Act of 2008 broadened the category of individuals entitled
> to statutory protection under the ADA and the Rehabilitation Act by altering the
> definition of the term "disability."  Prior to the enactment of the ADA Amendments
> Act, courts generally considered individuals who were "disabled" under the ADA
> and the Rehabilitation Act to be "handicapped" under the FHAA.  The ADA
> Amendments Act, however, did not amend the FHAA.  Therefore, some individuals
> may not be "handicapped" within the meaning of the FHAA even though they are
> "disabled" within the meaning of the ADA and the Rehabilitation Act.

*Brooker v. Altoona Hous. Auth.*, No. 11-CV-95, 2013 WL 2896814, at *9 n.8 (W.D. Pa. June 12,

2013) (citations omitted); *see also Bhogaita v. Altamonte Heights Condominium Ass'n*, No. 11-

CV-1637, 2012 WL 6562766, at *4–5 (M.D. Fla. Dec. 17, 2012) ("[T]he ADA was amended by

the ADA Amendments Act of 2008 . . . .  While the ADAAA substantively amended the ADA

and superseded prior case law, the FHA has not been similarly amended.  The question, then, is

whether the new standard announced in the ADAAA . . . applies to the definition of

'handicapped' under the FHA. . . .  Absent persuasive evidence to the contrary, the Court must

presume that [it does not].").  However, this difference does not alter the result here, as the THA

Defendants do not argue that Plaintiff is not "disabled" for the purposes of the ADA and the

Rehabilitation Act, or that Plaintiff is not "handicapped" for the purposes of the FHAA.  (*See* THA Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. ("THA Defs.' Mem.") 3–6.)

Another difference is that "the ADA and the [Rehabilitation Act] may be broader than the FHA because . . . coverage under the FHA is limited to statutorily defined 'dwellings,' but that term appears nowhere in the relevant provisions of the ADA and the [Rehabilitation Act]." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008); *see* 42 U.S.C. § 12132 (providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity"); 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."); 42 U.S.C. § 3604(f)(3)(B) (defining discrimination in part as "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy *a dwelling*" (emphasis added)).  Again, that difference is of no significance when applied to the facts of this case, as the THA Defendants do not argue that Plaintiff's accommodation request did not relate to a "dwelling."  (*See* THA Defs.' Mem. 3–6.)

Lastly, another reason why the ADA and the Rehabilitation Act may be broader than the FHA is that "[t]he FHA, in contrast with the ADA, does not regulate disability discrimination by public accommodations and in places of public accommodation," and is instead confined to "discriminat[ion] against handicapped individuals in providing housing."  *Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850, 858–59 (S.D. Ohio 2009); *see also Fair Hous. of the*

*Dakotas, Inc. v. Goldmark Prop. Mgmt., Inc.*, 778 F. Supp. 2d 1028, 1035 (D.N.D. 2011) (same). But again, this difference is not pertinent for the purposes of this Opinion, as Plaintiff's claims are based on allegations of housing discrimination.

Thus, it does not appear as though Plaintiff's reasonable-accommodation claim implicates any of the "subtle differences" between the three statutes.  Additionally, the THA Defendants have based their Summary Judgment Motion on the assumption that all three statutes are potentially applicable to Plaintiff's Amended Complaint.  (*See* THA Defs.' Mem. 3–6.) Accordingly, the Court will conduct its analysis of Plaintiff's reasonable-accommodation claim under the collective framework that case law interpreting the three statutes has established, making reference to case law decided under each as appropriate.

"To state a prima facie case for discrimination based on a failure to reasonably accommodate, a plaintiff must demonstrate that: (1) he suffers from a handicap as defined by the FHAA [or a disability as defined by the ADA and Rehabilitation Act]; (2) the defendant knew or reasonably should have known of the plaintiff's handicap [or disability]; (3) accommodation of the handicap [or disability] 'may be necessary' to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation." *Sinisgallo*, 865 F. Supp. 2d at 336 (applying the test in the context of the FHA); *see also Robbins*, 2012 WL 3940133, at *4 (applying an identical test in the context of the FHA and the Rehabilitation Act); *Turning Point Found. v. DeStefano*, No. 05-CV-895, 2008 WL 2064764, at *1 (D. Conn. May 13, 2008) ("[T]o prove that [the defendant] failed to make a reasonable accommodation [under the FHA, the ADA, and the Rehabilitation Act] . . . , [the plaintiff] must initially establish a prima facie case of discrimination by demonstrating that (1) its residents suffer from a disability

31

within the meaning of the FHA and the other statutes; (2) it requested a 'reasonable accommodation' from [the defendant]; and (3) [the defendant] denied that accommodation.").

Under the third prong of the prima facie test, "[t]he Second Circuit has defined a reasonable accommodation as one that gives the otherwise qualified plaintiff with disabilities meaningful access to the programs or services sought." *Sinisgallo*, 865 F. Supp. at 341 (internal quotation marks omitted) (quoting *Henrietta D.*, 331 F.3d at 282). "Whether a requested accommodation is required . . . is highly fact-specific, requiring case-by-case determination." *Freeland v. Sisao LLC*, No. 07-CV-3741, 2008 WL 906746, at *3 (E.D.N.Y. Apr. 1, 2008) (internal quotation marks omitted). "Ordinarily, the duty to make reasonable accommodations is framed by the nature of the particular handicap." *Bentley*, 367 F. Supp. 2d at 344 (internal quotation marks omitted) (quoting *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 301 (2d Cir. 1998)). "Although a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." *McElwee*, 700 F.3d at 641.

Several courts have held that, under certain circumstances, a mobility-impaired resident's request to move from an upper-floor apartment to a lower-floor apartment may be a cognizable request for a reasonable accommodation under the FHA, the ADA, and the Rehabilitation Act. *See, e.g., Bezi v. Camacho*, No. 11-CV-677, 2012 WL 5519386, at *5, 17 (C.D. Cal. Sept. 27, 2012) ("[P]laintiff alleges that she was denied her rights to a reasonable accommodation based on a disability under the [FHA], the Rehabilitation Act, and the ADA. . . . Plaintiff has alleged several medical conditions that interfere with her ability to undertake everyday activities . . . including bending, lifting, and walking when carrying loads. Taking her allegations as true, the Court finds that plaintiff has arguably sufficiently alleged that she suffers from a disability . . .

32

and that relocation to a first floor apartment may have been necessary to allow plaintiff an equal opportunity to use and enjoy the apartment."); *Bentley*, 367 F. Supp. 2d at 345–46 ("[The plaintiff] asserts that because her handicap limits her ability to move up and down the stairs to her apartment unit, she is only able to leave her unit when absolutely necessary.  Moving to a lower-floor unit will allow her to leave [the building] more or less at will . . . .  Because the requested accommodation would reduce the barriers to [the plaintiff's] isolation from her community, it furthers the spirt and purpose of the FHAA."); *Roseborough v. Cottonwood Apartments*, No. 94-CV-3708, 1994 WL 695516, at *2–3 (N.D. Ill. Dec. 9, 1994) ("[T]his case differs from most FHAA cases in that no actual denial of housing was present.  The plaintiffs continued to reside in the third floor apartment . . . for the duration of their lease.  Rather, the plaintiffs assert that, by failing to provide the plaintiffs with a lower floor apartment in the complex, the defendants did not reasonably accommodate the plaintiffs as required by the FHAA. . . .  Taking the facts . . . in a light most favorable to the plaintiff, we find that the plaintiffs have stated a claim under Section 3604 of the FHAA."); *cf. Reyes-Garay v. Integrand Assurance Co.*, 818 F. Supp. 2d 414, 438 (D.P.R. 2011) (rejecting a plaintiff's claim that she was denied a reasonable accommodation in violation of the FHA and the Rehabilitation Act where the defendant refused her request to relocate from her third-floor apartment to a first-floor apartment, but only because the plaintiff knew that the first-floor apartment in question was uninhabitable, not because such accommodation fell outside the scope of potential relief offered under the FHA and the Rehabilitation Act).

Under the fourth prong of the prima facie test, a refusal of a request for a reasonable accommodation "can be both actual or constructive, as an indeterminate delay has the same effect as an outright denial."  *Groome Res. Ltd. L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 199

33

(5th Cir. 2000); *see also Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 271–72

(4th Cir. 2013) (finding that, after the plaintiffs made a request for an accommodation in writing,

the defendants twice tabled the plaintiffs' request for 15 months, and had still not acted on the

plaintiffs' request at the time the district court granted summary judgment in favor of the

defendants, the defendants had constructively denied the plaintiffs' request); *Astralis Condo.*

*Ass'n v. Sec'y U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 69 (1st Cir. 2010) (rejecting the

defendant's argument that "it should not be held responsible because it never expressly refused

to accommodate the complainants," where the defendant had not responded to the plaintiff's

request for a reasonable accommodation "for at least a year prior to the commencement of [a]

HUD investigation"); *Taylor v. Hous. Auth. of New Haven,* 267 F.R.D. 36, 69–70 (D. Conn.

2010) ("Plaintiffs assert that [one of the plaintiffs] was constructively denied a reasonable

accommodation by [the defendant's] failure to respond to her request for mobility counseling

before she filed suit. . . .  The Court does not intend to cast doubt on the proposition that delay

may eventually become a denial."), *aff'd sub nom. Taylor ex rel. Wazyluk v. Hous. Auth. of City*

*of New Haven*, 645 F.3d 152 (2d Cir. 2011).

      In assessing whether a defendant has constructively denied a plaintiff's request for an

accommodation through unreasonable delay, courts often consider whether the delay was caused

by the defendant's unreasonableness, unwillingness to grant the requested accommodation, or

bad faith, as opposed to mere bureaucratic incompetence or other comparatively benign reasons.

*See, e.g., Astralis*, 620 F.3d at 69 ("[T]he circumstances permit a reasonable inference that [the

defendant] effectively short-circuited the interactive process."); *Groome*, 234 F.3d at 199 n.7

(finding that the delay in responding to the plaintiff's request for a special zoning

accommodation "demonstrated an attempt to frustrate [the plaintiff's] purchase and operation of

a group home"); *Daniel v. Avesta Hous. Mgmt. Corp.*, No. 12-CV-110, 2013 WL 4541152, at *7

(D. Me. Aug. 27, 2013) (noting, in the context of a reasonable-accommodation claim under the

FHA, that in assessing whether "unreasonable delay . . . amount[s] to a failure to provide

reasonable accommodations," the First Circuit has suggested that courts should look to, *inter*

*alia*, whether the defendant "failed to engage in any good faith interactive process to explore

whether some variant of the plaintiff's proposal might have been workable," and whether there

was any evidence that the defendant "tried to sweep the problem under the rug" (internal

quotation marks omitted)); *Bhogaita*, 2012 WL 6562766, at *7 ("[B]y persisting in its intrusive

request for more[] and largely irrelevant information, [the defendant] constructively denied [the

plaintiff's] request."); *Taylor*, 267 F.R.D at 70 ("[T]here is no evidence that [the defendant]

delayed acting on [the plaintiff's] application in order to prevent her from moving, or with any

motive to prevent a disabled Section 8 participant from obtaining housing.  If, as the evidence

suggests, [the defendant] failed to respond to [the plaintiff's] request because of bureaucratic

incompetence, that fact . . . does not show violations of Section 504 or the FHAA, which are

addressed to rules that hurt people with disabilities *by reason of their handicap*, rather than that

hurt them solely by virtue of what they have in common with other people." (internal quotation

marks and alterations omitted)); *Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304

F. Supp. 2d 1245, 1260 (D. Haw. 2003) ("The Court finds no evidence to indicate that

Defendants were unwilling to reasonably accommodate [the plaintiff] if shown to be necessary

for his equal use and enjoyment of [the condominium unit]."), *aff'd sub nom. DuBois v. Ass'n of*

*Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175 (9th Cir. 2006).

   In fact, in the analogous context of an employee's claim that an employer has

constructively denied the employee's request for a reasonable accommodation through delay in

violation of Title I, as opposed to Title II, of the ADA, courts in the Second Circuit have

consistently held that a plaintiff is required to provide evidence that the delay was motivated by

the employer's discriminatory intent, as opposed to mere negligence.  *See, e.g., Hamedl v.*

*Weiland*, No. 10-CV-2738, 2012 WL 3903499, at *7 (E.D.N.Y. Sept. 6, 2012) ("To demonstrate

that the delay in accommodation violated the ADA, plaintiff must prove that the delay was

motivated by discriminatory intent. . . .  As plaintiff has failed to show that [the defendant] failed

to provide him with reasonable accommodations, or that any delay in providing those

accommodations was motivated by discriminatory intent, summary judgment with respect to

plaintiff's ADA claim is granted." (internal quotation marks omitted)), *aff'd sub nom. Hamedl v.*

*Verizon Commc'ns, Inc.*, 557 F. App'x 68 (2d Cir. 2014); *Carlson v. Perry*, No. 06-CV-6621,

2012 WL 1067866, at *13 n.12 (W.D.N.Y. Mar. 29, 2012) ("[The plaintiff] argues that even

though his first accommodation request was granted, the delay . . . amounted to a *de facto* denial

of that request.  A delay in implementing an accommodation does not violate the ADA, however,

unless the delay was unreasonable or plaintiff has provided evidence of discriminatory intent. . . .

The record simply contains no evidence of any purposeful delay or discriminatory intent."); *De*

*La Rosa v. City of New York Police Dep't*, No. 09-CV-5290, 2010 WL 4177626, at *9 (S.D.N.Y.

Oct. 22, 2010) ("To prevail on the claim that the Defendants failed to accommodate her request

in a timely manner, [the plaintiff] must prove that the delay was motivated by discriminatory

intent.  [The plaintiff] does not offer any evidence to support that the delay was motivated by

such an intent."); *Wildman v. Verizon Corp.*, No. 05-CV-899, 2009 WL 104196, at *2 (N.D.N.Y.

Jan 14, 2009) (granting summary judgment to the defendant where the plaintiff "presented no

evidence, beyond the delay itself," in support of her constructive-denial claim); *Lyman v. City of*

*New York*, No. 01-CV-3789, 2003 WL 22171518, at *6–7 (S.D.N.Y. Sept. 19, 2003) ("In order

to prevail on the claim that the defendants failed to accommodate in a timely manner, [the plaintiff] must prove that the failure was motivated by discriminatory intent.  An unreasonable delay in providing an accommodation may provide evidence of discrimination. . . .  Considering the record as a whole, there was no unreasonable delay in accommodating [the plaintiff's] initial requests.  The plaintiff has provided no evidence that the delay of three months in providing the chair was intentional. . . .  [T]here is nothing here that suggests that the delay plaintiff experienced in receiving her requested accommodation was motivated by discriminatory intent. In fact, it appears to have been a negligent oversight on defendant's part." (citations, internal quotation marks, and alterations omitted)); *Manessis v. N.Y.C. Dep't of Transp.*, No. 02-CV-359, 2003 WL 289969, at *17 (S.D.N.Y. Feb. 10, 2003) ("[Plaintiff's] claim for failure to provide timely accommodation . . . fails.  In failure to timely accommodate cases, plaintiff must prove that the delay was motivated by discriminatory intent.  Although unreasonable delay in providing an accommodation can provide evidence of discrimination, there is nothing here that suggests that the delay plaintiff experienced in receiving his [requested accommodation] was motivated by discriminatory intent.  In fact, it appears to have been a negligent oversight. . . ." (internal quotation marks omitted)), *aff'd sub nom. Manessis v. Chasin*, 86 F. App'x 464 (2d Cir. 2004); *Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 202 (S.D.N.Y. 1999) ("As with all claims under the ADA, plaintiff must show that this three-week delay in granting plaintiff's request [for reasonable accommodation] was motivated by discriminatory intent.  However, plaintiff has adduced absolutely no evidence to show that plaintiff's three-week delay was motivated by an attempt to discriminate against plaintiff because of his mental illness." (citation omitted)).

A recent Second Circuit decision demonstrates that cases involving reasonable-accommodation claims brought under Title I of the ADA are useful interpretive tools for analyzing reasonable-accommodation claims brought under Title II of the ADA, the Rehabilitation Act, and the FHA.  In *McElwee v. County of Orange*, 700 F.3d 635 (2d Cir. 2012), the plaintiff, who had been diagnosed with a developmental disorder, was dismissed from the volunteer program at a federally funded center for nursing care and rehabilitation "after engaging in erratic and harassing behavior toward female staff members." *Id.* at 637.  Following his dismissal, he filed a complaint against the center, asserting causes of action under Title II of the ADA and Section 504 of the Rehabilitation Act, "alleging that he was denied a reasonable accommodation for his disability." *Id.*  In describing the standard by which courts analyze whether a plaintiff has been denied a reasonable accommodation in violation of Title II of the ADA, the court cited to 42 U.S.C. § 12112(b)(5)(A), *id.* at 641, a section that forms part of Title I of the ADA, and which provides in part that the term "discriminate against a qualified individual on the basis of disability" includes "not making *reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual with a disability," 42 U.S.C. § 12112(b)(5)(A) (emphasis added).  This is the same section of Title I of the ADA that the courts in the above-described cases were applying when they held that evidence of discriminatory intent is required to make out a claim that an employer constructively denied an employee's request for a reasonable accommodation through unreasonable delay.  *See, e.g., Hamedl*, 2012 WL 3903499, at *5, *7 (citing to 42 U.S.C. § 12112(b)(5)(A) for the governing reasonable-accommodation standard, and holding that, "[t]o demonstrate that the delay in accommodation violated the ADA, plaintiff must prove that the delay was motivated by discriminatory intent"); *cf. McBride v. BIC Consumer Products Mfg. Co.*, 583 F.3d 92, 96 (2d

38

Cir. 2009) (citing to 42 U.S.C. § 12112(b)(5)(A) for the governing standard in a reasonable-accommodation claim brought pursuant to Title I of the ADA).

The *McElwee* court also noted that, "[a]lthough [the plaintiff] [had] brought the . . . case pursuant to Title II of the ADA," the court was entitled to "look for guidance to case law under Title I of the ADA, which governs employment discrimination," both because the plaintiff's volunteer position was "analogous to that of an employee," but also because "courts use the terms 'reasonable modifications' in Title II and 'reasonable accommodations' in Title I interchangeably."  700 F.3d at 641 n.2.  The court also made the point that, even though plaintiffs regularly bring and courts regularly discuss "reasonable accommodation" claims under Title II, such causes of action are more accurately termed "reasonable modification" claims, given that the term "reasonable accommodation" appears nowhere in Title II, and is instead borrowed from a comparable provision of Title I.  *See id.* (characterizing *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85, 88 (2d Cir. 2004), as "discussing 'accommodations' provided in Title II case"); *see also Atia v. New York City Hous. Auth.*, No. 00-CV-46, 2002 WL 398812, at *3 n.5 (E.D.N.Y. Jan. 3, 2002) ("Actually, the ADA language requiring 'reasonable accommodations' applies only to employers, and not public entities, as it only appears in Title I of the ADA.  The language applicable to public services, benefits and programs is found in the regulations implementing Title II of the ADA[,] [which] . . . require that a public entity make [']reasonable modifications['] in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." (alterations, citations, and internal quotation marks omitted)).

It is thus reasonable to rely on Title I reasonable-accommodation case law in considering

Plaintiff's Title II, Rehabilitation Act, and FHA reasonable-accommodation claims as a general

matter, as well as in the specific context of constructive denial.  *Cf. Innovative Health Sys., Inc.*

*v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) ("Title II sets out only a general

definition of discrimination. . . .  The House Committee on Education and Labor indicated that

Title II's prohibitions are to be 'identical to those set out in the applicable provisions of titles I

and III of this legislation.'" (citation omitted)), *superseded on other grounds as recognized by*

*Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001).  Indeed, the First Circuit

has already taken this approach.  *See Astralis*, 620 F.3d at 69 (citing *Calero-Cerezo v. U.S. Dep't*

*of Justice*, 355 F.3d 6, 25 (1st Cir. 2004), in which the plaintiff asserted a reasonable-

accommodation claim under Title I of the ADA in the employment context, and characterizing

that case as "finding an actionable refusal to grant accommodation where . . . a factfinder could

supportably conclude that 'defendants simply stonewalled'"); *see also Daniel*, 2013 WL

4541152, at *7 (addressing a constructive-denial reasonable-accommodation claim brought

pursuant to the FHA, and citing to First Circuit cases involving constructive-denial reasonable-

accommodation claims brought pursuant to Title I of the ADA).

      3.  Analysis

          a.  The THA Defendants Granted Plaintiff's Request for a
          Reasonable Accommodation

The THA Defendants do not argue that Plaintiff cannot satisfy the first, second, or third

prongs of the prima facie test for a reasonable-accommodation claim under the FHA, the ADA,

and the Rehabilitation Act.  Rather, the THA Defendants challenge only Plaintiff's ability to

satisfy the fourth, arguing that Plaintiff cannot demonstrate that they "refused to make such

accommodation." (*See* THA Defs.' Mem. 5 ("Plaintiff cannot establish a *prima facie* claim of discrimination under the FHA, the ADA, or the Rehabilitation Act. . . . [T]he THA Defendants never refused to offer him a reasonable accommodation.").)

Attached to Plaintiff's Amended Complaint is what seems to be a letter dated August 7, 2008, in which Plaintiff asks that, because of his disabilities, he be moved from his third-floor apartment to a first-floor apartment. (*See* Pl.'s Ex. 7, at 22.) In the letter, Plaintiff makes specific reference to "31 Midland and 25 Midland, for these two buildings have the fewest amount of steps of all the [THA] building[s]." (*Id.*) Plaintiff alleges that he made a similar request on March 7, 2010, emphasizing that the reason that he was seeking relocation to a first-floor apartment in either 31 Midland Place or 25 Midland Place was because those buildings had "the fewest steps [of] all [the] other building units" that THA managed. (Pl.'s Ex. 8, at 1.) Also on March 7, 2010, Plaintiff sent another communication to the THA Board of Commissioners, in which he provided substantially the same information; confirmed his interest in moving to a first-floor apartment; observed that "whenever an apartment [became] available" in his buildings of choice, he and the family members with whom he lived were never asked if they wanted to move in; and wrote that "31 Midland and 32 Midland [were] the only two building[s] with the fewest amount of steps," likely referring to 31 Midland Place and 25 Midland Place. (Pl.'s Ex. 7, at 21.) Plaintiff sent another largely repetitive letter to the THA Board of Commissioners on the same day. (*See* Pl.'s Ex. 8, at 2.) As noted above, Plaintiff's communications were likely requests for accommodation cognizable under the FHA, the ADA, and the Rehabilitation Act. *See Bezi*, 2012 WL 5519386, at *5, 17; *Bentley*, 367 F. Supp. 2d at 345–46; *Roseborough*, 1994 WL 695516, at *2–3. Further, as also noted above, the THA Defendants do not argue that

41

Plaintiff's request was unreasonable, or that it was unnecessary to afford Plaintiff an equal opportunity to use and enjoy the dwelling.  (*See* THA Defs.' Mem. 3–6.)

THA responded on July 15, 2010, informing Plaintiff that he had been placed on a waiting list, but incorrectly characterizing Plaintiff's communications as a request to move to a larger apartment.  (Pl.'s Ex. 7, at 7.)  THA followed up approximately three weeks after that, on August 5, 2010, this time accurately characterizing Plaintiff's communications as a "request for a lower level apartment," and offering to move Plaintiff and his family to a vacant, first-floor, two-bedroom apartment at 12 Washington Street, and encouraging Plaintiff to "inform the THA immediately" if he wanted to take it.  (THA Defs.' Ex. D, at 11.)  On August 20, 2010, after approximately two weeks had passed, and having apparently not received any response from Plaintiff, THA wrote him again, informing him that, if THA did not hear from him within five days of receiving the letter, it would assume that he was not interested in the apartment.  (*Id.* at 13.)  Six days later, on August 26, 2010, Plaintiff called THA and stated that he was not interested in the apartment at 12 Washington Street, specifically citing the fact that 31 Midland Place and 25 Midland Place had "shorter steps for his elderly mother to use," and confirming in a letter that he sent on the next day that he had rejected the apartment at 12 Washington Street "because of the step factor."  (*Id.* at 15, 16.)  In his letter, he also emphasized yet again that, in his opinion, "the only . . . suitable" location for the move that he was seeking "would be in the area of 31 Midland Place or 25 Midland Place," "[f]or [those] location[s] [had] the fewest amount of steps for [Plaintiff and his mother] to go down."  (*Id.* at 16.)

Taking the facts in the light most favorable to Plaintiff, it could be said that THA's offer of an apartment at 12 Washington Street did not meet Plaintiff's stated needs.  Although the putative letters dated August 7, 2008 and March 7, 2010 are somewhat confusing, if one thing is

clear from those documents, it is that Plaintiff was seeking to move to a first-floor apartment in order to minimize the number of steps that he and his mother would have to negotiate on a daily basis. He communicated a preference for 31 Midland Place and 25 Midland Place for no reason other than that those buildings had a comparatively small number of such steps. If Plaintiff were to have accepted THA's offer to move to a first-floor apartment that had a substantial number of steps, it would not have been optimal. In his deposition, Plaintiff described the 12 Washington Street apartment as requiring an entrant to walk up four steps from the street into a level courtyard, and to then walk up another five steps to gain access. (Logan Dep. Tr. 42.) Plaintiff also described frequent flooding of the 12 Washington Street building's first floor, which he explained posed a particular risk to disabled residents like him and his mother. (*Id.*) While the THA Defendants dispute that there is a meaningful difference as to accessibility between the first-floor apartments located at 31 and 25 Midland Place and the first-floor apartment at 12 Washington Street that they offered to Plaintiff, the THA Defendants do not contest Plaintiff's characterization of the apartment at 12 Washington Street as being prone to dangerous flooding. (*See* THA Defs.' Ex. D, at 3 ("While it is correct that there are three outside steps to gain entrance from the street to the Washington Street building as opposed to two outside steps to gain entrance to the Midland Place building, all buildings on Washington Street and Midland Place have rear entrances with ramps that do not require use of steps to gain entrance from the street. In addition, all buildings on Washington Street and Midland Place have, once you enter from the outside, three interior steps to get to the 'ground floor' apartments . . . ."). Regardless, to the extent that the Parties dispute differences between the buildings as to accessibility, that is a factual dispute that it would be improper for the Court to resolve on a summary judgment motion. *See Westinghouse*, 735 F. Supp. at 1212. Thus, at least for the purposes of the THA

43

Defendants' Motion for Summary Judgment, THA's offer of the 12 Washington Street apartment did not satisfy Plaintiff's request for a reasonable accommodation.

The same cannot be said of the next offer that THA made to Plaintiff.  On November 8, 2010, THA informed Plaintiff that THA "currently [did] not have any vacant apartments located in either" 31 Midland Place or 25 Midland Place, but that Plaintiff was "first in [THA's] transfer list," and would be offered a suitable apartment in one of those buildings "[a]s soon as [one] [became] available." (THA Defs.' Ex. D, at 17.)  Plaintiff responded two days later, noting that, "[i]n all of the building units in [the] THA complex[,] there [were] only two buildings that [had] only two steps to come in and [to] go out [of] the building," and that those were 31 Midland Place and 25 Midland Place.  (Pl.'s Ex. 7, at 9.)  According to the THA Defendants, approximately four-to-five months after this exchange, in March 2011, THA "offered . . . to move a family out of a two-bedroom, handicapped accessible unit in 4 Union Place to accommodate [Plaintiff's] needs."  (Pl.'s Ex. 9, at 3; *see also* THA Defs.' Ex. F, at 4.)  "Access to that apartment [did not] require even a single step," which made it "easier for [Plaintiff] and [his] mother than any [other] building in Sanford Gardens," including 31 Midland Place and 25 Midland Place.  (*Id.*)  This offer was communicated to Plaintiff, as well as to Plaintiff's attorney.  (*See* Pl.'s Ex. 9, at 3; THA Defs.' Ex. F, at 4.)  Plaintiff rejected the offer of the apartment at 4 Union Place, not only the first time that THA offered it to him, but five subsequent times as well.  (*See* Pl.'s Ex. 9, at 3; THA Defs.' Ex. F, at 4; *id.* at 1–2; THA Defs.' Ex. H, at 1.)  Importantly, nowhere in Plaintiff's submissions does he challenge the THA Defendants' statements that they offered him a first-floor apartment at 4 Union Place in March 2011, as well as five subsequent times; that he rejected all of those offers; that the apartment at 4 Union Place was fully handicapped-accessible; or that access to the apartment at 4 Union Place required the negotiation

44

of fewer steps than would have a first-floor apartment in either 31 Midland Place or 25 Midland Place.  In fact, as part of his Amended Complaint, Plaintiff included the letter from Matveevskii from which the information described above is primarily drawn.  (*See* Pl.'s Ex. 9, at 3.)

In his submissions, Plaintiff did not provide any reason why he rejected THA's offers of the apartment at 4 Union Place.  However, in his deposition, Plaintiff cited two reasons for these rejections.  The first was his "comfort level" with 31 Midland Place, "the building that [he had] been in for close to 30 years."  (Logan Dep. Tr. 57.)  While Plaintiff's attachment to his building is understandable, it has no demonstrated relationship to his handicap or disability, and as such, THA had no obligation to take it into account in attempting to accommodate him.  *See Hamedl*, 552 F. App'x at 70 ("As to [plaintiff's] claims under the [ADA], the undisputed evidence demonstrates that he was offered a reasonable accommodation for his alleged disability—that is, a shift beginning at 5:30 a.m., to prevent the back-pain caused by sitting in traffic.  [The plaintiff's] preference for a midnight shift does not render unreasonable an otherwise reasonable accommodation."); *Schwarz*, 544 F.3d at 1226 ("The FHA's reasonable accommodation provision requires only those accommodations that may be *necessary* . . . to afford *equal* opportunity to use and enjoy a dwelling. . . .  In this context, 'equal opportunity' can only mean that handicapped people must be afforded the same (or 'equal') opportunity to use and enjoy a dwelling as non-handicapped people, which occurs when accommodations address *the needs created by the handicaps*.  If accommodations go beyond addressing these needs and start addressing problems not caused by a person's handicap, then the handicapped person would receive not an 'equal,' but rather a better opportunity to use and enjoy a dwelling, a preference that the plain language of this statute cannot support." (citation and internal quotation marks omitted)); *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 604 (4th Cir. 1997)

45

("The FHA does not require accommodations that increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap."); *Coe v. Soc'y Hill at Piscataway Condo Ass'n*, No. 08-CV-2870, 2010 WL 1424012, at *3 (D.N.J. Apr. 7, 2010) ("Plaintiff cannot demonstrate that his requested accommodation is necessary because there is no direct linkage or relationship between the requested accommodation and Plaintiff's disability.  Although it is undisputed that Plaintiff has cancer, he makes no suggestion that granting him the right to store an inoperable vehicle for a long period affords him equal opportunity to use and enjoy his housing.").

Moreover, there is also no evidence in the record from which a jury could reasonably conclude that Plaintiff ever communicated to THA that he did not want to leave 31 Midland Place because of his level of comfort with the building; in fact, in his communications with THA, he repeatedly stated that he wanted to move to a first-floor apartment in 31 Midland Place, *or* a first-floor apartment at 25 Midland Place, a different building, and the only stated reason for his desire to move to one of those locations was what he termed "the step factor."  Thus, because Plaintiff never requested an accommodation based on his comfort level with 31 Midland Place, the THA Defendants cannot be held responsible for having failed to provide one.  *See Taylor v. Harbour Pointe Homeowners Ass'n*, 690 F.3d 44, 49 (2d Cir. 2012) ("To make a prima facie showing in support of her failure to accommodate claim, [the plaintiff] was required to give [the defendants] an opportunity to accommodate her.  The defendants must have had an idea of what accommodation [the plaintiff] sought prior to their incurring liability for failing affirmatively to grant a reasonable accommodation.  Here, it is undisputed that [the plaintiff] never requested any accommodation."); *see also Mazzocchi v. Windsor Owners Corp.*, No. 11-CV-7913, 2013 WL 5295089, at *10 (S.D.N.Y. Sept. 17, 2013) (same).

46

The second reason for his refusal of the THA Defendants' offer of the first-floor apartment at 4 Union Place that Plaintiff cited in his deposition was that he "can't be around seniors on a constant basis," and that although he "can go and visit them," prolonged exposure makes him "claustrophobic" and "antsy." (Logan Dep. Tr. 69–70.) Plaintiff suggested that his discomfort with the elderly is rooted in experiences that he endured when housed with a group of seniors during a period of physical rehabilitation, during which he "got very depressed, very, very depressed, to the point that [his depression] was affecting [his] rehab[ilitation]." (*Id.* at 70.) However, although Plaintiff claims that one of his doctors explained his discomfort with the elderly in a letter that the doctor wrote to THA at some indeterminate point in time, which may or may not have been after THA offered him the apartment at 4 Union Place, this letter does not appear anywhere in Plaintiff's or the THA Defendants' submissions. One of the many medical records that Plaintiff included in his Opposition to the THA Defendants' Motion for Summary Judgment is a Social Security Act disability determination, in which the administrative law judge noted that Plaintiff's "mental condition has been described by treating sources as an explosive disorder since the claimant has a terrible temper and has a history of many disagreements with people, including rehabilitation people"; that Plaintiff "does not judge relationships well and is unrealistic in his talents"; that Plaintiff "would be touchy in dealing with supervisors in a work setting"; and that "[d]iagnosis was personality disorder with histrionic characteristics." (Pl.'s Opp., at Ex. H.) But although the determination touched on Plaintiff's mental condition, nothing contained therein, or in any of the other medical records that Plaintiff submitted, even remotely relates to the depression that Plaintiff allegedly experiences as the result of continued exposure to seniors. Indeed, the fact that Plaintiff lives with his elderly mother belies any such conclusion. In any event, even assuming that Plaintiff's supposed discomfort with the elderly

47

qualifies as a handicap or a disability within the meaning of the FHA, ADA, or the

Rehabilitation Act, which is a determination that the Court cannot make on the basis of

Plaintiff's submissions, Plaintiff still never requested an accommodation from THA on the basis

of that supposed handicap or disability, and as a result, as was the case in relation to Plaintiff's

"comfort level" with 31 Midland Place, it is not an accommodation for which the THA

Defendants can be faulted for not providing. *See Taylor*, 690 F.3d at 49.

  Based on the foregoing, the Court concludes that Plaintiff has failed to raise a genuine

issue of material fact as to whether the THA Defendants reasonably accommodated his request

to be moved to a first-floor apartment with a minimal number of steps.  The THA Defendants

did so in March 2011, by offering Plaintiff and his family residence in a first-floor apartment at 4

Union Place that would have been even easier for Plaintiff and his elderly mother to access than

the first-floor apartments at 31 Midland Place or 25 Midland Place.[10]

---

  [10] As noted above, Plaintiff sought his move to minimize the number of steps required to
access his apartment.  In other words, the "reasonable accommodation" that he requested was a
move to a first-floor apartment with the fewest possible number of steps.  Because in making this
request Plaintiff suggested that he be moved to a first-floor apartment in 31 Midland Place, the
building in which he lived at the time, *or* a first-floor apartment in 25 Midland Place, a different
building altogether, the Court need not address whether THA would have been required to
accommodate a request to stay in the same building, had Plaintiff made one.  With that being
said, the Court notes that there is at least some case law indicating that a landlord may satisfy a
request under the FHA for reasonable accommodation based on a tenant's handicap by offering
the tenant housing in a different building from the one in which the tenant is living at the time.
*See Congdon v. Strine*, 854 F. Supp. 355, 363 (E.D. Pa. 1994) (finding that the defendant did not
deny the plaintiffs' request for a reasonable accommodation under the FHA in part because the
defendant made a "good faith effort to accommodate [one of the plaintiffs] by offering her
occupancy in other apartments").  The Court also takes judicial notice under Rule 201 of the
Federal Rules of Evidence of the fact that, according to Google Maps, 4 Union Place is a mere
one-tenth of a mile from 31 Midland Place, and that the two buildings are approximately
equidistant from the Tuckahoe Senior Citizens' Center.  *See Deutch v. United States*, 367 U.S.
456, 470 (1961) ("tak[ing] judicial notice of the fact that Ithaca is more than one hundred and
sixty-five miles from Albany"); *Harris v. Del Taco, Inc.*, 396 F. Supp. 2d 1107, 1110 & n.4

### b.  The THA Defendants Did Not Constructively Deny Plaintiff's Reasonable Accommodation Request

The Court's finding that the THA Defendants reasonably accommodated Plaintiff in March 2011 does not conclude its inquiry, as the THA Defendants may have first constructively denied his request for a reasonable accommodation through delay before ultimately granting it. *See Bryant Woods Inn*, 124 F.3d at 602 ("Under the Fair Housing Act, . . . a violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings."); *Groome*, 234 F.3d at 199 (same); *Smith v. Cedars, Inc.*, No. 12-CV-667, 2013 WL 5819342, at *4 (D. Utah Oct. 29, 2013) (same); *United States v. City of New Orleans*, No. 12-CV-2011, 2012 WL 6085081, at *5 (E.D. La. Dec. 6, 2012) ("[T]he fact that the [defendant] eventually approved the variance requests is not dispositive . . . , because . . . [a] denial . . . is a violation under the FHA irrespective of the remedies granted in subsequent proceedings." (internal quotation marks omitted)).

The Court first considers whether it is appropriate to consider the request for a reasonable accommodation that Plaintiff claims that he made on March 27, 1996, in assessing whether the THA Defendants' behavior constituted a constructive denial of that alleged request.  As noted, in his Amended Complaint, Plaintiff included what appears to be a letter to De Esso, in which Plaintiff noted that "[l]andlord[s] are required to provide reasonable accommodation for tenants with . . . disabilities so they may enjoy equal access to and use of housing," characterized "the disability Act of 1987" and "24 CFR (<u>Code of Federal Regulations</u>), part 8" as relating to a "public housing authority['s] responsibility to make facilities handicapped accessible," and

---

(C.D. Cal. 2005) (taking "judicial notice of the distance between" the plaintiff's residence and various relevant locations in an action brought pursuant to the ADA).

stated that he was "putting [De Esso's] office on notice[] at THA." (Pl.'s Ex. 7, at 6.) As an initial matter, there is a significant question as to whether this correspondence is sufficiently specific to count as a request for any kind of reasonable accommodation whatsoever, much less a request for a first-floor apartment. *Cf. Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 129 (1st Cir. 2009) (noting, in the context of an employment-discrimination action arising under Title I of the ADA, that "[a]n employer's duty to accommodate an employee's disability is ordinarily activated by a request from the employee, and the request must be sufficiently direct and specific to give the employer notice of the needed accommodation" (citation and internal quotation marks omitted)); *Amerose v. Monroe Cnty. Water Auth.*, No. 10-CV-6383, 2012 WL 5398660, at *10 (W.D.N.Y. Nov. 2, 2012) (same); *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05-CV-5109, 2007 WL 1149979, at *21 (S.D.N.Y. Apr. 18, 2007) (noting, in the context of an employment-discrimination action arising under Title I of the ADA, that the plaintiff's counsel had claimed at oral argument that the plaintiff had sought "a little extra time to complete her paperwork, as well as understanding and assistance, as accommodations for her disability," but that such "requests [were] extremely vague," and that it was thus "not clear that they would constitute requests for a reasonable accommodation"), *aff'd sub nom. Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943 (2d Cir. 2008). However, the Court need not resolve the question of whether Plaintiff's request was specific enough to count as a request for a reasonable accommodation, because even if it was, the Court would still be barred from considering it by the applicable statutes of limitations.

The FHA provides that "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A);

50

*see also Adkins v. Stanley*, No. 12-CV-7667, 2013 WL 3835198, at *6 (S.D.N.Y. July 25, 2013)
(same).  By contrast, "Congress did not establish a statute of limitations for Title II or
Rehabilitation Act claims."  *Stamm v. New York City Transit Auth.*, No. 04-CV-2163, 2013 WL
244793, at *8 (E.D.N.Y. Jan. 22, 2013).  However, "[i]n the absence of a Congressionally
established time limitation for a federal cause of action, the settled practice is to adopt a local
time limitation as federal law if it is not inconsistent with federal law or policy to do so," which
in this case means that "Plaintiff's Title II and Rehabilitation Act claims are both governed by
the three-year statute of limitations applicable to New York personal injury actions."  *Id.*
(internal quotation marks and alterations omitted); *see also M.D. v. Southington Bd. of Educ.*,
334 F.3d 217, 224 (2d Cir. 2003) ("[A]ll actions under § 504 of the Rehabilitation Act are
governed by the state statute of limitations applicable to personal injury actions." (internal
quotation marks omitted)); *Ortiz v. City of New York*, No. 12-CV-3118, 2012 WL 6200397, at *9
(S.D.N.Y. Dec. 12, 2012) ("Plaintiff's ADA and Rehabilitation Act claim is subject to a three-
year statute of limitations."); *Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, No. 07-
CV-8828, 2009 WL 3151200, at *8 (S.D.N.Y. Sept. 29, 2009) ("New York's three-year statute
of limitations applicable to personal injury actions is the most analogous state statute of
limitations for claims brought under Section 504[] [and] the ADA. . . .").  Thus, in order for the
Court to consider Plaintiff's alleged 1996 request, the THA Defendants must have constructively
denied that request on or after December 2, 2007, three years before Plaintiff filed his original
Complaint.  (*See* Dkt. Nos. 1–2.)

　　　　Although the relevant cases make clear that determination of when a request for a
reasonable accommodation is constructively denied by unreasonable delay is highly fact-
specific, and is made on a case-by-case basis, the Court is not aware of any case in which a court

has found that it took anywhere near as long as eleven years for such a constructive denial to occur.  *See, e.g., Scoggins*, 718 F.3d at 271–72 (finding that a constructive denial occurred after a 15-month delay); *Astralis*, 620 F.3d at 69 (finding that a constructive denial occurred after a one-year delay); *Groome*, 234 F.3d at 199 (finding that a constructive denial occurred after a 127-day delay); *Weiss v. 2100 Condo. Ass'n*, 941 F. Supp. 2d 1337, 1344 n.2 (S.D. Fla. 2013) (holding that the plaintiff's failure-to-accommodate claim was ripe after a one-year-and-11-month delay); *City of New Orleans*, 2012 WL 6085081, at *5 (finding that a constructive denial occurred after a one-year-and-nine-month delay, making the plaintiff's FHA and ADA claims ripe).  Thus, insofar as Plaintiff's alleged 1996 request was constructively denied through unreasonable delay at all, the Court need not identify at exactly what point such a denial occurred to determine that a claim predicated on such a denial is barred by the applicable statutes of limitations.  Simply put, if Plaintiff's alleged 1996 request was in fact denied, it was denied long before 2007.[11]

---

[11] The application of the continuing-violation doctrine could prevent the relevant limitations periods from barring the Court's consideration of Plaintiff's alleged 1996 request, but the Court is unaware of any authority suggesting that this doctrine would apply here.  A recent FHA case from the Fourth Circuit provides useful guidance.  In *Scoggins v. Lee's Crossing Homeowner's Ass'n*, 718 F.3d 262 (4th Cir. 2013), the plaintiffs requested a modification from their homeowners association to add a ramp leading to the front door of their home for use by their disabled son.  *Id.* at 266.  The plaintiffs made verbal requests to their homeowners association in regard to the modification in 2003 and 2007, followed by a written request in 2009.  *See id.* at 267–68, 271.  In 2010, they filed a complaint in the district court, essentially arguing that the homeowners association had constructively denied their request for an accommodation through delay, in violation of the FHA.  *Id.* at 268.  The homeowners association moved for summary judgment.  The district court granted the motion, concluding that the plaintiffs' claim was premature, as the homeowners association review board "had not denied the ramp request but, rather, timely had informed the plaintiffs that the ramp request would be considered if they completed the application process and filed the necessary materials."  *Id.* at 269.  In other words, the district court found that there had been no constructive denial.

Chronologically speaking, the next document in Plaintiff's submissions that could arguably be taken as a request for an accommodation is dated August 7, 2008, and addressed to Matveevskii.  (*See* Pl.'s Ex. 7, at 22.)  In that document, Plaintiff wrote that, in light of his and his mother's disabilities, he "should be placed on [a] first[-]floor apartment[] . . . [i]n 31 Midland [or] 25 Midland, [because] [those] two buildings [had] the fewest amount of steps of all the [THA's] building[s]."  (Pl.'s Ex. 7, at 22.)  There are serious questions as to whether the Court may consider this as a request for an accommodation.  In the first instance, the only reference that Plaintiff makes to this document in his submissions comes in the form of a complaint that he submitted to the Westchester County Human Rights Commission ("the WCHRC"), in which he wrote that, "Beginning on or about August 7, 2008, [he] submitted a written request to Matveevskii, seeking a move from [his] third floor apartment to a ground floor unit, in order to accommodate [his and his mother's] physical disabilities."  (Pl.'s Ex. 2, at 8.)  But Plaintiff does

---

On appeal, the Fourth Circuit affirmed.  "In reaching [that] conclusion," the court "agree[d] with the district court's determination that the verbal inquiries made by the plaintiffs in 2003 and 2007 [were] barred from consideration in determining ripeness, because those requests were made outside the two-year statute of limitations," and further determined that the "oral requests also [did] not qualify for consideration pursuant to the 'continuing violation' doctrine, under which acts occurring outside the statute of limitations may be considered when there is a 'fixed and continuing practice' of unlawful acts both before and during the limitations period," as "the board's failure to act on [the requests] did not constitute a 'fixed and continuing practice.'" *Id.* at 271.  Thus, the practical effect of the court's decision was to find that the district court had not been entitled to consider the 2003 and 2007 requests in determining whether the homeowners association had constructively denied the plaintiffs' request for a modification.  In fact, in the same opinion, the court found that the homeowners association had constructively denied a related accommodation request that the plaintiffs had made in 2009, in which they had requested that their son be permitted to use an all-terrain vehicle in the subdivision in which they lived.  *Id.* at 272–73.  Applying *Scoggins* to the instant Action, the Court concludes that the continuing-violation doctrine does not allow for consideration of Plaintiff's alleged 1996 request.  *Cf. Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 135 (2d Cir. 2003) ("The rejection of a proposed accommodation is a single completed action when taken, quite unlike the series of separate acts that constitute a hostile work environment and collectively constitute an unlawful employment practice."(internal quotation marks omitted)).

not repeat that claim in any of the narrative portions of his submissions in this Action, including the Amended Complaint.

Further, in his deposition, Plaintiff discussed at length the letter that he claims to have sent to De Esso in 1996, as well as other letters that he claims to have sent to THA, but not once did he mention this alleged 2008 correspondence.  (*See* Logan Dep. Tr. 20–25, 28, 31.)  In fact, during his deposition, counsel for the THA Defendants asked Plaintiff point blank, "And so when did you notify Tuckahoe Housing Authority about the accommodation you needed?"  (*Id.* at 31.)  Plaintiff responded, "You saw the letter to Mrs. Jones.  I sent her a letter telling her back there when she put me on the waiting list . . . that I should have been on the waiting list as far back as '97 with Mr. De Esso, and they said they had no prior knowledge of it."  (*Id.*)  The August 7, 2008 document is addressed to Matveevskii, not Jones.  The letter from Jones informing Plaintiff that he had been placed on the waiting list is dated July 15, 2010, (*see* Pl.'s Ex. 7, at 7), and as such, any response to that letter that Plaintiff sent to THA must have been sent after that date.  Thus, when asked directly when he made first made a request for an accommodation, Plaintiff highlighted the March 27, 1996 letter to De Esso, and a letter that he sent to Jones some time after July 15, 2010, but not the document dated August 7, 2008.

What is more, the document that appears in Plaintiff's submissions contains a handwritten revision, changing the date from which the document states that THA has had information related to Plaintiff's disability in its files from "1997" to "1988," and also self-describes as "[r]evised."  (*See* Pl.'s Ex. 7, at 22.)  As such, even assuming that Plaintiff sent some form of correspondence regarding his housing situation to THA in August of 2008, the Court has no way of knowing whether the document that Plaintiff included in his submissions is an accurate copy of what he sent.  *Cf. Prindable*, 304 F. Supp. 2d at 1258 & n.27 (in an FHA

case, refusing to consider as an accommodation request a "handwritten note" from the plaintiff's doctor and a brief letter from the plaintiff, in part because "[t]he signature on the handwritten note is unclear and could easily have been forged").

Some of these issues with the August 7, 2008 letter were the subject of the Order that the Court issued on May 14, 2014.  (*See* Order (May 14, 2014) (Dkt. No. 86).)  In that Order, the Court stated that "determining the dates on which Plaintiff claims to have requested any accommodation, as well as the dates on which Defendants claim to have received such requests, is a necessary step in resolving the THA Defendants' Motion," and "note[d] the presence in Plaintiff's submissions of what appears to be an August 7, 2008 letter from Plaintiff to Matveevskii," as well as Plaintiff's WCHRC complaint.  (*Id.* at 2.)  The Court also drew the Parties' attention to the absence of any allegation that Plaintiff sent the August 7, 2008 letter to THA "in any of the portions of Plaintiff's Amended Complaint that could be construed as narrative pleadings"; the fact that although the THA Defendants' Motion for Summary Judgment "seem[ed] to proceed on the assumption that the relevant correspondence between the Parties began on or around July 2010, and that Plaintiff never sent and/or THA never received any August 7, 2008 letter, Plaintiff did not challenge that assumption in his Opposition"; and the fact that Plaintiff "did not mention this alleged 2008 correspondence" in his deposition, even when asked, "And so when did you notify Tuckahoe Housing Authority about the accommodation you needed?"  (*Id.* at 3 (citations omitted).)  The Court ordered Plaintiff and the THA Defendants to submit supplemental memoranda of law "addressing the potential impact of Plaintiff's submission of the August 7, 2008 letter and his WCHRC complaint on the THA Defendants' Motion," specifically "in the context of case law, from within the Second Circuit and elsewhere,

recognizing that, under certain circumstances, reasonable-accommodation requests may be 'constructively denied.'" (*Id.* at 4–5.)

But despite being presented with a clear opportunity to unequivocally state that he was in fact attempting to allege that he sent a letter requesting an accommodation to THA on August 7, 2008, Plaintiff failed to do so.  The only correspondence that the Court has received from Plaintiff since it issued the Order is a May 21 letter, which contains a printout of "patient information" that Plaintiff apparently received from one of his treating physicians at the Lawrence Hospital Center, describing "Degenerative Disc Disease" and "Lumbar Radiculopathy, Sciatica," as well as Plaintiff's prescriptions for percocet and robaxin; a June 2 letter, which contains a description of proceedings in Tuckahoe Village Court concerning an unrelated dispute over Plaintiff's lease; a June 8 letter, which is for the most part duplicative of other submissions that Plaintiff has made throughout the course of this Action; and a June 25 letter, which contains photographs of Plaintiff's "new condition," an injury that Plaintiff claims to have suffered to his back.  (*See* Dkt. Nos. 90–92.)

By contrast, in the Supplemental Reply Memorandum of Law that they submitted in response to the Order, the THA Defendants note the "overwhelming evidence in the record that neither THA nor Ms. Matveevskii ever received Plaintiff's purported August 7, 2008 letter"; that "[t]he August 2008 Letter is not date-stamped as having been received by THA, which signifies that THA does not have this letter in its possession and was not aware of Plaintiff's purported request in August 2008"; that in its answer to Plaintiff's WCHRC complaint, "THA denied that Plaintiff made such a request on August 7, 2008"; and that in correspondence with Plaintiff predating the instant litigation, THA had described "the very first request" for an accommodation that it had received from Plaintiff as a letter from one of Plaintiff's doctors that

56

was delivered to THA on July 11, 2010.  (THA Defs.' Supplemental Reply Mem. of Law in Further Supp. of Mot. for Summ. J. (May 28, 2014) 1–3.)  According to the THA Defendants, "[s]ince neither THA nor Ms. Matveevskii ever received the August 2008 Letter, THA did not have knowledge of this purported request and thus, had no meaningful opportunity to consider such a request at that time," which means that "the August 2008 Letter, which was not received by anyone at THA, did not trigger the reasonable accommodation requirement."  (*Id.* at 3.) Plaintiff has not refuted any of these assertions in subsequent submissions to the Court.

In short, Plaintiff did not state in his Amended Complaint that he sent a letter requesting a reasonable accommodation to any of the THA Defendants on August 7, 2008.  Nor did he do so in his deposition, even when asked a specific question about the issue.  Nor did he do so in response to a Court Order specifically directing his attention to the matter.  Based on all of the foregoing, the Court determines that Plaintiff's Amended Complaint does not allege that he made a reasonable-accommodation request on August 7, 2008, and as a result, the Court will not consider any such request in assessing whether a constructive denial occurred.

Moving forward chronologically, Plaintiff also submitted several other documents purporting to be letters to THA requesting a move to a first-floor apartment.  (*See, e.g.*, Pl.'s Ex. 8, at 1; *id.*, at 2; Pl.'s Ex. 7, at 21.)  In two of these documents, dated March 7, 2010, Plaintiff indicated his desire to be placed in a first-floor apartment to accommodate his and his mother's disabilities.  (*See* Pl.'s Ex. 8, at 2; Pl.'s Ex. 7, at 21.)[12]  Assuming that Plaintiff actually sent and

---

[12] In further support of the Court's determination that Plaintiff's Amended Complaint does not allege that he made a reasonable-accommodation request on August 7, 2008, neither of the two March 7, 2010 documents refer to any correspondence from August 2008 seeking a first-floor apartment.  (*See* Pl.'s Ex. 8, at 2; Pl.'s Ex. 7, at 21.)  Moreover, in his submissions, Plaintiff has attached copies of return receipts, presumably to establish that he sent certain

THA actually received these documents, the amount of time that passed between THA's receipt thereof and its response thereto, which response came on July 15, 2010, (*see* Pl.'s Ex. 7, at 7), and in which response it informed Plaintiff that he had been placed on a waiting list, thus initiating an interactive process with Plaintiff, was just over four months.

As noted above, under some circumstances, courts have found plaintiffs' requests for reasonable accommodations to have been constructively denied after delays approximating four months. *See, e.g., Groome*, 234 F.3d at 199 (finding that a constructive denial occurred after a 127-day delay). However, as also noted above, the case law makes clear that the length of the delay is not the only factor that courts consider in determining whether a constructive denial has taken place. Instead, to make out a claim of constructive denial, a plaintiff bears the burden of demonstrating discriminatory intent. *See, e.g., Hamedl*, 2012 WL 3903499, at *7; *Carlson*, 2012 WL 1067866, at *13 n.12; *De La Rosa*, 2010 WL 4177626, at *9; *Wildman*, 2009 WL 104196, at *2; *Lyman*, 2003 WL 22171518, at *6–7; *Manessis*, 2003 WL 289969, at *17; *Powers*, 40 F. Supp. 2d at 202. Moreover, while courts have held that an unreasonable delay itself might be evidence of discriminatory intent, *see Manessis*, 2003 WL 289969, at *17, in cases brought under the FHA, Title II of the ADA, and the Rehabilitation Act, courts have also considered whether the delay was caused by the defendant's unreasonableness, unwillingness to grant the requested accommodation, or bad faith, as opposed to mere bureaucratic incompetence or other comparatively benign reasons. *See, e.g., Astralis*, 620 F.3d at 69; *Groome*, 234 F.3d at 199 n.7; *Daniel*, 2013 WL 4541152, at *7; *Taylor*, 267 F.R.D at 69–70; *Prindable*, 304 F. Supp. at 1260.

---

correspondence to THA, including receipts for the March 7, 2010 documents, (*see* Pl.'s Ex. 7, at 14–15), but he did not provide any such receipts for any August 2008 correspondence.

Here, there is insufficient evidence in the record to raise a triable issue as to whether the delays in this case were due to the THA Defendants' "stonewalling" of Plaintiff or "short-circuiting" of the interactive process, *see Astralis*, 620 F.3d at 69; their "attempt to frustrate" Plaintiff's requested move, *see Groome*, 234 F.3d at n.7; their lack of "good faith," or attempts to "sweep the problem under the rug," *see Daniel*, 2013 WL 4541152, at *7; their "intrusive quest for more[] and largely irrelevant information," *Bhogaita*, 2012 WL 6562766, at *7; their "unwilling[ness] to reasonably accommodate [Plaintiff] if shown to be necessary for his equal use and enjoyment of" his apartment, *Prindable*, 304 F. Supp. at 1260; or their "motive to prevent a disabled Section 8 participant from obtaining housing," *Taylor*, 267 F.R.D. at 70.

In fact, there is affirmative evidence of THA's good faith in responding to Plaintiff's request. On August 5, 2010, THA offered Plaintiff a first-floor apartment at 12 Washington Street. (THA Defs.' Ex. D, at 11.) However, it appears as though Plaintiff did not initially respond to this offer. Despite this lack of response, THA nevertheless followed up with Plaintiff, contacting him again on August 20, 2010, to confirm whether he wanted it, and asking Plaintiff to contact THA "[i]f the apartment [was] not suitable for [his] family's needs." (*Id.* at 13.) THA also informed Plaintiff on November 8, 2010 that it "did not, as yet, have any two-bedroom ground floor apartments available in either 25 or 31 Midland Place," but placed Plaintiff first on its waiting list. (Pl.'s Ex. 9, at 2–3; *see also* THA Defs.' Ex. F, at 3–4.) And in March 2011, "[c]ontinuing to have no ground floor two-bedroom apartments available in either 25 or 31 Midland Place," THA offered "to move a family out of a two-bedroom, handicapped accessible unit in 4 Union Place in order to accommodate [Plaintiff's] needs," access to which apartment did not require "even a single step, which [made] it easier for [Plaintiff] and [his] mother than any building in Sanford Gardens," (*id.*)—an offer that THA made to Plaintiff not

once, but *six times*, (*see* Pl.'s Ex. 9, at 3; THA Defs.' Ex. F, at 4; *id.* at 1–2; THA Defs.' Ex. H, at 1).  It is implausible that a housing authority with discriminatory animus would go out of its way to attempt to accommodate the needs of one of its handicapped residents.  Indeed, Plaintiff himself seems unsure whether he even *thinks* THA acted in bad faith.  As he put it, "I mean maybe it's absence of malice."  (Logan Dep. Tr. 119.)

There is a paucity of case law in the Second Circuit addressing the issue of constructive denial of a request for a reasonable accommodation under the FHA, Title II of the ADA, and the Rehabilitation Act.  However, in *Taylor v. The Housing Authority of New Haven*, 267 F.R.D. 36 (D. Conn. 2010), a court in the Second Circuit did address the issue, in a decision that the Second Circuit later affirmed.  There, the plaintiffs claimed that the defendant housing authority discriminated against them and other disabled persons in violation of the FHA and the Rehabilitation Act by failing to afford them certain accommodations, including "mobility counseling to assist them in searching for, finding, applying for, and moving into disabled-accessible housing."  267 F.R.D. at 39.  "Plaintiffs assert[ed] that [one of the plaintiffs] was constructively denied a reasonable accommodation by [the defendant's] failure to respond to her request for mobility counseling before she filed suit."  *Id.* at 69.  The court noted that, in support of their argument, the plaintiffs cited to three cases, one of which was *Groome Res. Ltd., L.C.C. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000), which the Court cited above.  The court distinguished *Groome* on several grounds, including that the defendant's "reasonable accommodation staff had not received or reviewed [the plaintiff's] letter, let alone unofficially approved it and left her waiting for what was essentially a ministerial act."  *Id.* at 70. The Court then stated the following:

60

> [T]here is no evidence that [the defendant] delayed acting on [the plaintiff's] application in order to prevent her from moving, or with any motive to prevent a disabled Section 8 participant from obtaining housing. If, as the evidence suggests, [the defendant] failed to respond to [the plaintiff's] request because of bureaucratic incompetence, that fact—unlike in *Groome*, where the zoning board's delay demonstrated an attempt to frustrate the plaintiff's purchase and operation of a group home—does not show violations of Section 504 or the FHAA, which are addressed to rules that hurt people with disabilities *by reason of their handicap*, rather than that hurt them solely by virtue of what they have in common with other people.

> For these reasons, the Court concludes that Plaintiffs have not shown that [the defendant] denied [the plaintiff] a reasonable accommodation by failing to respond to her request for mobility counseling or search assistance in the two months between when she first requested it and the date she moved for a preliminary injunction.

*Id.* at 70 (citations, internal quotation marks, and alterations omitted).[13]

As did the court in *Taylor*, the Court here finds that there is no evidence in the record to suggest that the delay between Plaintiff's accommodation request on March 7, 2010, and the THA Defendants' initiation of an interactive process on July 15, 2010, which process eventually culminated in the satisfaction of Plaintiff's request, was at all due to any form of discriminatory intent, bad faith, or obstructionism on the THA Defendants' part. As such, there is no triable issue as to whether the THA Defendants constructively denied any accommodation request that Plaintiff may have made. Therefore, because the Court finds that THA satisfied Plaintiff's reasonable-accommodation request, and that THA did not constructively deny that request beforehand, the Court grants the THA Defendants' Motion for Summary Judgment as to Plaintiff's FHA, ADA, and Rehabilitation Act reasonable-accommodation claims.[14]

---

[13] The Second Circuit affirmed. *See Taylor*, 645 F.3d 152.

[14] In a single passage in his Opposition, Plaintiff requests that the Court order the THA Defendants to "construct accessible apartment entrance and apartments at Stanford Gardens to provide the Logan, Gunther family with meaningful access to their apartment," and "mak[e] the Logan, Gunther family apartment, an equivalent three-bedroom apartment in Stanford Gardens

c.  Plaintiff's References to Other Federal Statutes

i.  24 C.F.R. § 8.22

Throughout his submissions, Plaintiff makes various references to 24 C.F.R. § 8.22, a

HUD regulation that reads as follows:

> (a) New multifamily housing projects (including public housing and Indian housing projects as required by § 8.25) shall be designed and constructed to be readily accessible to and usable by individuals with handicaps.

> (b) Subject to paragraph (c) of this section, a minimum of five percent of the total dwelling units or at least one unit in a multifamily housing project, whichever is greater, shall be made accessible for persons with mobility impairments.  A unit that is on an accessible route and is adaptable and otherwise in compliance with the standards set forth in § 8.32 is accessible for purposes of this section.  An additional two percent of the units (but not less than one unit) in such a project shall be accessible for persons with hearing or vision impairments.

> (c) HUD may prescribe a higher percentage or number than that prescribed in paragraph (b) of this section for any area upon request therefor by any affected recipient or by any State or local government or agency thereof based upon demonstration to the reasonable satisfaction of HUD of a need for a higher

---

fully handicapped accessible, including, but not limited to . . . widening the hallways; . . . widening the doorway . . . [,] providing any such relief as is required to bring the apartment into compliance with HUD regulations[.]"  (*See* Pl.'s Opp., at Ex. E.)  However, Plaintiff did not request such relief anywhere in his Amended Complaint or the exhibits attached thereto.  *See Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, No. 11-CV-8511, 2014 WL 812820, at *22 (S.D.N.Y. Mar. 3, 2014) ("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." (internal quotation marks omitted)).  What is more, insofar as Plaintiff is attempting to claim that the THA Defendants did not reasonably accommodate his disability in light of their failure to construct an accessible entrance to and widen hallways and doorways in his apartment building, there is no evidence in Plaintiff's Amended Complaint or the exhibits attached thereto that he ever requested such accommodations from the THA Defendants.  Thus, this tardy claim will not be considered.  *See Taylor*, 690 F.3d at 49 ("To make a prima facie showing in support of her failure to accommodate claim, [the plaintiff] was required to give [the defendants] an opportunity to accommodate her.  The defendants must have had an idea of what accommodation [the plaintiff] sought prior to their incurring liability for failing affirmatively to grant a reasonable accommodation.  Here, it is undisputed that [the plaintiff] never requested any accommodation." (internal quotation marks omitted)).

percentage or number, based on census data or other available current data (including a currently effective Housing Assistance Plan or Comprehensive Homeless Assistance Plan), or in response to evidence of a need for a higher percentage or number received in any other manner.  In reviewing such request or otherwise assessing the existence of such needs, HUD shall take into account the expected needs of eligible persons with and without handicaps.

24 C.F.R. § 8.22(a)–(c).

Specifically, Plaintiff claims that "THA has not complied to (See 24 CFR 8.22(c),) there are NO minimum of 5 percent of the total dwelling units, or at least one unit made accessible for a person with mobility impairment . . . ."  (Am. Compl. 6.)  However, the Second Circuit held in *Taylor* that there is generally no private right of action to enforce HUD regulations.  645 F.3d at 153.  To be sure, the regulations at issue in *Taylor*, 24 C.F.R. §§ 8.28 and 100.204, were different than those at issue here.  However, in affirming the district court's conclusion that those sections are not enforceable through a private right of action, the court cited approvingly to *Three Rivers Center for Independent Living, Inc. v. Housing Authority of Pittsburgh*, 382 F.3d 412, 418–32 (3d Cir. 2004), and described the court in that case as having "reach[ed] analogous conclusions with respect to HUD regulations at 24 C.F.R. §§ 8.22, .23, and .26."  *Id.* at 154.

Thus, because there is no private right of action to enforce 24 C.F.R. § 8.22, the Court dismisses any claims that Plaintiff is attempting to assert under that section.  *Cf. Boyle v. JP Morgan Chase Bank*, No. 13-CV-454, 2013 WL 6000462, at *4 (E.D. Tex. Nov. 8, 2013) ("A violation of HUD regulations does not create a private right of action for a plaintiff . . . ."); *Ashford v. Bank of Am., N.A.*, No. 13-CV-12153, 2013 WL 5913411, at *4 (E.D. Mich. Oct. 31, 2013) ("Plaintiffs cannot seriously dispute that no private right of action exists under the HUD regulations."); *Weatherford*, 946 F. Supp. 2d at 1111 (dismissing claims that the plaintiff

attempted to assert under 24 C.F.R. §§ 982.505(d), 8.11, and 8.28(a)(5), because the plaintiff

"[did] not have a private right of action to enforce HUD regulations").

### ii.  The Privacy Act of 1974

Plaintiff also makes various references throughout his submissions to the Privacy Act of

1974, 5 U.S.C. § 552a.  It is not entirely clear on what basis and against whom Plaintiff is

attempting to assert this cause of action.  However, at his deposition, Plaintiff explained the

nature of his Privacy Act claims:

> And your Mr. Zuckerman is doing government business, he's not a government
> employee, and he has no business in Housing Authority business, writing letters on
> their behalf, harassing tenants.  It's a violation of my Privacy Act.  Visiting people's
> houses when there's been damage done to them, he's not authorized to do none of
> this.  He was appointed by the Village of Tuckahoe, and he was—as a trustee for
> Tuckahoe Housing Authority.  That means he's our trustee on that trustee board,
> whether he's the chairperson or what have you.  Every day daily operations that has
> to do and involve HUD business, he has no business in it.  It's a violation of our
> Privacy Act.

(Logan Dep. Tr. 19–20.)

Later in his deposition, Plaintiff elaborated on these allegations, which apparently relate

to Zuckerman's alleged entry into his aunt's apartment:

> [Zuckerman] has no right, as the chairperson for the Housing Authority, because he's
> appointed by the village, and not by HUD, knocking on a tenant's apartment, you
> understand, that he has no—knows nothing about.  That's Irina's responsibility.  We
> pay her to get up off her hiney to walk down there to see the damages.  She's getting
> paid a hundred thousand dollars to see the damages that occurs in these buildings.
> . . . That's her responsibility.  That's not Jeff Zuckerman's responsibility.  She's the
> director. . . .   [Zuckerman] got chased out of the building . . . because he was
> harassing my aunt. . . .  He has no business in that—in people's apartment.  He has
> no authorities.

(*Id.* at 26–28.)

Plaintiff also appears to be attempting to assert a separate Privacy Act claim in

connection with THA's alleged sale of a computer to De Esso upon De Esso's retirement.  At his

deposition, in response to a question from counsel for the THA Defendants regarding the 1996

letter that Plaintiff claims that he sent to De Esso, Plaintiff stated the following:

> [A]ll the paper copies of Tuckahoe Housing Authority was scanned onto a computer
> that was sold to Mr. De Esso when he retired from the Housing Authority, okay.
> And they did not take the hard drive out, Tuckahoe Housing Authority.  And that's
> why I got Mark Kamensky there, because he lied and said it was erased on tape.  And
> I got a copy of the tape, because the tenants meeting used to be taped by the Village
> of Tuckahoe.  And he said that the—on the first time he said that they erased all files
> on that computer.  I notified the mayor.  The mayor notified the people that they
> bought the computer from.  The guy said he never erased nothing off of the laptop
> computer that was sold to Eric De Esso, which violates our Privacy Act in there.
> And we asked them for protection, and they did not respond.  They did not give us
> protection for identity theft after the document, which is clearly all—all
> municipality—federal and municipality documents go into an auction, and they take
> out all hard drives prior to sales of it.  And they did not do that at Tuckahoe Housing
> Authority, which they're breaking the law.  They're breaking the law.  And they got
> up and they all of 137 units, all their Social Security numbers, all their bank account
> numbers and everything, you understand.  People had to scramble to get protection
> on their own for something that they—that they, not allegedly, they did it.  They
> illegally sold the computer.

(*Id.* at 25–26.)

Thus, it appears that Plaintiff is asserting his Privacy Act claims against Zuckerman, and

potentially THA.  However, the Second Circuit, "joining many of its sister Circuits, has . . . held

that the private right of civil action created by the Privacy Act is specifically limited to actions

against agencies of the United States government."  *Burch v. Pioneer Credit Recovery, Inc.*, 551

F.3d 122, 124 (2d Cir. 2008); *see also Williams v. New York City Dep't of Educ. ex rel. City Sch.

Dist.*, No. 12-CV-8518, 2013 WL 5226564, at *15 (S.D.N.Y. Sept. 17, 2013) ("[T]he [Privacy]

Act [of 1974] imposes limitations only on agencies of the federal government."); *Leftridge v.

Support Enforcement Servs.*, No. 12-CV-150, 2013 WL 1947174, at *8 (D. Conn. May 3, 2013)

("[T]he Privacy Act [of 1974] does not apply to state agencies or state officials."); *Duffy v.

Evans*, No. 11-CV-7605, 2012 WL 4327605, at *6 n.4 (S.D.N.Y. Sept. 19, 2012) ("The Privacy

Act [of 1974] does not apply . . . to the conduct of state agencies."); *Stoianoff v. Comm'r of Motor Vehicles*, 107 F. Supp. 2d 439, 444 (S.D.N.Y. 2000) ("The Privacy Act [of 1974] . . . does not apply to state agencies or officials . . . ."), *aff'd sub nom. Stoianoff v. Comm'r of Dep't of Motor Vehicles*, 12 F. App'x 33 (2d Cir. 2001).

Accordingly, the Privacy Act does not apply to THA, as there is nothing in the record to suggest, and Plaintiff does not argue, that THA is a federal agency.  *See Hunter v. Underwood*, 362 F.3d 468, 477 (8th Cir. 2004) ("The Des Moines Housing Authority . . . provides federally subsidized public housing to low income families, but it is not a federal agency . . . ."); *Staten v. Hous. Auth. of City of Pittsburgh*, 638 F.2d 599, 603 (3d Cir. 1980) ("The Pittsburgh Housing Authority is a creature of state law which, by federal law, has a unique relationship with the federal government.  While a great deal of funding for the Housing Authority comes from the federal government, that funding alone does not establish an agency relationship between the Housing Authority and the federal government."); *Capitol Blvd. Partners v. United States*, 31 Fed. Cl. 758, 761 (Fed. Cl. 1994) ("It is well-established that HUD's grant of funds does not establish an agency relationship, even if the local public housing authority is nothing more than a conduit for federal funds.  Also, federal approval of the expenditure of such funds does not create an agency relationship." (citations omitted)); *Allen v. City of Kansas City, Kan.*, 660 F. Supp. 489, 494–95 (D. Kan. 1987) ("The court . . . finds that the contractual relationship between the . . . Kansas City Housing Authority and HUD does not impute federal agency status on the Kansas City Housing Authority . . . .").  It does not apply to Zuckerman, either, as there is nothing in the record to suggest, and Plaintiff does not argue, that Zuckerman is a representative of a federal agency or a federal officer.  *Cf. Greene v. Philadelphia Hous. Auth.*, 789 F. Supp. 2d 582, 585 (E.D. Pa. 2011) (finding that an official appointed by the federal government to serve

66

as the sole member of a public housing authority's board of commissioners was not acting as a

"federal official" when acting on behalf of the public housing authority, even though the official

was HUD's chief operating officer).  Accordingly, the Court dismisses any claims that Plaintiff

is attempting to assert against THA and Zuckerman under the Privacy Act.[15]

iii.  Plaintiff's References to Other Potential Federal Causes of Action

Plaintiff also make various statements throughout his Amended Complaint and

---

[15] The only possible exception to the general rule that the Privacy Act of 1974 does not apply to state and local government agencies arises in connection with Section 7 of the statute, which makes specific reference to such entities:

> (a)(1) It shall be unlawful for any federal, *state, or local government agency* to deny any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

> (2) The provisions of paragraph (1) of this subsection shall not apply with respect to—

>> (A) any disclosure which is required by federal statute, or

>> (B) the disclosure of a social security number to any federal, *state, or local agency* maintaining a system of records in existence and operating before January 1, 1975, if such disclosure was required under statute or regulation adopted prior to such date to verify the identity of an individual

> (b) Any federal, *state, or local government agency* which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.

Pub. L. No. 93-579, 88 Stat. 1896, 1909 (1974) (emphasis added).

However, because Plaintiff does not claim that he was "den[ied] . . . any right, benefit or privilege provided by law because of [his] refusal to disclose his social security account number," or that THA or Zuckerman requested that he "disclose his social security account number" without "inform[ing] [him] whether that disclosure [was] mandatory or voluntary, by what statutory or other authority such number [was] solicited, and what uses [would] be made of it," Section 7 is inapplicable here.

67

Opposition that might be understood as relating to other possible federal causes of action. In each case, the allegations are confusing and threadbare, but even construing Plaintiff's submissions with all of the special solicitude due to a pro se litigant, the Court cannot conclude that they constitute attempts by Plaintiff to seek relief.

For example, at one point in his Amended Complaint, Plaintiff states that "[i]t is a sad moment in time, but an honest and ugly truth that . . . we find PHA administration practicing DISCRIMINATION against a person of color, who happens to be a handicap living in THA." (Am. Compl. 19.) Plaintiff also states that he, "the senior tenant in THA with over 14 year[s] of living" in THA housing, "could not get a disability apartment," but "[a] white family move[d] into THA and, also in need of handicap accessible unit," received one. (*Id.*) However, Plaintiff does not identify the "white family" in question, although it is possible that he is referring to "the Molinari family," to which he makes reference elsewhere. (*See id.* at 20.) Additionally, in his Amended Complaint, Plaintiff refers to the Emancipation Proclamation, (*see id.* at 14); includes a quote about lynching, (*see id.*); and states that he was "stero-typed by [his] ethnicity; the information is in [Matveevskii's] office all she had to do was look," (Pl.'s Ex. 5, at 11). Plaintiff further states that "Ms. Matveevskii has problem dealing with people of color." (Pl.'s Ex. 7, at 2.) But nowhere does Plaintiff allege that he is actually asserting a race-based discrimination claim under any federal statute or other cause of action, an omission that stands in stark contrast to his myriad allegations that he is asserting disability-based discrimination claims under a variety of federal laws. Therefore, the Court does not interpret Plaintiff's Amended Complaint to assert a race-based discrimination claim. Should Plaintiff seek to assert such a claim in a subsequent version of his Amended Complaint, he may want to clarify and elaborate on the factual allegations that underpin it, or face the risk of dismissal for failure to state a claim.

The same holds true for any claims that Plaintiff may be attempting to assert under the Architectural Barriers Act, 42 U.S.C. §§ 4151–57, to which Plaintiff refers in conclusory fashion, (*see* Am. Compl. 7 ("The Architectural Barriers Act requires that buildings and facilities designed, constructed, altered, or leased with certain federal funds must be accessible to and useable by handicapped persons.  THA has not met the architectural barriers act."), as well as Executive Orders 12892, 12898, and 13217, and 24 C.F.R. §§100.300, 100.301, 100.302, 100.304, 100.305, 100.306, and 100.308, the text of which Plaintiff included in his Opposition, (*see* Pl.'s Opp., at Ex. B).

Plaintiff also references an event that he describes in the following manner:

On May 10, 2011 in the even[ing], three federal officers came directly to my apartment at 31 Midland Place, stating that a pet-filer was using my address for the pass 15 years.  I have been living here in THA for over 26, years and mother for about 16 years) about the same time I began standing up for my rights under the ADA laws and filed a claim with the Human Rights Commission after being told time after time I don't know what I am talking about)

When asked if they had informed the Tuckahoe Police Department me and my family was told; they were federal officers and did not have notified Tuckahoe Police Department.  The officers came armed with *GUNS showing; looking for a pet-filer? If this person is so damages; could you please explain why there is still not a poster posted on this pet-filer, as of this date 5/13/11 no posting in our building at 31 Midland Place about this so call pet-filer or on any polls on my block.  Again my apartment was the only one out of 137 unit*.

We were later told by Tuckahoe Police Department Chief that all pet-filer, must be first report to the Police Department.

The next the Tuckahoe Police Department Chief calls my mother and later told me that the call came from THA.

(Am. Compl. 24–25.)

Plaintiff does not "question the right [of] [Matveevskii] and [Zuckerman] . . . [to] send[] Federal Investigators' to [his] apartment," but he claims that he and his mother "should [have]

69

had some notice sent to [his] mother and [him] stating that [they] [were] under an Investigation

for some kind of Housing rules and regulations." (*Id.* at 16.)  Instead, "they knock on my sister

opens the door with three officers with guns out stating they didn't need a warrant and they came

from HUD looking for a pet-filer who has been living at this address for 16 years (Big miss

stake); all pet-filer must first be report to Tuckahoe Police Department.  They did not so after

they left my mother . . . called down to Tuckahoe Police Department, because now these HUD

Federal Investigators' were in violation of the village law." (*Id.*)  In another part of his

Amended Complaint, Plaintiff suggests the type of action that he might be attempting to assert in

connection with the federal investigators' alleged actions:

> As for Mr. Jeff Zuckerman and director Ms. Irene Matveevskii; my responsibility as a man is to protect my name, and stop people like Mr. Zuckerman and Ms. Matveevskii from Liable, SLANDER and with a large touch of DEFAMATION of character, these people sent FEDERAL INVESTIGATORS to my home.  Out of 99 Units it was only my apartment did they come to; looking for a pet-filer.  One thing went wrong with this action (Even if they had the right come to my apartment with guns out) they did not inform the Tuckahoe Police Department about the pet-filer. (The investigator Supervisor name is Stephen Perez) the phone call came from THA.

(*Id.* at 28.)

Plaintiff also cites to Section 228 of New York Public Service Law, N.Y. Pub. Serv. Law

§ 228, writing the following:

> A key fact the tenant's must be notified prior that any said party would be enter my apartment at 31 Midland Place . . . with a reasonable prior notice; Not any general un-Official notice put under every tenants door, and not on official THA paper heading paper; and never once referencing a pet-filer.  Under Public Service Law 228 THA abused their limited power and had NO right to harass my mother, Ms. Annie Logan Gunther, she 85 years old and myself as tenants of THA[.]

(Pl.'s Ex. 1, at 3.)

Thus, the best reading of Plaintiff's Amended Complaint is that he is asserting a cause of

action in relation to these alleged events not against the federal investigators for an illegal

search, nor even against the THA Defendants for causing an illegal search, but against the THA Defendants either for some type of privacy violation under Section 228, or for libel, slander, and defamation, which in either case would be based in state and not federal law.  However, should Plaintiff seek to assert causes of action against the federal investigators or the THA Defendants in connection with these alleged events under the Fourth Amendment of the United States Constitution or any other federal statute, he may amend his Complaint to do so.[16]

Lastly, Plaintiff alleges throughout his submissions that the THA Defendants denied him a "formal hearing."  (*See, e.g.*, Am. Compl. 5 ("FORMAL HEARING denial"); *id.* at 15 ("For-over the, passed three years, THA personnel have denial me a Fair Hearing for grievances."); *id.* at 19 ("But, a over site of 14 years of requesting handicap dwelling, after asking for a formal hearing; I have grievances against THA policies for not following the 24 CFR and the 2003 mandate section of 504.  In the pass 3 years I been applying for a formal hearing, but Mr. Jeff Zuckerman chairperson and the director Ms. Irene Matveevskii, have been denying a *formal hearing*."); *id.* at 28 ("Because in my response to Jeff Zuckerman, I clearly state that if what he said is the truth, then grant me a *formal hearing* which I am entitle to under the Tenant Right Guide under 24 CFR 8.3, WHICH STATES REGULATORY DEFINITION, and then we will see who's facts will stand the test of truth."); Pl.'s Ex. 5, at 11 ("I wrote the Broad of Commissioner and Ms. Irina Matveevskii Executive Director of THA requesting a Formal Hearing regarding the New HUD Community Program for residents . . . Which clearly exempt me from this program under article 15.4 of HUD Law."); Pl.'s Ex. 9, at 16–17 ("As far as the

---

[16] The Court does not, based on these allegations, understand Plaintiff to be asserting a cause of action against the THA Defendants or anyone else for retaliation under the disability statutes on which his Amended Complaint is based, given that Plaintiff does not claim to be doing so anywhere in his submissions.

meeting set on April 15, 2010 as you mentioned, it was not a formal hearing as requested.  A formal hearing was requested after being ignored and overlooked on several occasions.  As a tenant of the Tuckahoe Housing Authority, I exercised my rights to request a <u>formal hearing</u>, as of this date, I have not been given a formal hearing.  The word formal tends to be overlooked.”); Pl.’s Ex. 12, at 20 (“As per our conversation on April 20, 2011 on, or about 11:45 AM this morning, about THA practices concerning TENANT RIGHTS.  That deals with HUD and THA interpretation on FORMAL HEARING vs. informal hearing.  Our THA tenants are entitle to a fair hearing[.] Once a tenant files a formal complaint against THA in an official letter, requesting a FORMAL HEARING against the landlord of THA; five certified letters was sent in total to either the director or the board of commissioner.”).

However, it is unclear on what basis Plaintiff claims to have had a right to such a hearing in the first place, and what the subject of such a hearing would have been.  The only indication of the basis on which Plaintiff claims to have had such a right appears in Plaintiff’s assertion that he is entitled to a formal hearing “under the Tenant Right Guide under 24 CFR 8.3, WHICH STATES REGULATORY DEFINITION . . . .”  (*Id.* at 28.)  However, to the extent that THA’s Tenants’ Rights Guide confers substantive rights on THA tenants, Plaintiff does not explain why a cause of action asserted on the basis of an alleged breach of those rights would arise under federal law, instead of under a state law breach-of-contract theory, or in a proceeding under Article 78 of New York’s Civil Practice Laws and Rules.  The HUD regulation to which Plaintiff cites, 24 C.F.R. § 8.3, provides a list of definitions “used in this part” of the regulations, but does not mention formal or informal hearings or tenants’ rights guides at all.  *See* 24 C.F.R. § 8.3.

To the extent that Plaintiff believes that he has a cause of action against the THA Defendants or any other parties for their alleged denial of his requests for a formal hearing that

arises under federal law, he may amend his Complaint to explain the source of federal law that supposedly provides that right, as well as specify precisely when he requested such a formal hearing, to what subject such request related, and how the THA Defendants or other parties improperly denied his request. But until Plaintiff does so, the Court is unable to comprehend the nature of his claim. Therefore, any claim that Plaintiff is attempting to assert on the basis of the THA Defendants' alleged denial of his request for a formal hearing is dismissed without prejudice. *Cf. Marshall v. Nat'l Ass'n of Letter Carriers BR36*, No. 03-CV-1361, 2003 WL 22519869, at *5 (S.D.N.Y. Nov. 7, 2003) ("[The plaintiff's] claims involve his writing down legal terms, without supporting facts, that make no sense. The claims are vague and incomprehensible. Because a claim is frivolous when it is vague and incomprehensible, the Court can dismiss . . . [the plaintiff's] claims immediately." (citation, internal quotation marks, and alterations omitted)), *adopted by* 2004 WL 2202574 (S.D.N.Y. Sept. 30, 2004); *Berger v. Lowden*, No. 95-CV-7840, 1997 WL 170823, at *3 (S.D.N.Y. Apr. 10, 1997) (dismissing the plaintiff's claim where it was "so thoroughly incoherent that [the court had] difficulty determining the body of law that mandate[d] its dismissal").

B.  The HUD Defendants' Motion to Dismiss

1.  Construing Plaintiff's Claims

Although the main thrust of Plaintiff's Amended Complaint is directed at the THA Defendants, it also names the HUD Defendants, against whom Plaintiff appears to be attempting to assert claims for failing to investigate Matveevski's and Zuckerman's qualifications for their current positions and the reason why Matveevskii left her prior position, as well as allowing allegedly unqualified people to manage THA, (*see* Am. Compl. 16 ("Asking for an investigation of Ms. Irene Matveevskii the direct of THA qualifications, and why she left Greenburgh Housing

will not give out FOIL data other then she worked there for 11 months.  What is HUD hiding

from the Tenant of THA; everytime I asked I am being blocked by Mr. Jeff Zuckerman, or Mark

Kamensky?  Jeff Zuckerman; about Ms. Irene Matveevskii who's the director of THA don't

have the qualifications for a GS15 position.  She never took the tests that is a requirement, unless

someone from HUD gave out a waiver to Ms. Irene Matveevskii.")); *id.* at 18 ("I am doing this

for the betterment of mankind, by letting the court system know what is being done with the

handicap tenants at THA and the lack of qualified people running Public Housing (section

23) . . . .  I am willing to compare my background against both Mr. Zuckerman and Ms.

Matveevskii and day of the year.  Whatever, happen to the qualification of standard issue by

HUD for a level 15 position?")); Pl.'s Ex. 1, at 7 ("Not mention that I became disable because I

feel [sic] down a flight of your stair because of lack of qualified people that don't me your GS15

standard"); Pl.'s Ex. 2, at 1 ("You knew that Irene Matveevskii was leaving Greenburgh Housing

under the cover of discrimination and you place her at THA with weak back ground."); Pl.'s Ex.

2, at 1 ("The last two directors before just before Irene Matveevskii only had High School

educational background before holding down a GS 15 position with HUD NO experience in the

public sector.  NO one down there at 16 federal Plaza investigate directors' any more before

allowing then too hold a director position?"); for failing to adequately investigate, monitor, and

supervise how THA is managed, (*see* Pl.'s Ex. 1, at 7 ("You investigate or monitor the program

if you did just maybe the director of THA would had not thrown away 5 certified letter requested

a grievance fair hearing against THA back on 4/14/10 or the letter from 3/7/10 about your Title

II program that went in effect on 1/26/1992 for starter."); Pl.'s Ex. 2, at 1 ("After the audit where

was the follow up on THA activities?  Or were you part of the deceit and deception game that

Tuckahoe director seem to able to play on HUD director for Westchester County."); for failing

to respond to communications that Plaintiff sent to HUD, (*see* Pl.'s Ex. 1, at 15 ("I sent you a 46 page fax that outline the problems that I was having.  I just might be one voice crying in the wilderness.  The problems are real."); Pl.'s Ex. 2, at 1 ("I sent you about 30 pages of information where did it go Ms. Moral?"); Pl.'s Ex. 12, at 20 ("I am asking you Ms. Mirza Negron Morales, for some clarity about rules that deals with a FAIR HRARING for HUD HOUSING under section 23 for tenants."); and for allowing whatever violations the THA Defendants allegedly committed to happen, (*see* Am. Compl. 17 ("My thoughts for the above actions, That HUD Must be included into, because the buck, either stops at HUD, or in your courtroom."); Pl.'s Ex. 1, at 3 (naming the "[e]ntity" about which Plaintiff is complaining as "HUD (for allowing this to happen[)]"); *id.* at 7 ("You are the boss of HUD at 26 Federal Plaza in NYC.  The buck stop at your desk.").

Plaintiff's claims against the HUD Defendants are thus most charitably construed as claims for negligent hiring, negligent supervision, negligent investigation, and general negligence, all of which sound in tort, and all of which are therefore governed by the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), and 2671–2680 ("the FTCA").  *See Junior v. City of New York Hous. Pres. & Dev. Corp.*, No. 12-CV-3846, 2013 WL 646464, at *3 (S.D.N.Y. Jan. 18, 2013) ("Plaintiffs seek a declaration to the effect that HUD has been negligent in its training and supervision of [the City of New York and the New York City Department of Housing Preservation and Development] . . . .  Even though Plaintiffs do not specifically invoke the FTCA, claims asserting negligent supervision against a federal agency have been construed as tort actions analyzed under the FTCA.  There is no reason not to treat Plaintiffs' negligent supervision claim as a tort claim to which the FTCA would apply." (citations and internal quotation marks omitted)); *Hunt v. Delvecchio*, No. 10-CV-686, 2010 WL

2948573, at *4–5 (N.D.N.Y. July 1, 2010) ("Plaintiff in this case seems to claim that HUD and the individual HUD defendants failed to investigate plaintiff's . . . complaint.  Plaintiff alleges that in his complaint to HUD, he raised claims of housing discrimination and misappropriation of government funding. . . .  To the extent that plaintiff's claims of failure to investigate may sound in tort, the exclusive remedy for tort claims against the United States is the Federal Tort Claims Act. . . ."), *report and recommendation adopted*, 2010 WL 2948148 (N.D.N.Y. July 22, 2010); *Hallowell v. United States*, No. 06-CV-412, 2007 WL 708634, at *1 (D. Conn. Feb. 25, 2007) (construing as tort claims governed by the FTCA the plaintiff's claims "that an employee of [HUD] had failed to properly investigate her complaint of discriminatory housing practices"); *K.P.M. Corp. v. U.S. Dep't of Hous. & Urban Dev.*, No. 86-CV-4089, 1987 WL 16039, at *2 (E.D. Pa. Aug. 21, 1987) (construing as tort claims governed by the FTCA the plaintiff's allegations "that defendant HUD . . . negligently monitored the Philadelphia Housing Authority," "that HUD was negligent in its lack of competent supervision over the Philadelphia Housing Authority," "that defendant HUD negligently supervised the Philadelphia Housing Authority's contract funded by defendant HUD with plaintiff," and "that HUD breached its duty to monitor and oversee the renovation work performed at the Schuylkill Falls Housing Project" (alteration in original) (internal quotation marks and emphasis omitted)).

### 2.  Standard of Review

#### a.  Rule 12(b)(1) of the Federal Rules of Civil Procedure

The HUD Defendants move to dismiss Plaintiff's Amended Complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  (*See* HUD Defs.' Mem. 6–9.)[17]  "A federal

---

[17] The HUD Defendants also move to dismiss Plaintiff's Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (*See* HUD Defs.' Mem. 12–13.)  However, the

court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, — F. Supp. 2d —, 2014 WL 2475608, at *5 (E.D.N.Y. June 3, 2014) (internal quotation marks omitted) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *vacated and superseded on reh'g on other grounds*, 585 F.3d 559 (2d Cir. 2009) (en banc)).  "Determining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also N.Y. State Citizens' Coal. for Children v. Carrion*, — F. Supp. 2d —, 2014 WL 3545295, at *3 (E.D.N.Y. July 17, 2014) (same).  While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alterations and internal quotation marks omitted); *see also Ray Legal Consulting Grp. v. Gray*, — F. Supp. 2d —, 2014 WL 3891356, at *5 (S.D.N.Y. Aug. 8, 2014) ("[W]here subject matter jurisdiction is contested a

---

Court need not address that argument because, as discussed below, it finds that it lacks subject-matter jurisdiction over Plaintiff's claims.  *See Li v. I.N.S.*, No. 00-CV-7868, 2003 WL 102813, at *3 (S.D.N.Y. Jan. 10, 2003) (declining to reach the defendant's argument that the petitioner failed to state a claim upon which relief could be granted under Rule 12(b)(6) because the court first determined that subject-matter jurisdiction was lacking under Rule 12(b)(1)).

district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

As was true in the context of analyzing the THA Defendants' Motion for Summary Judgment, here, because Plaintiff proceeds pro se, the Court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]," *Sykes*, 723 F.3d at 403, although "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law," *Bell*, 980 F. Supp. 2d at 559. *See Thompson v. Ocwen Fin. Corp.*, No. 13-CV-386, 2013 WL 4522504, at *3 (D. Conn. Aug. 27, 2013) ("On a 12(b)(1) motion, the court interprets submissions by a *pro se* plaintiff to raise the strongest arguments that they suggest." (internal quotation marks omitted)); *Jones v. Dep't of Hous. Pres. & Dev.*, No. 06-CV-2085, 2007 WL 582751, at *1–2 (S.D.N.Y. Feb. 22, 2007) (applying the "liberal standard accorded to *pro se* pleadings" in the context of a motion to dismiss for lack of subject matter jurisdiction brought pursuant to Rule 12(b)(1)).

### b. The Federal Tort Claims Act

"The Federal Tort Claims Act . . . provides that a suit against the United States is the exclusive remedy for a suit for damages for injury resulting from the negligent or wrongful act or omissions of any employee of the Government while acting within the scope of his office or employment." *Bearam v. Sommer*, No. 12-CV-1858, 2013 WL 5405492, at *8 (S.D.N.Y. Sept. 25, 2013) (internal quotation marks omitted) (citing, *inter alia*, 28 U.S.C. § 2679(b)(1)); *see also Finley v. Hersh*, No. 12-CV-162, 2013 WL 3450270, at *7 (D. Vt. July 9, 2013) ("As to [the plaintiff's] tort claims, his exclusive remedy for monetary damages against the United States is under the Federal Tort Claims Act.").

The FTCA also states that, "[u]pon certification by the Attorney General of the United States that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose," "the United States shall be substituted as the party defendant" "in any civil action or proceeding." 28 U.S.C. § 2679(d)(1); *see also Qian Jin Lin v. Anderson*, No. 12-CV-451, 2013 WL 3776249, at *3 (S.D.N.Y. July 18, 2013) ("[U]nder the FTCA, . . . the United States must be substituted as the proper party upon certification by the Attorney General that the defendants were acting within the scope of their office or employment at the time the claim arose." (internal quotation marks omitted)). "Nonetheless, in the absence of a certification by the Attorney General, the statute permits the court to certify." *B & A Marine Co. v. Am. Foreign Shipping Co.*, 23 F.3d 709, 715 (2d Cir. 1994) (citing 28 U.S.C. § 2679(d)(3)); *see also Ford v. Spears*, No. 10-CV-1314, 2012 WL 4481739, at *5 n.4 (E.D.N.Y. Sept. 27, 2012) ("The FTCA . . . permits the court to certify that a federal employee was acting within the scope of his employment in the absence of a certification by the Attorney General." (internal quotation marks omitted)); *Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 371 (E.D.N.Y. 2005) (same).  A court may do so if "the employee . . . at any time before trial petition[s] the court to find and certify that the employee was acting within the scope of his office or employment." 28 U.S.C. § 2679(d)(3); *see also B & A Marine Co.*, 23 F.3d at 715 n.4 (same); *Bamba v. U.S. Dep't of Homeland Sec.*, No. 11-CV-7466, 2012 WL 3020034, at *4 (S.D.N.Y. July 24, 2012) ("Upon a petition by a defendant federal employee, a court may substitute the United States for the defendant employee if the court finds that the employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose."), *aff'd*, 533 F. App'x 33 (2d Cir. 2013).  "A brief on behalf of the named defendants may serve as such a petition." *Bamba*, 2012 WL 3020034, at *4; *see also B & A*

*Marine Co.*, 23 F.3d at 715 n.4 ("[T]he brief filed by [the employees asking the court to find and certify that they were acting within the scope of their office or employment] [c]ould serve as the 'petition.'"); *Fiore v. Medina*, No. 11-CV-2264, 2012 WL 4767143, at *6 (S.D.N.Y. Sept. 27, 2012) (treating the defendants' "opening brief [as] . . . a petition to certify that the [i]ndividual [d]efendants were employees acting within the scope of their employment at the time of the incidents alleged in the [c]omplaint"); *Tsitrin v. Jacobs*, No. 12-CV-1411, 2012 WL 1267982, at *3 (S.D.N.Y. Apr. 10, 2012) ("Defendants' opposition to the motion to remand functions as a petition for certification of the scope of defendants' employment under 28 U.S.C. § 2679(d)(3) . . . ."); *Zandstra v. Cross*, No. 10-CV-5143, 2012 WL 383854, at *3 (S.D.N.Y. Feb. 6, 2012) ("A brief on behalf of the named defendants may serve as such a petition."); *Cates v. Williams*, No. 08-CV-1529, 2009 WL 723021, at *5 (S.D.N.Y. Mar. 19, 2009) (same), *aff'd sub nom. Cates v. Potter*, 363 F. App'x 822 (2d Cir. 2010).

The FTCA further provides that, "[b]efore instituting a claim against the United States for money damages for injury caused by the negligent or wrongful act or omission of any employee of the Government, a claimant must have first presented the claim to the appropriate federal agency and his claim shall have been finally denied by the agency in writing, or the agency must have failed to dispose of a claimant's claim within six months after it was filed." *Bearam*, 2013 WL 5405492, at *9 (internal quotation marks omitted) (quoting, *inter alia*, 28 U.S.C. § 2675(a)); *see also Freitas v. Cooper*, No. 13-CV-4566, 2014 WL 494525, at *3 (S.D.N.Y. Feb. 5, 2014) ("[T]he FTCA requires that a claimant exhaust all administrative remedies before filing a complaint. The claimant must first present the claim to the appropriate federal agency within two years of the date the claim accrued and can only initiate his or her lawsuit once the claim has been denied by the agency (or if the agency has failed to make a

80

decision within six months after the claim was filed." (alterations and internal quotation marks omitted)).

Because the FTCA's exhaustion requirement is "jurisdictional and cannot be waived," *Bearam*, 2013 WL 5405492, at *9 (internal quotation marks omitted); *see also Freitas*, 2014 WL 494525, at *3 (noting that "the FTCA exhaustion requirement is jurisdictional and cannot be waived" (internal quotation marks omitted)), courts regularly dismiss tort claims governed by the FTCA for lack of jurisdiction where a plaintiff has not exhausted the requisite administrative remedies before the complaint in which the claims are asserted was filed, *see, e.g., Saleh v. Holder*, 470 F. App'x 43, 44 (2d Cir. 2012) ("The district court correctly determined that it lacked subject matter jurisdiction over [the plaintiff's] claims because he had not exhausted his administrative remedies prior to filing his initial district court complaint."); *Qian Jin Lin*, 2013 WL 3776249, at *4 ("Plaintiff's failure to exhaust her administrative remedies prior to bringing suit deprives the Court of jurisdiction over her FTCA claims.").

This rule applies equally even where a plaintiff has presented a claim to the relevant agency after the filing of the complaint in the district court, but before the district court has ruled on a defendant's motion to dismiss that complaint. *See, e.g., Gonzalez v. Fallon*, No. 98-CV-3505, 1998 WL 879692, at *3 (S.D.N.Y. Dec. 16, 1998) ("[E]ven if plaintiffs did submit the form [after they filed their complaint], and the [federal agency] failed to respond [within six months]—a delay that would be treated as a final denial under the statute—the present action could not proceed. By its terms, the statute states that an action against the United States *shall not be instituted* unless the claimant shall have *first* presented the claim to the appropriate Federal agency and his claim shall have been finally denied. Satisfaction of this provision is an

absolute prerequisite to this court's subject matter jurisdiction, and cannot be waived."
(alterations, citations, and internal quotation marks omitted)).

### 3. Analysis

As an initial matter, as per the request of the HUD Defendants, (*see* HUD Defs.' Mem.
5), and as required by the FTCA, (*see* 28 U.S.C. § 2679(d)(1), (3)), the United States is hereby
substituted as the party defendant for the HUD Defendants.  The HUD Defendants "intend[] for
[the] [M]emorandum of [L]aw" that they submitted in support of their Motion To Dismiss "to
serve as a petition to certify that [the HUD] [D]efendants were employees . . . acting within the
scope of their employment" at the time of the incident out of which the claim arose, (*see* HUD
Defs.' Mem. 5 n.4), and the law permits their Memorandum of Law to serve that function, *see*
*B & A Marine Co.*, 23 F.3d at 715 n.4; *Fiore*, 2012 WL 4767143, at *6; *Bamba*, 2012 WL
3020034, at *4; *Tsitrin*, 2012 WL 1267982, at *3; *Zandstra*, 2012 WL 383854, at *3; *Cates*,
2009 WL 723021, at *5.  Plaintiff has not challenged that the HUD Defendants were acting
within the scope of their employment in his Opposition or anywhere else in his submissions.
Indeed, as described above, Plaintiff's allegations against the HUD Defendants seem to depend
on the fact that they were.  Thus, because "Plaintiff's allegations against the [HUD] Defendants
are consistent with the representations in [the HUD Defendants' Memorandum of Law], . . . the
United States must be substituted as the Defendant with respect to Plaintiff's FTCA claims."
*Fiore*, 2012 WL 4767143, at *6; *cf. Cates*, 2009 WL 723021, at *5 ("[T]he [d]efendants' brief
maintains that, as federal employees, the [e]mployee [d]efendants are immune from suit under
the [FTCA], and the pleadings make clear that the [e]mployee [d]efendants are [government]
human resources employees who are sued for personnel decisions.  Consequently, the United
States must be substituted as the party defendant . . . ." (citation omitted)).

Having substituted the United States as the proper Defendant, the Court finds that any tort claims against the United States that Plaintiff is attempting to assert must be dismissed for lack of jurisdiction.  The HUD Defendants have submitted a declaration demonstrating that Plaintiff first attempted to submit a claim to HUD related to the Amended Complaint's allegations on November 16, 2012.  (*See* HUD Defs.' Decl. in Supp. of Their Mot. to Dismiss ("Hud Defs.' Decl.") ¶ 3 ("A review of the files in my office shows that on or about November 16, 2012, we received a packet of materials from Thomas Logan, which was comprised of a partially completed SF-95 Claim for Damage, Injury, or Death (including handwritten notations on the back of page 1), and approximately 70 pages of accompanying material, all of which concerned the Tuckahoe Housing Authority.").  The HUD Defendants provided the Court with a copy of Plaintiff's submission.  (*See id.* at Ex. A.)  Plaintiff has not expressly challenged the HUD Defendants' declaration in his Opposition, nor is there anything in Plaintiff's Amended Complaint or Opposition to the contrary.  As noted above, Plaintiff filed his Amended Complaint naming the HUD Defendants on January 31, 2012—approximately ten-and-a-half months *before* he first attempted to submit a claim to HUD.  (*See* Dkt. No. 21.)

Accordingly, Plaintiff's claims against the United States are dismissed without prejudice, as he failed to "*first* present[] [his] claim to the appropriate Federal agency" before filing his Amended Complaint.  28 U.S.C. § 2675(a) (emphasis added); *see also Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999) ("Unless a plaintiff complies with [the exhaustion] requirement, a district court lacks subject matter jurisdiction over a plaintiff's FTCA claim."); *Done v. Wells Fargo, N.A.*, No. 12-CV-4296, 2013 WL 3785627, at *5 (E.D.N.Y. July 18, 2013) ("As a prerequisite to bringing a FTCA claim in federal court, a plaintiff is required to first exhaust the claim before the appropriate federal agency.  This requirement is jurisdictional."

(citation omitted)). Because Plaintiff did not attempt to submit a claim to HUD before filing his Amended Complaint, the Court does not reach the question of whether Plaintiff's submission to HUD was sufficient to constitute the type of "claim" that the FTCA requires, or the question of whether HUD has "finally denied" his claim within the meaning of the FTCA. *See* 28 U.S.C. § 2675(a). However, should Plaintiff seek to assert the same tort-based causes of action against the United States in any subsequent Amended Complaint that he might file, he would do well to consider any potential deficiencies with his November 16, 2012 submission to HUD that the HUD Defendants identified in their Memorandum of Law. (*See* HUD Defs.' Mem. 8–9.)

### C. Plaintiff's Remaining State Law Claims

The Court has granted summary judgment to the THA Defendants on Plaintiff's FHA, ADA, and Rehabilitation Act reasonable-accommodation claims; granted the HUD Defendants' Motion To Dismiss all tort claims asserted against them on the basis of Plaintiff's failure to exhaust his administrative remedies prior to filing his Amended Complaint; and dismissed without prejudice any other federal causes of action that Plaintiff may be attempting to assert, for a variety of reasons described above. This leaves only Plaintiff's state law claims, which are scattered across his submissions, and which appear to be based on theories of defamation, slander, or libel, as well as breach of contract.

"[A] district court[] may decline to exercise supplemental jurisdiction over" related state-law claims that form part of the same case or controversy under Article III of the United States Constitution "if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity in deciding whether to exercise jurisdiction." *Kolari v. New York-Presbyterian Hosp.*,

455 F.3d 118, 122 (2d Cir. 2006) (citation and internal quotation marks omitted) (quoting

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "In weighing these factors, the

district court is aided by the Supreme Court's . . . guidance . . . that in the usual case in which all

federal-law claims are eliminated before trial, the balance of factors will point toward declining

to exercise jurisdiction over the remaining state-law claims."  *Id.* (alterations and internal

quotation marks omitted) (quoting *Cohill*, 484 U.S. at 350 n.7).  Here, none of the factors that

the Supreme Court enunciated in *Cohill*—"judicial economy, convenience, fairness, [or]

comity"—militate against such dismissal, and there is no reason to believe that this is not

otherwise a "usual case in which all federal-law claims are eliminated before trial."  *Id.*

Accordingly, Plaintiff's remaining state law claims are dismissed without prejudice.

## III.  CONCLUSION

For the foregoing reasons, the THA Defendants' Motion for Summary Judgment is

granted as to Plaintiff's reasonable-accommodation claims under the FHA, the ADA, and the

Rehabilitation Act.  Any other claims that Plaintiff may be attempting to assert against the THA

Defendants are dismissed without prejudice, for the reasons set forth in this Opinion.

Additionally, the HUD Defendants' Motion To Dismiss is also granted.  Any claims that

Plaintiff may be attempting to assert against the United States, as the party properly substituted

for the HUD Defendants pursuant to the FTCA, are dismissed without prejudice.

Plaintiff may file a Second Amended Complaint within 30 days of the issuance of this

Opinion, which Complaint may address the deficiencies that the Court has identified.  Given that

the Court has already granted Plaintiff leave to file an Amended Complaint once, and that the

Court has granted summary judgment on the claims that appear to have been at the heart of

Plaintiff's Amended Complaint, should Plaintiff fail to file a Second Amended Complaint within

30 days of the issuance of this Opinion, or should whatever claims Plaintiff chooses to assert in a Second Amended Complaint be deficient for the same reasons described in this Opinion, the Court may dismiss any federal claims that Plaintiff asserts with prejudice. *See McGee v. Pallito*, No. 10-CV-11, 2014 WL 360289, at *12 (D. Vt. Feb. 3, 2014) (noting that "[t]he Second Circuit has cautioned that district courts should not dismiss *pro se* complaints with prejudice without granting leave to amend *at least once*" (emphasis added)); *Duren v. Cnty. of Nassau*, No. 12-CV-298, 2013 WL 5406443, at *2 (E.D.N.Y. Sept. 23, 2013) (dismissing pro se plaintiff's second amended complaint with prejudice).

Additionally, should Plaintiff choose to file a Second Amended Complaint, he is respectfully requested to clearly state the sources of law on which the claims that he asserts therein are based, and to limit his factual allegations to a reasonable length. While the Court will not impose a page limit, Plaintiff should keep in mind that Rule 8 of the Federal Rules of Civil Procedure requires only "a *short* and *plain* statement of the grounds for the court's jurisdiction," "a *short* and *plain* statement of the claim showing that the pleader is entitled to relief," and "a demand for the relief sought," Fed. R. Civ. P. 8 (emphasis added), and that the Second Circuit has suggested that a district court has the "power to dismiss a . . . complaint without leave to amend . . . where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible," *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *see also Fisch v. Consulate Gen. of Republic of Poland*, Nos. 11-CV-4182, 11-CV-4183, 2011 WL 3847398, at *2 (S.D.N.Y. Aug. 30, 2011) (noting that "prolix, unintelligible, speculative complaints that are argumentative, disjointed and needlessly ramble have routinely been dismissed in [the Second] Circuit" (internal quotation marks omitted)).

86

Should Plaintiff choose to file a Second Amended Complaint, Defendants will be given 20 days either to answer the operative complaint or to file a pre-motion letter. The Clerk of the Court is respectfully directed to terminate the pending Motions. (*See* Dkt. Nos. 56, 61.)

SO ORDERED.

Dated:        September 29, 2014
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE