UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS LOGAN,

              Plaintiff,

      -v-

IRINA MATVEEVSKII, TUCKAHOE HOUSING
AUTHORITY, TUCKAHOE HOUSING
AUTHORITY BOARD OF COMMISSIONERS,
MARK KAMENSKY, JEFF ZUCKERMAN,
ADOLPHO ORRIOL, and MIRZA ORRIOL,

          Defendants.

Case No. 10-CV-9247 (KMK)

OPINION & ORDER

Appearances:

Thomas Logan
Tuckahoe, NY
*Pro Se*

Joan M. Gilbride, Esq.
Kaufman, Borgeest & Ryan, LLP
New York, NY
*Counsel for Defendants Irena Matveevskii, Tuckahoe Housing Authority, Jeff Zuckerman, and
Mark Kamensky*[1]

KENNETH M. KARAS, District Judge:

      Pro se plaintiff Thomas Logan ("Plaintiff") brings the instant lawsuit alleging various

causes of action against defendants Irina Matveevskii ("Matveevskii"), Tuckahoe Housing

Authority ("THA"), Tuckahoe Housing Authority Board of Commissioners, Mark Kamensky

---

[1] The Clerk of Court is respectfully requested to update the docket to reflect that Ms. Gilbride also represents Defendants Jeff Zuckerman and Mark Kamensky.  (*See* Dkt. No. 23.)

("Kamensky"), and Jeff Zuckerman ("Zuckerman") (collectively, "Defendants").[2]  Defendants

have moved to dismiss the Third Amended Complaint.  For the reasons that follow, Defendants'

Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from Plaintiff's Third Amended Complaint and, for

purposes of this Motion, are accepted as true.  Plaintiff currently resides at 31 Midland Place,

Apartment 3D, in Tuckahoe, New York.  (Third Am. Compl. ("TAC") ¶ 1 (Dkt. No. 104).)  The

THA, which was incorporated in 1938 as a not-for-profit public corporation, and is charged with

providing affordable housing for low-income families, owns and operates a four-building

complex called Sanford Gardens, as well as a single-building complex called Jefferson Gardens.

(*Id*, at unnumbered 1 ¶ 2.)  In addition, THA administers 175 Section 8 housing choice vouchers,

and receives funding under the "capital fund" program.  (*Id.*, at unnumbered 1 ¶ 2.)[3]  According

---

[2] The docket also includes as defendants Adolpho Orriol and Mirza Orrioli, (*see* Dkt.),
and the Second Amended Complaint—but not the Third—includes as defendants "Adolofo
Carrion" and "Mirza Orriol (A.K.A. Mirzal Negron Morales)," (*compare* Dkt. No. 100, *with* Dkt.
No. 104).  However, in light of (1) the letter from counsel to former Department of Housing and
Urban Development ("HUD") director Adolfo Carrión and HUD Deputy Regional Administrator
Mirza Orriols noting their apparent omission from the Third Amended Complaint, (*see* Dkt. No.
106), and (2) the lack of any allegations relating to these Defendants in the Third Amended
Complaint, the Court believes Plaintiff did not intend to include them as Defendants.  In any
event, because the Third Amended Complaint does not assert any allegations against them, they
are dismissed.  *See Clarke v. Flushing Manor Care Ctr.*, No. 02-CV-3079, 2009 WL 2136385, at
*1 n.1 (S.D.N.Y. July 17, 2009) (dismissing a named defendant where "[the] complaint ma[de]
no allegations about how th[at] [defendant] was liable to [the plaintiff].")  It is of no moment that
the Second Amended Complaint mentioned them because "[i]t is well established that an
amended complaint ordinarily supersedes the original and renders it of no legal effect."  *Int'l
Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977); *see also Myers v. New York*, No. 14-
CV-1492, 2016 WL 538470, at *1 n.2 (N.D.N.Y. Feb. 9, 2016) (same).

[3] "The housing choice voucher program is the federal government's major program for
assisting very low-income families, the elderly, and the disabled to afford decent, safe, and

to Plaintiff, he contracted with the THA to reside in his current apartment on October 1, 1981, although the Parties had earlier signed a contract stating the terms of the rental agreement lease under the Section 8 housing program in March 1981.  (*Id.*, at unnumbered 1 ¶¶ 3–4; *see also id.*, at unnumbered 8 ¶¶ 1–2.)[4]

### 1.  Plaintiff's Quest for Reasonable Accommodations

According to Plaintiff, on March 27, 1996, Plaintiff made a written request for a larger apartment to the THA's then-acting Executive Director.  (*See id.*, at unnumbered 2 ¶ 5.)  The THA responded that Plaintiff's family composition did not warrant a two-bedroom unit like the one that he currently lived in, but that he would be relocated to the first one-bedroom unit to accommodate his family status.  (*Id.*)  Roughly a year and a half later, on October 30, 1997, Plaintiff received a letter from the Social Security Administration indicating that he was disabled.  (*Id.*, at unnumbered 2 ¶ 6.)

Additionally, on approximately June 19, 2008, according to Plaintiff, the THA was reported to Department of Housing and Urban Development ("HUD") for non-compliance for failing to adequately administer its low-rent program.  (*See id.*, at unnumbered 2 ¶ 7; *id.*, at unnumbered 8 ¶ 4.)  "Within . . . this complaint[,] it was found that THA was cited with non-compliance with the Regulations at 24 [C.F.R.] Part 8[,] implementing the provisions of Section 504 of the Rehabilitation Act of 1973 that require[] that Public Housing maintain a minimum

---

sanitary housing in the private market."  U.S. Dep't of Hous. & Urban Dev., *Housing Choice Vouchers Fact Sheet*, http://portal.hud.gov/hudportal/HUD?src=/topics/housing_choice_voucher_program_section_8 (last visited March 21, 2016).

[4] Here and elsewhere, Plaintiff refers to "Defendant."  (*See* TAC, at unnumbered 1 ¶ 3.)  Because Plaintiff says early on in his TAC that "Defendant is the Tuckahoe Housing Authority," (*see id.*, at unnumbered 1 ¶ 2), despite the fact that Plaintiff has, in fact, sued multiple defendants, this Opinion will assume that such references are properly understand as alluding to the THA.

number of units as handicap[] accessible."  (*Id.*, at unnumbered 2 ¶ 7; *see also id.*, at unnumbered 8–9 ¶ 4)  In addition, the THA was "noted to be in non-compliance with the admission policy under HUD regulations 24 CFR 960.206[](b)(2)[] that requires that applicants for low-rent housing units be given working family preference if the head of household and spouse or sole member is age 62 or older or is a person with disabilities."  (*Id.*, at unnumbered 2 ¶ 7; *id.*, at unnumbered 8–9 ¶ 4.)  Despite such regulations, according to Plaintiff, the THA did not extend this preference to disabled persons, giving preference instead to working, non-disabled applicants.  (*Id.*, at unnumbered 2 ¶ 7; *see also id.*, at unnumbered 9 ¶ 4.)

On or about August 7, 2008, Plaintiff emailed Matveevskii, "describing [his] needs and concerns" as a disabled tenant with a heart condition and a third-floor apartment, to ask for a "reasonable accommodation" for a first-floor apartment at either 31 Midland Place or 25 Midland Place.  (*Id.*, at unnumbered 2 ¶ 8.)  Plaintiff's request allegedly went "unanswered and ignored."  (*Id.*)

On or about March 3, 2010, Plaintiff received a letter from the THA indicating that his rent would be increased from $473 to $527.  (*Id.*, at unnumbered 3 ¶ 9.)  Around the same time, Plaintiff "requested reasonable accommodations under the Fair Housing Act" to be moved to a lower floor apartment at either 31 Midland Place or 25 Midland Place.  (*Id.*, at unnumbered 3 ¶ 10.)  Additionally, Plaintiff requested a formal hearing to "discuss the delay in providing his reasonable accommodation request," (*id.*), a request apparently acknowledged on July 30, 2014, (*see id.*, at unnumbered 7 ¶ 32).[5]  The request for a reasonable accommodation was again ignored.  (*See id.*, at unnumbered 3 ¶ 10.)  Approximately two weeks later, Plaintiff sent a letter

---

[5] More specifically, Plaintiff alleges that "[o]n or about July 30, 2014, Defendant's attorney Mr. Kamensky initially acknowledged the request of Plaintiff for a 'formal hearing' (4 years later) as requested in Item 9 [sic] of this complaint."  (*See* TAC at unnumbered 7 ¶ 32.)

to the THA "Board of Commissioners" and Matveevskii reiterating his earlier requests and asking why he had been overlooked when an apartment in one of the units he requested became available.  (*Id.*, at unnumbered 3 ¶ 11.)

On approximately May 12, 2010, Plaintiff learned that the certified letters he sent to the "Board of [D]irectors" had "never [been] forwarded to them," despite having signed receipts indicating they were delivered.  (*Id.*, at unnumbered 3 ¶ 12.)  Accordingly, as apparently described in a police report, he "slapped . . . down" the letters on the table, and Matveevskii, concerned for her safety, called the Tuckahoe Police Department, which was dispatched to 4 Union Place as a result.  (*See id.* (internal quotation marks omitted).)

Throughout the coming months, Plaintiff's submissions relating to his desire to be relocated to a new apartment continued: On October 25, 2010, Plaintiff's orthopedic doctor, Dr. Rozbruch, sent a letter to the THA requesting a "reasonable accommodation," which was allegedly ignored.  (*Id.*, at unnumbered 3 ¶ 13 (internal quotation marks omitted).)  On approximately December 2, 2010, Plaintiff filed a complaint against Matveevskii and the THA. (*Id.*, at unnumbered 4 ¶ 14.)  On April 2, 2011, Plaintiff "requested a FOIA to the Tuckahoe Police Department for a copy of the Police Report where[,] during a [t]enants['] meeting[,] Ms. Matveevskii called 911 to report that Plaintiff was attending the THA tenants meetings with a 'gang' of people coming at her."  (*Id.*, at unnumbered 4  ¶ 15.)

On approximately July 14, 2011, the THA proposed two offers of what it felt would be "an appropriate accommodation to show a 'good faith' offer for a 'reasonable accommodation,'" but which were inappropriate as "the unit locations [would] place [Plaintiff's] disabled mother and [Plaintiff] in further physical harm," and, as a result, Plaintiff declined the offers based on concern for their physical safety.  (*Id.*, at unnumbered 5 ¶ 18.)  That request was followed up by

a "fraudulent offer" for a unit in 31 Midland Place that was not available for immediate occupancy. (*Id.*, at unnumbered 5 ¶ 19.)

### 2.  The THA's Alleged Acts of Aggression Towards Plaintiff

On approximately May 10, 2011, Defendants allegedly reported Plaintiff to the "Department of Housing," indicating that "Plaintiff was housing a pedophile." (*Id.*, at unnumbered 4 ¶ 16.)  As a result, three HUD officers entered Plaintiff's apartment "on the pretense that a pedophile had been living at [his] address for the past 15 years." (*Id.*)  Plaintiff gave the officers—who had their guns drawn—permission to search the apartment, and the officers showed Plaintiff and his mother a picture of the person for whom they were looking. (*Id.*)  Neither Plaintiff nor his mother recognized the person. (*Id.*)  After the officers finished their search, Plaintiff asked how they came to believe that a pedophile was living at the address. (*Id.*)  The officers told Plaintiff that someone had called the HUD office from the THA and informed them so. (*Id.*)  Plaintiff also called Chief Constanza at the Tuckahoe Police Department, who confirmed for Plaintiff that the call came from the THA. (*Id.*)  At the time the call was placed, Plaintiff and Matveevskii were "in a law[]suit . . . with the Human Rights Commissioner of Westchester . . . regarding violations of Tenants rights." (*Id.*)

Approximately a week later, on or about May 18, 2011, Zuckerman, the Chairman of the Board of Commissioners for the THA, wrote a letter to Plaintiff's sister, the substance of which seemed to be that Zuckerman was pressured by others to seek her resignation from some organization affiliated with the THA in light of the perception that Plaintiff's family had been "stealing extraordinary sums of money."[6]  (*Id.*, at unnumbered 4–5 ¶ 17.)

---

[6] Plaintiff's allegation, which is unclear, reads:

### 3.  Lease Terminations and Plaintiff's Search for a New Apartment

On November 4, 2011, THA, or its representatives, "terminated [Plaintiff's] lease without 'good cause,'" and, the same day, refused a request that Plaintiff's brother, John Gunther, be permitted to reside in Plaintiff's apartment to look after John Gunther's 83-year-old disabled mother, Anne Gunther, who lived in the unit, while Plaintiff was "going to be in the hospital for an undisclosed period of time." (*Id.*, at unnumbered 5 ¶¶ 20–21.)[7]  Two months later, Plaintiff was served "an affidavit for [e]viction" by Matveevskii and Zuckerman, albeit in a manner that Plaintiff considers to be out of accord with certain legal requirements. (*See id.*, at unnumbered 5 ¶ 22.)  "On or about January 4, 2012[,] Mr. Zuckerman admitted on the affidavit that he had been stalking . . . Plaintiff['']s brother John Gunther the entire year of 2011 for the purpose of the affidavit of eviction." (*Id.*, at unnumbered 6 ¶ 23.)

In spring 2012, Plaintiff apparently corresponded with Defendants' counsel about his housing options.  On or about April 3, 2012, Plaintiff sent a letter to Defendants' attorney, Mr. Leo ("Leo"), requesting a copy of the "breakdown of his rent calculations" and to be issued a new lease.  (*Id.*, at unnumbered 6 ¶ 24.)  Around that same time, Leo sent Plaintiff an offer for the unit at 31 Midland Place, Apt. 1D, and Leo further "advised [Plaintiff] that the Unit at 31

---

On or about May 18, 2011[,] Defendant (Zuckerman, Chairman of the Board of Commissioners for the THA) wrote a letter to Trudy, Plaintiff's sister questioning her ability to contribute to "our Board and the THA."  Zuckerman stated that he has been deluged by members of the community as well as Board members to seek her resignation because you (Trudy) "had to have known" that your family members were stealing extraordinary sums of money, while other residents are legally paying their rents required by law.  These people find it more than a little uncomfortable having you now "represent" their interests . . . .  This letter continues to "bad mouth" Trudy and Plaintiff's family within the rest of the letter.

(TAC, at unnumbered 4 ¶ 17 (ellipses in original).)

[7] Context makes clear that Anne Gunther is also Plaintiff's mother.

Midland Place Apt. 1D was not the 'apartment for me,'" going on to say that the "'1' floor apartment in building 31 Midland Place" was neither handicap accessible nor compliant with the Americans with Disabilities Act ("ADA").  (*Id.*, at unnumbered 6 ¶ 25.)  In order to take possession of the unit, Plaintiff would have to waive his rights to a handicap accessible/ADA compliant apartment, and further assent to the unit's continued noncompliance.  (*Id.*)  Leo then presented Plaintiff with a new lease containing those provisions, and, about one month later, Defendants' lawyer sent Plaintiff, John Gunther, and Anne Gunther a letter regarding signing the lease.  (*See id.*, at unnumbered 6 ¶¶ 25–26.)

Additionally, sometime around approximately September 11, 2013, Plaintiff received a letter from Defendants' lawyer, Kamensky, accusing Plaintiff of loud, abusive, and aggressive behavior when asking someone named Ms. Jones ("Jones") questions about his rent several days earlier.  (*Id.*, at unnumbered 6 ¶ 27.)  The letter further indicated that Matveevskii and Jones "felt threatened by [Plaintiff's] behavior" and called the police.  (*Id.*)  The letter warned Plaintiff that if this sort of behavior continued, it would result in the termination of Plaintiff's lease.  (*Id.*)

In addition to these disputes, Plaintiff and Defendants also found themselves in various legal entanglements: On January 29, 2014, Matveevskii submitted an affidavit in support of a Motion to Dismiss, which stated that Matveevskii provided a "true and accurate copy of documentation showing Plaintiff's annual rent calculations for years 2009, 2010, 2011 along with a copy of the Public Housing lease Agreement, [d]ated February 18, 2009," but which, allegedly, was in fact "invalid" "documentation" that "d[id] not correspond to the years in question" or "follow the guidelines esta published [sic] by HUD and the Fair Housing Act."  (*Id.*, at unnumbered 6 ¶ 29.)  On or about April 25, 2014, Plaintiff submitted a Freedom of

Information Act request to, among others, the THA for a copy of his rental budget and computations dating back to 2009.  (*See id.*, at unnumbered 6–7 ¶ 28.)

On approximately June 18, 2014, Plaintiff received notice signed by Matveevskii that his lease was terminated, because he apparently had not "provid[ed] re-certification within the allotted time."  (*Id.*, at unnumbered 7 ¶ 30.)  On July 8, 2014, Defendants "replied with acknowledgment and receipt for recertification," but indicated that they would not take Plaintiff's medical expenses into account when recertifying his rent.  (*See id.*, at unnumbered 7 ¶ 31.)  Nevertheless, on approximately October 3, 2014, Defendants notified Plaintiff that there was an apartment at 39 Midland Place that would become available on October 20, 2014, although, Plaintiff alleges, "[t]his was another fraudulent offer made by the THA as the unit was not readily available for immediate occupancy . . . ."  (*Id.*, at unnumbered 7 ¶ 33.)  On October 13, 2014, Plaintiff's doctor, Dr. Ro, sent a letter to the THA management offices requesting reasonable accommodations for Anne Gunther, as her medical condition took a turn for the worse.  (*Id.*, at unnumbered 7 ¶ 34.)  Shortly thereafter, on or about November 17, 2014 and December 3, 2014, Plaintiff filed "Housing Discrimination Complaint[s]" against Defendants.  (*Id.*, at unnumbered 7–8 ¶¶ 35–36.)  On December 12, 2014, Defendants called the "Protective Services for Adults hotline to report elderly abuse against Anne Gunther."  (*Id.*, at unnumbered 8 ¶ 37.)  Afterwards, "Protective Services" conducted an investigation, which was "found to be ineligible to receive Protective Services that Ms. Anne Gunther had another system or person willing and able to assist in a responsible manner" [sic].  (*Id.*)

### 4.  Putative Legal Misdeeds

In his Third Amended Complaint, Plaintiff also posits a number of other wrongs that Defendants allegedly committed.  First, he claims that the THA violated the Architectural

Barriers Act, 42 U.S.C. §§ 4151–57.  (*Id.*, at unnumbered 8 ¶ 3.)  Additionally, as noted, Plaintiff asserts that the THA was reported to HUD in the summer of 2008 for noncompliance with § 504 of the Rehabilitation Act and regulations promulgated thereunder, including "24 [C.F.R.] Part 8" and 24 C.F.R. § 960.206(b)(2).  (*Id.*, at unnumbered 9 ¶ 4.)  In addition, Plaintiff alleges that the THA discriminates against the disabled in that (1) it does not have an appropriate number of handicap-accessible units, (2) the Policy of the THA does not accommodate disabled tenants, (3) there is a continued practice to deny requests for reasonable accommodations "[o]ver applicants who[] are working, non-disabled[,] or elderly," and, with respect to Plaintiff specifically, and (4) by "refusing to provide 'reasonable accommodations' that were requested in March of 1997 and on several other occasions following the initial request."  (*Id.*, at unnumbered 9 ¶¶ 5–6.)  Plaintiff also alleges that Defendants "[i]mproper[ly] execut[ed] . . . the [r]ental [a]greement," in that the lease "stated . . . that if a reasonable accommodation is needed . . . [t]he THA has the right to make changes in the utilization of the currently rented units to make changes to accommodate the needs of a disabled tenant."  (*Id.*, at unnumbered 9–10 ¶ 8.)  Similarly, by "prolong[ing] providing . . . the 'reasonable accommodations,'" Defendants allegedly "[i]ntentionally plac[ed] [Plaintiff's] family in physical harm on a daily basis," as exemplified by the fact that Plaintiff twice fell down the stairs.  (*Id.*, at unnumbered 10 ¶ 9.)  Plaintiff similarly accuses the Defendants of "[d]elay and refusal to provide reasonable accommodations," citing 42 U.S.C. § 3604(f)(3), a provision of the Fair Housing Act clarifying the scope of discrimination within the Act's provisions concerning persons with disabilities.  (*Id.*, at unnumbered 10 ¶ 10.)

Additionally, Plaintiff alleges that (1) Matveevskii "[d]iscriminat[ed] against a black family" by saying that Plaintiff "had a 'gang' coming after her . . . in a public meeting whereby

[sic] she called 911 to come investigate," when, in fact, "[t]here was no gang but a gathering of tenants for the monthly tenants meeting."  (*Id.*, at unnumbered 9 ¶ 7.)

Somewhat duplicatively, Plaintiff alleges "[h]arassments/[r]etaliation against [Plaintiff] due to [his] having filed a complaint with the Dept. of HUD" for (a) "noncompliance of our needed Reasonable Accommodations," (b) "[v]iolations of the Architectural Barriers Act," (c) "[c]ontinued disregard for [t]he Rehabilitation Act Section 504," (d) the Fair Housing Act, (e) "Real Property Laws, The Apartment Law," (f) "[v]iolations of [c]ivil [r]ights, discrimination against the disabled, family status, elderly, and race," (g) "[t]enants [r]ights," (h) "[h]ealth and [s]afety [c]odes" and "[c]oercing Plaintiff to accept a unit with known flooding," and (i) "Village of Tuckahoe Building and Planning codes."  (*Id.*, at unnumbered 10–11 ¶ 11.)

Additionally, Plaintiff alleges that Defendants are responsible for the "[i]ntentional [i]nfliction of undue emotional distress," inasmuch as they "created a state of depression in [Plaintiff's] mother that eventually le[]d to her untimely death," and "also placed an increased stress[] load on [Plaintiff]," through "continued attacks against [Plaintiff's] family, bringing to court over rent [sic], writing letters accusing [Plaintiff's] family of stealing from the THA, and continually calling the police."  (*Id.*, at unnumbered 12–13 ¶ 15.)

Plaintiff also imputes a variety of other "improper" actions to Defendants.  First, he says, Defendants, in a number of respects, "[i]ntentional[ly] [i]mproper[ly] calculate[ed] . . . [his] rent," including by refusing Plaintiff copies of all his rent receipts and his signed 50059 Lease Change forms showing year-to-year changes in rent, "mandated by DCHR, HUD, and the Fair Housing act," and also by refusing to accept medical deductions in calculating his rent, which "can be construed as trying to de-regulate the THA rental housing programs."  (*Id.*, at unnumbered 11 ¶ 12.)  Second, in a set of allegations he categorizes as "[i]mproper use of

11

services," Plaintiff says Defendants "t[ook] him to court for an improper eviction 4 times,"

"utilize[ed] the Tuckahoe police department for unwarranted reasons," including when

Matveevskii called 911 to say that Plaintiff was "threatening and scaring her," and by reporting

Plaintiff's family to "the Department of HUD Homeland security" and to the "Elder Abuse

Hotline." (*Id.*, at unnumbered 12 ¶ 13.) Next, Plaintiff accuses Defendants of "[i]mproper[ly]

handling . . . [his] private and personal information," including through "sale of personal

information that was to be safe[]guarded under the Rights to Privacy within the boundaries of the

Fair Housing Act." (*Id.*, at unnumbered 12 ¶ 14.) Additionally, Plaintiff accuses Defendants of

"[i]nterference of [his] rights as a tenant to have equal enjoyment." (*Id.*, at unnumbered 13 ¶ 16.)

Finally, Plaintiff alleges "[d]iscrimination with regards to family status," in that Defendants

attempted to remove Anne Gunther from 31 Midland Place by calling Adult Protective Services

with the complaint that she could not care for herself. (*Id.*, at unnumbered 14 ¶ 17.)

At the end of his TAC, Plaintiff breaks out separately a one-item list of his counts,

comprising a single count of negligence. As Plaintiff alleges therein:

> Defendant failed to perform the duties in the written contract in a safe and effective manner[,] leading to the injuries sustained by Plaintiff. That if the reasonable accommodations had been granted when originally requested in 1996, the injuries that resulted in the falls [sic] down the stairs would not have occurred. Matveevskii was aware of [Plaintiff's] walking disabilities that have been documented several times by [Plaintiff's] doctors.

> Falling down the stairs from the 3r[d] floor 2 times. As a result of the fall has [sic] had to have knee surgery on the right [k]nee and will now as a result of the second fall have to have surgery on the left knee with possible back surgery along with nerve damage.

(*Id.*, at unnumbered 14.)

B.  Procedural Background

Plaintiff filed a Complaint on December 2, 2010, in which he named Matveevskii and THA as Defendants.  (*See* Dkt. No. 2.)  On April 7, 2011, Plaintiff voluntarily dismissed the causes of action that he had asserted against Matveevskii without prejudice, leaving only the causes of action that he had asserted against THA.  (*See* Dkt. No. 9.)  Plaintiff then voluntarily dismissed the causes of action that he had asserted against THA as well, again without prejudice, on May 13, 2011.  (*See* Dkt. No. 11.)  Approximately two months later, on July 11, 2011, Plaintiff moved to reopen the case and file an Amended Complaint.  (*See* Dkt. No. 12.)  On December 14, 2011, Plaintiff's case was reassigned to this Court.  (*See* Dkt. No. 17.)  The Court granted Plaintiff's request to reopen the case and file an Amended Complaint on January 12, 2012.  (*See* Dkt. No. 19.)  On January 31, 2012, Plaintiff filed an Amended Complaint.  (*See* Dkt. No. 21.)  Defendants filed an Answer in response to Plaintiff's Amended Complaint on June 6, 2012.  (*See* Dkt. No. 32.)  On March 7, 2013, Plaintiff submitted an application for pro bono counsel, which the Court subsequently denied.  (*See* Dkt. Nos. 48, 49.)

On August 9, 2013, Defendants moved for summary judgment, (*see* Dkt. Nos. 61–69), and certain then-defendants affiliated with HUD moved to dismiss, (*see* Dkt. Nos. 56–59).  On September 25, 2013, Plaintiff requested an extension of time to respond to the motions, which request the Court granted, (*see* Dkt. No. 72), and, on October 28, 2013, Plaintiff submitted his opposition to the motions, (*see* Dkt. No. 89).  Defendants then submitted a reply memorandum in support of their motion for summary judgment on November 14, 2013, (*see* Dkt. No. 73), and the HUD then-defendants submitted their reply memorandum the next day as well, (*see* Dkt. No. 75).  On May 14, 2014, in an attempt to clarify certain aspects of Plaintiff's allegations, the Court directed the parties to submit supplemental memoranda of law.  (*See* Dkt. No. 86.)

Defendants thereafter submitted a supplemental reply memorandum on May 28, 2014, (*see* Dkt. No. 87), and, on May 21, June 2, June 8, June 13, and June 25, 2014, Plaintiff submitted various documents and photographs to the Court, none of which was responsive to the Court's May 14, 2014 Order, (*see* Dkt. Nos. 90–92).

On September 29, 2014, the Court issued its Opinion and Order (the "Opinion") granting summary judgment in favor of Defendants, and further granting the HUD then-defendants' motion to dismiss.  (*See* Dkt. No. 93.)  That Opinion also granted Plaintiff leave within 30 days to file a Second Amended Complaint.  (*See id.*)  Plaintiff then submitted a number of letters to the Court, including (1) a letter "ask[ing] for an extension the motion [sic] made by Mr. Tyra R Saechao of kbr LLP," (*see* Dkt. No. 94), to which the Court instructed Defendants to respond, (*see* Dkt. No. 94–95), (2) another letter submitted "to this [C]ourt to ask for a DISONANCE motion [sic]," (*see* Dkt. No. 96), and (3) a letter enclosing a copy of a housing discrimination complaint apparently submitted by Plaintiff to HUD's Office of Fair Housing and Equal Opportunity, (*see* Dkt. No. 97), and (4) a letter "[e]nclos[ing] . . . additional information that support[s][Plaintiff's] case," and attaching a letter to Matveevskii from THA's commercial general liability insurance provider, (*see* Dkt. No. 98).  On February 23, 2015, the Court issued an Order informing Plaintiff that he had 30 more days to file a Second Amended Complaint if he chose to do so, but that, otherwise, his case would be closed.  (*See* Dkt. No. 99.)

On March 19, 2015, Plaintiff filed a four-page Second Amended Complaint, making seven "charges against the defendants[]," identifying several putative "Laws and Acts" that Defendants allegedly violated, and detailing, in a semi-epistolary form, Plaintiff's past dealings with Defendants.  (*See* Dkt. No. 100.)  Additionally, by letter dated March 26, 2015, Plaintiff wrote that his mother had passed away, and informed the Court that he was "working very hard

to get to [the Court's] chambers the rest of the time line to [Plaintiff's] documented complaints," which the Court memo-endorsed, expressing its condolences to Plaintiff, and granting him a final 30 days to submit an amended Complaint.  (*See* Dkt. No. 101.)

Thereafter, on April 17, 2015, Plaintiff submitted a letter to the Court "[e]nclos[ing] . . . some of the information [Plaintiff had been] gathering," and informing the Court that "Matveevskii . . . has [Plaintiff] back in local court in the Village of Tuckahoe." (*See* Dkt. No. 103.)  Likewise, on April 21, 2015, the Court received a second letter from Plaintiff, indicating that Plaintiff had had an accident involving his left eye, and that he may have a concussion, but that, nevertheless, he was "trying very hard to make [the Court']s dead[]line of 30 days." (*See* Dkt. No. 102.)

Finally, on April 29, 2015, Plaintiff submitted his Third Amended Complaint.  (*See* Dkt. No. 104.)  On May 13, 2015, Defendants submitted a pre-motion letter to the Court in advance of their anticipated Motion to Dismiss, (*see* Dkt. No. 105), which the Court granted leave to file on May 19, 2015, (*see* Dkt. No. 107).  On May 19, 2015, counsel for Adolfo Carrión and Mirza Orriols submitted a letter noting that the TAC did not name any HUD employee or HUD itself as a defendant, and informed the Court that the Government did not intend to file an answer or a pre-motion letter.  (*See* Dkt. No. 106.)

On June 5, 2015, Plaintiff submitted a request dated May 25, 2015 to the Court asking for a "ruling on the information requested[ ]in [Plaintiff's] two [Freedom of Information Law requests]" sent to THA and a "[r]uling on how many lawyers . . . Plaintiff ha[s] to answer[] to," issues in which the Court declined to involve itself prior to discovery.  (*See* Dkt. No. 108.)  In support of this letter, Plaintiff submitted yet another letter to the Court attaching additional

documents on June 11, 2015, which Plaintiff asserted would "support [his] argument and make a strong case for a favorable decision by the Supreme Court." (*See* Dkt. No. 118.)

On June 18, 2015, Defendants submitted an Answer to the TAC, (*see* Dkt. No. 109), which they then withdrew that same day, (*see* Dkt. No. 110), before submitting their Motion to Dismiss and accompanying papers the following day, (*see* Dkt. Nos. 111–17). By letter dated July 14, 2015, Plaintiff submitted a letter informing that Court that he had contacted an attorney who agreed to review his case, and asked for an extension to file his opposition by August 21, 2015, a request the Court granted. (*See* Dkt. No. 119.) On August 19, 2015, Plaintiff submitted a one-page self-styled "Response Complaint" to the Court informing the Court that it was his "understanding under the Fifth Amendment . . . [that] [he] [is] entitled to due process," and summarizing what he believes that proposition to entail. (*See* Dkt. No. 120.) On September 21, 2015, Defendants submitted their Reply Memorandum, arguing that Plaintiff's August 19, 2015 submission did not constitute an opposition to their Motion, and requesting that Plaintiff's claims be deemed abandoned. (*See* Dkt. No. 121.)

On October 1, 2015, Plaintiff submitted a letter to the Court attaching various other documents, apparently further describing the merits of his complaint, and invoking such authorities as the "[l]egal [p]roof defining [s]lander," the Emancipation Proclamation, and the works of Danish philosopher Søren Kierkegaard. (*See* Dkt. No. 122.) Additionally, on October 5, 2015, Plaintiff submitted a document entitled "Response to: Complaint," describing his complaints concerning the defendants' conduct, detailing certain personal losses, and enclosing a copy of Defendants' withdrawn answer. (*See* Dkt. No. 125.) On October 7, 2015, the Court tabled the issues in the October 1, 2015 letter until such time as the Motion to Dismiss was resolved. (*See* Dkt. No. 124.)

16

## II.  Discussion

### A.  Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.'" *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)); *see also Neroni v. Coccoma*, No. 13-CV-1340, 2014 WL 2532482, at *4 (N.D.N.Y. June 5, 2014) (same), *aff'd*, 591 F. App'x 28 (2d Cir. 2015).  "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff."  *Gonzalez*, 2014 WL 2475893, at *2 (internal quotation marks omitted); *see also Seemann v. U.S. Postal Serv.*, No. 11-CV-206, 2012 WL 1999847, at *1 (D. Vt. June 4, 2012) (same).  However, "[o]n a Rule 12(b)(1) motion, . . . the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)."  *Gonzalez*, 2014 WL 2475893, at *2; *see also Sobel v. Prudenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014) ("In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." (internal quotation marks omitted)).  This difference as to the allocation of the burden of proof is "[t]he only substantive difference" between the standards of review under these two rules.  *Smith v. St. Luke's Roosevelt Hosp.*, No. 08-CV-4710, 2009 WL 2447754, at *9 n.10 (S.D.N.Y. Aug. 11, 2009), *adopted by* 2009 WL 2878093 (S.D.N.Y. Sept. 2, 2009); *see also Fagan v. U.S. Dist. Court for S. Dist. of N.Y.*, 644 F. Supp. 2d 441, 447 n.7 (S.D.N.Y. 2009) (same).

17

### 1.  Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted).  "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also N.Y. State Citizens' Coal. for Children v. Carrion*, 31 F. Supp. 3d 512, 516 (E.D.N.Y. 2014) (same).

### 2.  Rule 12(b)(6)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alterations, citations, and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alterations and internal quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the

18

line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

For the purposes of Defendants' Motion To Dismiss, the Court is required to consider as true the factual allegations contained in the Amended Complaint.  *See Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (italics and internal quotation marks omitted)); *see also Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) (same).  "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).  Finally, the Court construes "the submissions of a pro se litigant . . . liberally" and interprets them "to raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks omitted).

B.  Analysis

    1.  Subject Matter Jurisdiction

As with his First Amended Complaint, it is less than entirely clear what claims Plaintiff intends to press in his TAC.  Defendants rightly note that Plaintiff asserts only one cause of action for negligence.  (*See* Mem. of Law in Supp. of Mot. To Dismiss Third Am. Comp. ("Defs.' Mem.") 4 (Dkt. No. 113).)  Because negligence is not a federal question, and because diversity of citizenship is lacking, Defendants argue that this matter must be dismissed for want of subject matter jurisdiction.  (*Id.* at 4–5.)

Because the Parties are non-diverse (i.e., New Yorkers), (*see* TAC, at unnumbered 1 ¶¶ 1–2), and all other constitutional bases for jurisdiction are plainly inapposite, the only possible basis upon which to find subject matter jurisdiction is if the TAC implicates a federal question. *See Zelawska v. Lufthansa German Airlines*, No. 13-CV-5114, 2013 WL 6330672, at *1 (E.D.N.Y. Dec. 5, 2013) ("[B]ecause [the] [p]laintiff does not meet the requirements for diversity jurisdiction, or allege a federal cause of action, the [c]omplaint is sua sponte dismissed for lack of subject matter jurisdiction." (italics omitted)); *Richards v. W2005 Wyn Hotels, LP*, No. 11-CV-8880, 2011 WL 7006505, at *1 (S.D.N.Y. Dec. 13, 2011) (dismissing complaint in light of its "assertions identifying [the] [p]laintiffs and a defendant as citizens of the same state," which "defeat[ed] complete diversity and render[ed] subject matter jurisdiction lacking in th[e] case"); *Receiveables Exch., LLC v. Hotton*, No. 11-CV-292, 2011 WL 239865, at *1 (E.D.N.Y. Jan. 21, 2011) (dismissing complaint, where, "on its face, [it] fail[ed] to properly plead the existence of diversity jurisdiction").  For subject matter jurisdiction purposes, it is sufficient that the complaint could be liberally construed to raise a federal question.  *See, e.g.*, *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) ("Based upon the record before

us and following our policy of liberal construction of complaints, we believe [the plaintiff]'s

complaint should not have been dismissed for lack of subject matter jurisdiction."); *Qian Jin Lin*

*v. Anderson*, No. 12-CV-451, 2013 WL 3776249, at *2 (S.D.N.Y. July 18, 2013) ("Liberally

construed, however, the [c]ourt concludes that [the] [p]laintiff's complaint can be read as

asserting certain federal claims over which the [c]ourt may have subject matter jurisdiction,

pursuant to 28 U.S.C. § 1331.").  Here, liberally construed, the TAC arguably alleges not just a

single count of negligence, but indeed violations of several federal statutes, to be discussed

below.  Therefore, at least prior to considering the merits of those claims, the Court plainly has

subject matter jurisdiction.

### 2.  What Are Plaintiff's Claims?

Defendants move to dismiss Plaintiff's claim on several grounds.  Before delving into

those reasons and whether Defendants are correct, it is first necessary to determine what, exactly,

Plaintiff is claiming.  By the Court's liberal read, Plaintiff at least attempts to assert a claim for

the following:

- Failure to provide a reasonable accommodation and a hearing on those accommodations.[8]

- Violations of the Architectural Barriers Act.[9]

- Violations of the Rehabilitation Act § 504.[10]

---

[8] (*See* TAC, at unnumbered 2 ¶ 8; *id.*, at unnumbered 3 ¶ 10; *id.*, at unnumbered 3 ¶ 11; *id.*, at unnumbered 3 ¶ 13; *id.*, at unnumbered 5 ¶¶ 18–19; *id.* at unnumbered 6 ¶ 25; *id.* at unnumbered 7 ¶¶ 32–34; *id.* at unnumbered 9 ¶¶ 5–6; *id.*, at unnumbered 9–10 ¶¶ 8–11(a); *id.*, at unnumbered 13 ¶ 16.)

[9] (*See* TAC, at unnumbered 8 ¶ 3; *id.* TAC, at unnumbered 10 ¶ 11(b).)

[10] (*See* TAC, at unnumbered 8–9 ¶ 4; *id.*, at unnumbered 11 ¶ 11(c).)

21

- Violations of HUD regulations.[11]

- Unspecified disability discrimination.[12]

- Racial discrimination, including allegations said Plaintiff had a "gang" of people coming after Matveevskii.[13]

- Unspecified discrimination based on familial status.[14]

- Unspecified discrimination against the elderly.[15]

- Violations of the Fair Housing Act, including failure to accommodate and "Rights to Privacy" under it.[16]

- Violations of health, safety, building, planning, and occupancy codes, and coercing Plaintiff into accepting a unit with "known flooding[]."[17]

- Rent over-charging, including by not allowing medical deductions and/or not providing Plaintiff with breakdowns of his rent calculations.[18]

- Terminating Plaintiff's lease and/or evicting him.[19]

---

[11] (*See* TAC, at unnumbered 2 ¶ 7; *id.* at unnumbered 8–9 ¶ 4; *id.*, at unnumbered ¶ 11(g).)

[12] (*See* TAC, at unnumbered 8–9 ¶ 4; *id.*, at unnumbered 11 ¶ 11(f).)

[13] (*See* TAC, at unnumbered 4 ¶ 15; *id.*, at unnumbered 9 ¶ 7; *id.*, at unnumbered 11 ¶ 11(f).)

[14] (*See* TAC, at unnumbered 11 ¶ 11(f); *id.*, at unnumbered 14 ¶ 17.)

[15] (*See* TAC, at unnumbered 11 ¶ 11(f).)

[16] (*See* TAC, at unnumbered 10 ¶ 10; *id.*, at unnumbered 11 ¶¶ 11(d), 11(g); *id.*, at unnumbered 12 ¶ 14.)

[17] (*See* TAC, at unnumbered 11 ¶¶ 11(h)–11(i); *id.*, at unnumbered 13 ¶ 16(c).)

[18] (*See* TAC, at unnumbered 6 ¶ 24; *id.*, at unnumbered 6–7 ¶ 29; *id.*, at unnumbered 7 ¶ 31; *id.*, at unnumbered 11 ¶ 12.)

[19] (*See* TAC, at unnumbered 5 ¶¶ 21–22; *id.*, at unnumbered 7 ¶ 30; *id.*, at unnumbered 12 ¶ 13(a); *id.*, at unnumbered 12 ¶ 14(a); *id.*, at unnumbered 12 ¶ 15; *id.*, at unnumbered 13 ¶ 16(b).)

- Calling the police.[20]

- Informing HUD and/or the Department of Homeland Security that Plaintiff was housing a pedophile.[21]

- Calling the Elder Abuse Hotline.[22]

- Putting stress on and/or otherwise attacking Plaintiff's family.[23]

- Not letting Plaintiff's brother live in the apartment, and stalking him "for the purpose of the affidavit of eviction."[24]

- Violations of "Real Property Law, The Apartment Law."[25]

- Interfering with Plaintiff's "rights as a tenant to have equal enjoyment" to his apartment.[26]

- Negligence, in that Plaintiff fell down the stairs twice.[27]

For the following reasons, to the extent these claims raise a federal question, dismissal is appropriate.

---

[20] (*See* TAC, at unnumbered 3 ¶ 12; *id.* at unnumbered 6 ¶ 27; *id.*, at unnumbered 12 ¶ 13(b); *id.*, at unnumbered 12 ¶ 14(a).)

[21] (*See* TAC, at unnumbered 4 ¶ 16; *id.*, at unnumbered 12 ¶ 13(c); *id.*, at unnumbered 13 ¶ 16(a).)

[22] (*See* TAC, at unnumbered 8 ¶ 37; *id.*, at unnumbered 12 ¶ 13(d); *id.*, at unnumbered 14 ¶ 17.)

[23] (*See* TAC, at unnumbered 4–5 ¶ 17; *id.*, at unnumbered 12 ¶ 14(a); *id.*, at unnumbered 12–13 ¶ 15.)

[24] (*See* TAC, at unnumbered 5 ¶ 20; *id.*, at unnumbered 6 ¶ 23; *id.*, at unnumbered 13 ¶¶ 16(d)–(f).)

[25] (*See* TAC, at unnumbered 11 ¶ 11(e); *id.*, at unnumbered 13–14 ¶ 16(f).)

[26] (*See* TAC, at unnumbered 13 ¶ 16.)

[27] (*See* TAC, at unnumbered 10 ¶ 9; *id.*, at unnumbered 14.)

3.  Types of Discrimination

As noted, Plaintiff's Third Amended Complaint may well implicate the Fair Housing Act ("FHA"), the ADA, and § 504 of the Rehabilitation Act.  The FHA proscribes "refus[al] to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin," 42 U.S.C. § 3604(a), or "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" for any of those same reasons, *id.* § 3604(b).  In addition, in 1988, Congress amended the FHA to forbid discrimination on the basis of disability, *see* Fair Housing Amendments Act of 1988, sec. 6, § 3604(f), 102 Stat 1619 (1988), such that the FHA today prohibits "discriminat[ing] in the sale or rental, or . . . otherwise mak[ing] unavailable or deny[ing], a dwelling to any buyer or renter because of a handicap of" certain persons, including the renter or anyone associated with the renter, and further prohibits "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of," among others, that person or anyone associated with that person, *see* § 3604(f)(1), (2).  Similarly, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Finally, § 504 of the Rehabilitation Act, in pertinent part, states that "[n]o otherwise qualified individual with a disability in the United States . . . , shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

24

financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."  29 U.S.C. § 794(a).

In the context of a disability claim, "plaintiffs who allege violations under the ADA, the FHA, and the Rehabilitation Act may proceed under any or all of three theories:  disparate treatment, disparate impact, and failure to make reasonable accommodation."  *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002), *superseded by statute on other grounds*, ADA Amendments of 2008, Pub. L. No. 110–325, 122 Stat. 3553, *as recognized in Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015); *see also Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) ("A qualified individual can base a discrimination claim [under Title II of the ADA or § 504 of the Rehabilitation Act] on any of 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.'" (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003)).  Similarly, under §§ 3604(a) and (b) of the Fair Housing Act, "[a] plaintiff can make out a claim of discrimination either on a theory of disparate impact or one of disparate treatment."  *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 366 (2d Cir. 2003) (internal quotation marks omitted) (describing standard under § 3604(a)); *see also Khalil v. Farash Corp.*, 452 F. Supp. 2d 203, 207 (W.D.N.Y. 2006) (noting same in context of § 3604(a) and (b) claims), *aff'd*, 277 F. App'x 81 (2d Cir. 2008).

Read liberally, Plaintiff's TAC can be taken to assert (1) a claim for disparate treatment under the FHA, the ADA, and Rehabilitation Act, and (2) a claim for failure to accommodate under these same statutes.

### a.  Disparate Treatment

As noted in the Opinion resolving the prior Motions for Summary Judgment and To Dismiss, "subtle differences" exist among these laws.  *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 253 (S.D.N.Y. 2014) (internal quotation marks omitted).  Unlike at that juncture, here, one of those differences is arguably significant, as will be explained below.

### i.  FHA, ADA

To begin, a plaintiff asserting a claim of housing discrimination must establish that the basis upon which he was discriminated against was "*a* significant factor" in the position taken by the defendants. *See Reg'l Econ. Cmty. Action Program*, 294 F.3d at 49 ("To establish a prima facie case of discrimination under the FHA and the ADA, the plaintiffs must present evidence that animus against the protected group was *a* significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.") (internal quotation marks omitted); *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 400 (S.D.N.Y. 2013) ("[F]or disparate treatment cases, '[t]o establish a prima facie case of discrimination under the FHA [ ], the plaintiffs must present evidence that animus against the protected group was *a* significant factor' in the position taken by the defendant." (second and third alterations in original) (quoting *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 49)); *Palmieri v. Town of Babylon*, No. 01-CV-1399, 2006 WL 1155162, at *14 (E.D.N.Y. Jan. 6, 2006) (noting at summary judgment stage in race discrimination case, that "[t]o [establish a prima facie case of FHA discrimination], [a plaintiff] must offer evidence that 'animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'"

(quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995))), *aff'd*, 277 F. App'x

72 (2d Cir. 2008).[28]

While this is not a pleading requirement, and a plaintiff "need [not] allege discriminatory

animus for [his or] her disparate treatment claim to be sufficiently pleaded," *Boykin v. KeyCorp*,

521 F.3d 202, 215 (2d Cir. 2008), and while it may be "sufficient that [a] plaintiff state[] [his or]

her protected status, set forth the circumstances under which [he or] she was treated differently,

and include[] an allegation that this differential treatment was on the basis of [his or] her

protected status," *L.C.*, 987 F. Supp. 2d at 401 (citing *Boykin*, 521 F.3d at 215), a claim is

appropriately dismissed where a complaint's factual allegations do not permit the conclusion that

the complained-of conduct occurred because of discriminatory animus, *see Smith v. NYCHA*, No.

08-CV-4717, 2009 WL 2486930, at *1 (S.D.N.Y. Aug. 14, 2009) (concluding a complaint failed

to state a claim where "there [was] nothing in [it] . . . that could . . . permit the conclusion that

anything of which [the] [p]laintiff complain[ed] occurred because the [housing authority

defendant] acted with a discriminatory animus on account of any disability . . . ."), *aff'd*, 410 F.

App'x 404 (2d Cir. 2011).

Here, Plaintiff simply has not alleged sufficient facts to conclude that he was in any way

directly discriminated against on the basis of race, family status, age, or disability.  With respect

to racial discrimination, Plaintiff has alleged (1) in conclusory fashion that he was the victim of

racial discrimination or, at best redundantly, "[d]iscrimination against a black family," (TAC, at

unnumbered 9 ¶ 7; *id.*, at unnumbered 11 ¶ 11(f)), and (2) that Matveevskii called 911 over

Plaintiff's presence at a meeting, where she reported that Plaintiff had a "gang" of people coming

---

[28] Although this language refers to "municipal decision-makers," the doctrine is also
applied against private actors as well.  *Cf. L.C.*, 987 F. Supp. 2d at 400–01 (applying the same
standard in claim against defendant other than the municipality itself).

after her, (*id.*, at unnumbered 4 ¶ 15; *id.*, at unnumbered 9, ¶ 7).  With regard to the latter, even a public allusion to gangs is not sufficient to form the basis of discriminatory intent in a FHA disparate treatment claim.  *See Bonasera v. City of Norcross*, 342 F. App'x 581, 584 (11th Cir. 2009) (per curiam) (finding statements made at a meeting about, inter alia, "gang types" in the neighborhood insufficient to establish discriminatory animus in intentional-discrimination FHA claim).  Even recognizing that the word "gang" can have racially offensive connotations; *cf. Williams v. Lindenwood Univ.*, 288 F.3d 349, 356 (8th Cir. 2002) ("[The defendant] argues on appeal that there is no . . . intent to discriminate . . . because . . . phrases such as "gang bangers[]" . . . were never used in connection with the plaintiff or in a manner exhibiting negative racial connotations.  We disagree."); it can also have innocuous meanings, *see* Webster's II New Riverside University Dictionary 519 (Anne H. Soukhanov et al. 1988) (listing as the first definition of "gang" "[a] group of people who socialize regularly").  Consequently, even were the Court to conclude that Matveevskii's gang reference rendered "conceivable," *Twombly*, 550 U.S. at 570, that racial animosity was a "significant factor," *Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d at 49 (internal quotation marks omitted), in the putative wrongs visited upon Plaintiff, the line of plausibility remains uncrossed.  Without this tittle of factual support, the rest of Plaintiff's race-based FHA claim—to the extent he ever had one—fails: his other assertions that tread near race discrimination are pure conclusion, (*see* TAC, at unnumbered 9 ¶ 7; *id.*, at unnumbered 11 ¶ 11(f)), and, therefore, cannot stand, *see Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

    This latter observation also dooms any possible disparate treatment discrimination claims based upon disability, age, or familial status.  (*See* TAC, at unnumbered 8–9 ¶ 4; *id.*, at

unnumbered 11 ¶ 11(f); *id.*, at unnumbered 14 ¶ 17.)  The latter two are particularly infirm because age is not a protected class under the FHA, *see* § 3604(a), (b); *see also Quad Enters., LLC v. Town of Southold*, 369 F. App'x 202, 206 (2d Cir. 2010) ("[A]ge itself is not a protected category under the [FHA] or ADA."); *Mesi v. Wash. Mut. Home Loans, Inc.*, No. 08-CV-486, 2011 WL 2174967, at *2 (D. Nev. June 3, 2011) ("[A]ge is not a protected category under the FHA."), and "familial status" is elsewhere defined in the FHA as "mean[ing] one or more individuals (who have not attained the age of 18 years) being domiciled with" either "(1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person," *see* § 3602(k), which is fatal because, vague though it may at times seem, the TAC simply contains no facts relating to a minor cohabitant.[29]  With respect to any potential disability-based disparate treatment claim that Plaintiff intends to bring above and beyond his failure-to-accommodate disability claim, there is simply nothing other than Plaintiff's legal conclusions in the TAC from which the Court could surmise that "animus against the [disabled] was a significant factor" in any position taken by Defendants, *see Reg'l Econ. Cmty. Action Program*, 294 F.3d at 49 (emphasis omitted), and, accordingly, he has not stated a disparate treatment disability discrimination claim, *cf. Mazzocchi v. Windsor Owners Corp.*, No. 11-CV-

---

[29] It is possible that Plaintiff's many allegations concerning Defendants' purported mistreatment of his family—specifically, stalking and forbidding Plaintiff's brother from living in the apartment, (*see* TAC, at unnumbered 5 ¶ 20; *id.*, at unnumbered 6 ¶ 23; *id.*, at unnumbered 13 ¶¶ 16(d)–(f)), calling the Elder Abuse Hotline, (*see id.*, at unnumbered 8 ¶ 37; *id.*, at unnumbered 12 ¶ 13(d)), putting stress on or otherwise attacking Plaintiff's family, (*id.*, at unnumbered 4, ¶ 17; *id.*, at unnumbered 12 ¶ 14(a))—could be construed as an effort to show that Defendants discriminated against Plaintiff on the basis of familial status.  However, given the specialized and even arguably unintuitive meaning of "familial status" as defined in § 3602(k), coupled with the non-cognizability of age claims under the FHA, they do not give rise to a housing discrimination claim.

7913, 2013 WL 5295089, at *11 (S.D.N.Y. Sept. 17, 2013) (finding that "[t]he amended complaint allege[d] enough facts that, when combined with reasonable inferences, show[ed] a plausible disparate treatment discrimination claim under the FHA," where "complaints about [an] illegal subtenancy [by the plaintiff's girlfriend, who had bipolar disorder] were paired with vague comments about [her] appearance and behavior" and where "the timing of the . . . decision to initiate a state-court ejectment proceeding . . . g[a]ve[] rise to the inference that the action was pretextual").  Therefore, Plaintiff's disparate treatment claims under the FHA and ADA are dismissed.

### ii.  Rehabilitation Act

In contrast with Plaintiff's FHA and ADA claims, "[t]o establish a prima facie case of discrimination under the Rehabilitation Act . . . , [a] plaintiff[] must show that the defendants denied the permit *solely* because of the disability."  *Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d at 49 (emphasis added) (internal quotation marks omitted).  As noted in the previous section, Plaintiff has failed to adequately allege that "animus against the [disabled] was a significant factor in [Defendants'] position taken."  *Id.* (emphasis and internal quotation marks omitted).  A fortiori, he has failed to adequately allege that it was the "sole[]" reason.  *See id.*; *see also Logan*, 57 F. Supp. 3d at 254 (noting that "the reach of the Rehabilitation Act is limited to denials of benefits solely by reason of disability, while the ADA applies more broadly to such denials by reason of disability." (alterations, citation, emphasis, and internal quotation marks omitted).

### b.  Reasonable Accommodation

In its last Opinion, the Court found that Plaintiff's failure-to-accommodate claims under the ADA, FHA, and Rehabilitation Act all failed because (1) Plaintiff could not make out a

prima facie claim, and (2) Plaintiff could not show that Defendants constructively denied his accommodation request.  With respect to the former, the Court found that Plaintiff's claim failed because Defendants offered to reasonably accommodate Plaintiff's needs for a lower-level apartment when, in March 2011, they proposed moving a family out of a two-bedroom, handicap-accessible unit at 4 Union Place.  *See Logan*, 57 F. Supp. 3d at 263–65.  It rejected Plaintiff's two stated reasons for why that offer did not make for a reasonable accommodation— specifically, that he was more comfortable in his current building, 31 Midland Place, and his discomfort being around the elderly for whom the Union Place building was partially designed— on the grounds that neither putative need was conveyed to Defendants.  *See id.* at 263–65. Similarly, the Court concluded that Defendants did not constructively deny Plaintiff's request for a reasonable accommodation through delay in granting it, because (1) Plaintiff's first potential request for a reasonable accommodation that accrued even arguably within the statute-of-limitations period was an August 7, 2008 submission to Matveevskii, although, for a variety of reasons, the Court would not consider that letter, and (2) Plaintiff's next submission—a March 7, 2010 letter—was not constructively denied because, even though Defendants did not respond for four months, there was an insufficient basis to conclude the delay was caused by unreasonableness, unwillingness to grant the requested accommodation, or bad faith.  *See id.* at 266–73.

With regard to the reasonable accommodation issue, it has already been decided that Defendants' March 2011 offer was a reasonable accommodation of Plaintiff's need for a lower-level apartment.  Plaintiff again has provided no basis to conclude that he conveyed additional needs to Defendants such that the March 2011 offer was somehow unreasonable.  (*See generally*

TAC.)  Therefore, absent some reason to depart from its prior decision, the Court declines to do so.

As a general matter, "[w]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise."  *Grimes v. Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 608 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) ("The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.  The doctrine expresses the practice of courts generally to refuse to reopen what has been decided but it does not limit courts' power." (alteration, citations, and internal quotation marks omitted)).  While Plaintiff apparently has deleted references to Defendants' March 2011 offer in the TAC, his subterfuge is not a "cogent and compelling reason[]," *Grimes*, 933 F. Supp. 2d at 608 (internal quotation marks omitted), to avoid application of the doctrine, *see Colliton v. Cravath, Swaine & Moore LLP*, No. 08-CV-400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) ("Where a plaintiff blatantly changes his statement of the facts in order to respond to the defendant's motion to dismiss and directly contradicts the facts set forth in his original complaint, a court is authorized to accept the facts described in the original complaint as true." (alterations and internal quotation marks omitted)), *aff'd*, 356 F. App'x 535 (2d Cir. 2009).

With regard to the latter, given the procedural posture of this case, the Court is obligated to accept as true Plaintiff's assertion that he sent an email on August 7, 2008 to Matveevskii—the same date as the correspondence the Court declined to consider in its last Opinion—describing "[his] needs and concerns for being a disabled tenant with a heart condition, especially with [his] apartment being located on the 3rd floor and the difficulty [he] [was]

experiencing walking up and down the 3 flights of stairs" and "ask[ing] for a 'reasonable accommodation' for a first floor apartment in either 31 Midland [P]lace or 25 Midland Place." (TAC, at unnumbered 2 ¶ 8.)  However, apart from Plaintiff's assertion that his request went "unanswered and ignored," Plaintiff offers no reason to believe that the delay was caused by other than benign reasons.

To be sure, taking August 7, 2008 and the March 2011 reasonable accommodation as the relevant dates, Plaintiff alleges a delay of over two and a half years, which courts have found sufficient to constitute constructive denial of a reasonable accommodation.  *See Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1286 (11th Cir. 2014) (six-month delay in a Fair Housing Act case); *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272 (4th Cir. 2013) (15-month delay between request to use all-terrain vehicle in community's roads and driveways and a follow-up request by the board of directors for additional information); *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 68 (1st Cir. 2010) (noting that "the [administrative law judge] found that the complainants had been requesting a parking space accommodation for at least a year prior to the commencement of the . . . investigation"); *Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000) (finding FHA suit ripe where "the application had been pending for 127 days without action at the time of the court's decision").  However, in so doing, courts have typically found something other than mere silence to suggest that the delay was indeed a constructive denial. *See Bhogaita*, 765 F.3d at 1286 (the defendants had "request[ed] additional information and . . . indicate[d] that if [the plaintiff] failed to provide that information, [the defendant] would file for arbitration"); *Scoggins*, 718 F.3d at 272 (noting that "[t]he board of directors twice 'tabled' the . . . request pending a decision to seek additional information from the plaintiffs"

before eventually asking for more information); *Astralis Condo.*, 620 F.3d at 68 ("Although

[b]oard representatives had at times offered to grant the accommodation, it never materialized.");

*Groome*, 234 F.3d at 199 (only 95 of the eventually-elapsed 127 days had passed at the filing of

the lawsuit, and the plaintiff was forced to delay the closing date for the property at issue four

times).

       As explained in the last Opinion, "case law makes clear that the length of the delay is not

the only factor that courts consider in determining whether a constructive denial has taken

place[;] [i]nstead, to make out a claim of constructive denial, a plaintiff bears the burden of

demonstrating discriminatory intent." *Logan*, 57 F. Supp. 3d at 271; *see also Taylor v. Hous.*

*Auth. of New Haven*, 267 F.R.D. 36, 70 (D. Conn. 2010) (If . . . [the defendant] failed to respond

to [the plaintiff's] request because of bureaucratic incompetence, that fact . . . does not show

violations of [§] 504 or the [FHA], which are addressed to rules that hurt people with disabilities

*by reason of their handicap*, rather than that hurt them solely by virtue of what they have in

common with other people." (emphasis in original) (alterations and internal quotation marks

omitted)), *aff'd sub nom. Taylor ex rel. Wazyluk v. Hous. Auth. of City of New Haven*, 645 F.3d

152 (2d Cir. 2011).[30]  This is, however, a problem for Plaintiff's claim, because while Plaintiff

---

       [30] In the prior Opinion, the Court noted the "paucity of case law in the Second Circuit addressing the issue of constructive denial of a request for a reasonable accommodation under the FHA, Title II of the ADA, and the Rehabilitation Act."  *See Logan*, 57 F. Supp. 3d at 272. While it is still a slim jurisprudence, it merits acknowledgement that, in the intervening months, the Second Circuit decided *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 119 (2d Cir. 2014).  In that case, the plaintiff company applied for a special permit under the zoning ordinance of White Plains, New York to establish a facility for persons recovering from drug or alcohol addiction, which the plaintiff proposed be designated as a "community residence."  *Id.* at 119.  Finding it was not a community residence, the relevant city authorities determined that the city could take no further action until the plaintiff applied for a variance or appealed the determination.  *Id.*  In considering the "specific ripeness requirements applicable to land use disputes," *see id.* at 122 (internal quotation marks omitted), the Second Circuit explicitly differentiated the case before it from a scenario involving "the manipulation of a zoning process

has adduced sufficient facts to conclude that his August 7, 2008 email went unaddressed; he offers no factual groundwork from which one could divine any sort of improper motive on Defendants' part.[31]  In reaching this conclusion, the Court has sincerely endeavored to liberally construe Plaintiff's TAC to raise the strongest arguments it suggests, *Triestman*, 470 F.3d at 474 (internal quotation marks omitted); however, it simply cannot find facts alleged in the TAC that make plausible that Defendants acted with the proscribed "discriminatory intent," *Logan*, 57 F. Supp. 3d at 271, in ignoring Plaintiff's email.  Because, at best, Plaintiff's claim is "merely consistent with" such misfeasance, yet does not "plausibly suggest[]" it, *Twombly*, 550 U.S. at 557, he cannot make out a claim for failure to accommodate on a constructive denial theory, *see Logan*, 57 F. Supp. 3d at 271.

### 4.  Architectural Barriers Act

Next, Plaintiff invokes the Architectural Barriers Act ("ABA"), 42 U.S.C. §§ 4151–56. (*See* TAC, at unnumbered 8 ¶ 3; *id.*, at unnumbered 10 ¶ 11(b).)  "Congress enacted the ABA 'to insure whenever possible that physically handicapped persons will have ready access to, and use of, [federal] buildings.'"  *Cooke v. U.S. Bureau of Prisons*, 926 F. Supp. 2d 720, 727 (E.D.N.C. 2013) (alteration in original) (quoting 42 U.S.C. § 4152).  As used in the ABA, however, "building" has a specialized meaning, and refers to

> any building or facility (other than (A) a privately owned residential structure not leased by the Government for subsidized housing programs and (B) any building or facility on a

---

out of discriminatory animus to avoid a final decision," and cited *Groome*.  *Id.* at 123. Therefore, to the extent that the Second Circuit, like this Court, considers *Groome* sound authority that opens the courthouse doors to litigants aggrieved by a delays *stemming from discriminatory animus*, such a view further counsels against finding that Plaintiff has stated a plausible constructive failure-to-accommodate claim.

[31] Plaintiff does, however, claim that his request was "ignored," (*see* TAC, at unnumbered 2 ¶ 8); however, that is too conclusory, and does not offer any plausible explanation as to why it was "ignored."

military installation designed and constructed primarily for use by able bodied military personnel) the intended use for which either will require that such building or facility be accessible to the public, or may result in the employment or residence therein of physically handicapped persons, which building or facility is—

> (1) to be constructed or altered by or on behalf of the United States;

> (2) to be leased in whole or in part by the United States after August 12, 1968;

> (3) to be financed in whole or in part by a grant or a loan made by the United States after August 12, 1968, if such building or facility is subject to standards for design, construction, or alteration issued under authority of the law authorizing such grant or loan; or

> (4) to be constructed under authority of the National Capital Transportation Act of 1960, the National Capital Transportation Act of 1965, or title III of the Washington Metropolitan Area Transit Regulation Compact.

42 U.S.C. § 4151.

With respect to residential structures in particular, the statute further provides that:

> [t]he Secretary of Housing and Urban Development, in consultation with the Secretary of Health and Human Services, shall prescribe standards for the design, construction, and alteration of buildings which are residential structures subject to this chapter to insure whenever possible that physically handicapped persons will have ready access to, and use of, such buildings.

42 U.S.C. § 4153.  The relevant regulations further define what HUD considers to be a "residential structure."  *See* 24 C.F.R. § 40.2.  Furthermore, 24 C.F.R. § 40.4 provides that "[r]esidential structures subject to this part shall be designed, constructed or altered to ensure that physically handicapped persons have access to, and use of, these structures.  This requirement is satisfied by using the specifications contained in . . . the Uniform Federal Accessibility Standards (UFAS)."

The UFAS were promulgated in connection with input from the Architectural and Transportation Barriers Compliance Board ("ATBCB"), *see* Uniform Federal Accessibility Standards, 49 Fed. Reg. 31528, 31528 (Aug. 7, 1984) ("Issuance of this document follows

36

consideration of public comments received on proposed uniform standards and involved close cooperation with the staff of the Architectural and Transportation Barriers Compliance Board."), a body created in 1973, *see* Act of Sept. 26, 1973, Pub. L. No. 93–112, § 502, 87 Stat. 355, which, today, is charged with, among other things, "ensur[ing] compliance with the standards prescribed pursuant to the [ABA]," 29 U.S.C. § 792(b)(1), as well as establishing and maintaining "minimum guidelines and requirements for the standards issued pursuant to the [ABA]," *id.* § 792(b)(3)(A).  Importantly, the ATBCB is empowered to "conduct investigations, hold public hearings, and issue such orders as it deems necessary to ensure compliance with the provisions of the [ABA]."  *Id.* § 792(e)(1).

Since the passage of the ABA and the development of the ATBCB, a number of courts have grappled with whether and when a plaintiff may maintain a suit for alleged violations of the ABA.  A number of well-reasoned decisions have concluded that a plaintiff cannot bring a private cause of action pursuant to the ABA, at least not without first presenting a claim to the ATBCB.  *See, e.g.*, *Weber v. Eash*, No. 15-CV-225, 2015 WL 8481885, at *4 (E.D. Wash. Dec. 8, 2015) ("[T]he ABA provides for purely administrative remedies and does not provide for a private cause of action." (internal quotation marks omitted)), *reconsideration denied*, 2015 WL 9166084 (E.D. Wash. Dec. 15, 2015); *Cooke*, 926 F. Supp. 2d at 727 ("[U]nder the statutory scheme [a] plaintiff[] first must exhaust the administrative process under the ABA, and then seek judicial review."); *Gray v. United States*, No. 10-CV-467, 2011 WL 5191294, at *6 (D. Me. Oct. 31, 2011) ("[B]etter-reasoned caselaw has held, consistent with the language of the ABA, that it creates no direct private right of action . . . ."), *adopted by* 2011 WL 5826600 (D. Me. Nov. 18, 2011); *Jackson v. Fed. Bureau of Prisons*, No. 06-CV-1347, 2007 WL 843839, at *20 (D. Minn. Mar. 16, 2007) (noting that the ABA "does [not] provide for a private cause of action"); *Telep v.*

*Potter*, No. 04-CV-6, 2005 WL 2454103, at *9 (E.D. Va. Sept. 30, 2005) ("There is no private

right of action by handicapped individuals complaining of a violation of the ABA; enforcement

is purely administrative."); *Crowder v. True*, No. 95-CV-4704, 1998 WL 42318, at *2 (N.D. Ill.

Jan. 29, 1998) ("There is no private right of action by handicapped individuals complaining of a

violation of the [ABA]; enforcement is purely administrative." (internal quotation marks

omitted)). *But see Rose v. U.S. Postal Serv.*, 774 F.2d 1355, 1363 (9th Cir. 1984) ("Because this

case was dismissed at the pleadings stage, we cannot determine whether plaintiffs could prevail

on their claims under the Rehabilitation Act as to buildings that are not currently subject to

alteration under the Barriers Act.").

      It makes sense that the ABA would not provide a private right of action.  29 U.S.C.

§ 792(e) expressly contemplates both an investigatory mission for the ATBCB and judicial

review of its orders.  Because, "[t]he judicial task is to interpret the statute Congress has passed

to determine whether it displays an intent to create not just a private right but also a private

remedy," *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), and because the statute evinces an

intent for the ATBSB to remedy violations of the ABA, the Court concludes that a litigant may

not initiate his challenge under the ABA, at least in the first instance, in a federal court.

      Here, "[P]laintiff does not allege that [he] filed a complaint with the ATBCB and that

[he] appeals any final order of that body," *Gray*, 2011 WL 5191294, at *6, suggesting that his

action is premature.  (*See also* TAC, at unnumbered 8 ¶ 3; *id.*, at unnumbered 10 ¶ 11(b).)

Plaintiff's ABA claim is therefore dismissed.[32]

---

[32] In case it bears mentioning, any theoretical claim brought pursuant to the UFAS, rather
than the ABA directly, would be unavailing.  Courts have recognized that the UFAS themselves
do not establish a private right of action.  *See, e.g.*, *Gray*, 2011 WL 5191294, at *6 ("[T]he
UFAS do not, standing alone, provide a private right of action against the United States.");
*DeFrees v. West*, 988 F. Supp. 1390, 1393 (D. Kan. 1997) ("[T]he UFAS serve as standards by

5.  Rent Overcharges

Plaintiff also includes a number of claims concerning Defendants' alleged miscalculation of his rent, apparently given their failure to consider certain medical deductions and otherwise not providing Plaintiff with breakdowns of his rent calculations.  (*See* TAC, at unnumbered 6 ¶ 24; *id.*, at unnumbered 6–7 ¶ 29; *id.*, at unnumbered 7 ¶ 31; *id.*, at unnumbered 11 ¶ 12.) Defendants argue that Plaintiff's rental rate issues were resolved by a stipulation on the record in the Village Court of Tuckahoe in April 2013, and that his claim of rent overcharge was dismissed by the New York State Supreme Court, in a decision that Plaintiff did not appeal.  (*See* Defs.' Mem. 11 n.6 (citing Decl. of Joan M. Gilbride ("Gilbride Decl.") Ex. E (Dkt. No. 116); Gilbride Decl. Ex. F).)  In essence, Defendants argue that Plaintiff's claims are barred by the doctrine of res judicata.

"A federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the [s]tate in which the judgment was rendered." *O'Connor v. Pierson*, 568 F.3d 64, 69 (2d Cir. 2009) (alteration and internal quotation marks omitted (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81 (1984)); *see also Yoon v. Fordham Univ. Faculty & Admin. Ret. Plan*, 263 F.3d 196, 200 (2d Cir. 2001) (citing 28 U.S.C. § 1738) (same).  "Federal courts must use the res judicata doctrine of the state in which the state court judgment was granted."  *Fequiere v. Tribeca Lending*, No. 14-CV-812, 2016 WL 1057000, at *5 (E.D.N.Y. Mar. 11, 2016) (italics omitted); *see also Barnes v. N.Y. State Div. of Human Rights*, No. 14-CV-2388, 2016 WL 110522, at *6 (S.D.N.Y. Jan. 8, 2016) ("[W]here a federal court is considering the res judicata effect of a state court judgment, the federal court

---

which to measure compliance with the requirements of . . . the Architectural Barriers Act . . . . As such, they do not appear to provide for [a] separate and distinct cause[] of action . . . .").

must afford the state court judgment the same preclusive effect it would have under the law of the state in which it was entered.")  Therefore, because the preclusive effect of a New York state court decision is asserted, the Court must consider New York's law of res judicata.  *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (noting that the court would apply "New York law in determining the preclusive effect of a New York State court judgment"). "Under New York's transactional approach to the rule, once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy."  *Josey v. Goord*, 880 N.E.2d 18, 20 (N.Y. 2007) (internal quotation marks omitted); *see also Giannone v. York Tape & Label, Inc.*, 548 F.3d 191, 194 (2d Cir. 2008) (same); *Gordon v. First Franklin Fin. Corp.*, No. 15-CV-775, 2016 WL 792412, at *6 (E.D.N.Y. Feb. 29, 2016) (same); *Toscano v. 4B''s Realty VIII*, 921 N.Y.S.2d 882, 883 (App. Div. 2011) (same).

Here, res judicata bars Plaintiff's rent claims.  First, the Supreme Court's Decision and Order made clear that it dismissed Plaintiff's rent overcharge claim pursuant to C.P.L.R. 3211(a)(1), (*see* Gilbride Decl. Ex. F 2–3), a determination sufficiently final to trigger res judicata, *see Corsini v. Bloomberg*, 26 F. Supp. 3d 230, 246 (S.D.N.Y. 2014) ("In New York, a dismissal is on the merits if granted pursuant [to] Rule 3211(a)(1) of the CPLR . . . ."), *aff'd in part, appeal dismissed in part sub nom. Corsini v. Nast*, 613 F. App'x 1 (2d Cir. 2015); *Randall's Island Aquatic Leisure, LLC v. City of N.Y.*, No. 12-CV-6039, 2013 WL 2951945, at *3 (S.D.N.Y. June 13, 2013) ("[D]ismissals based on Rule 3211(a)(1) and supporting documentary evidence are on the case's merits, and thus have preclusive effect." (internal

quotation marks omitted)).[33]  Similarly, there can be no serious question that Plaintiff's claims relating to alleged miscalculation of his rent arise out of the same transaction or series of transactions, as his allegations very strongly suggest that Plaintiff's complaints center around the exact same conduct at issue in his state court proceeding.  Indeed, his statements about his rent amount issues include assertions that (1) he requested a copy of his rent calculations on approximately April 3, 2012, (TAC, at unnumbered 6 ¶ 24), (2) documents Matveevskii submitted in support of "[a] Motion to Dismiss, Index No. 50208/2014" reflecting Plaintiff's rent calculations for 2009–11 were "invalid as [they] d[id] not correspond to the years in question, nor d[id] [they] follow the guidelines esta published [sic] by the HUD and the Fair Housing Act," (TAC, at unnumbered 6–7 ¶ 29), (3) Defendants indicated on July 8, 2014 that they "would not be utilizing [Plaintiff's] medical expenses in the calculation of [his] rent," (*id.*, at unnumbered 7, ¶ 31), and (4) Defendants refused to accept certain medical deductions in a manner that "can be construed as trying to de-regulate the THA rental housing programs," (*id.*, at unnumbered 11 ¶ 12).  In so alleging, it is telling that Plaintiff alludes to documents Matveevksii submitted in connection with "Index No. 50208/2014," (*see id.*, at unnumbered 6–7, ¶ 29), as that is the same index number as was used in the New York State Supreme Court case upon which Defendants rely, (*see* Gilbride Decl. Ex. F, at 1).  Therefore, because Plaintiff's rent overcharge claim arises from "the same transaction or series of transactions," *Josey*, 880 N.E.2d at 20, as his state court judgment, it is barred by the doctrine of res judicata, *see Marinelli Assocs. v. Helmsley-Noyes Co.*, 705 N.Y.S.2d 571, 576 (App. Div. 2000) (finding New York's

---

[33] It bears noting that, while the defendants in that case raised the statute of limitations defense as well, (*see* Gilbride Decl. Ex. F, at 2 ("[T]he defendants contend that the rent overcharge claim should be dismissed . . . as time barred.")), the court, in dismissing the claim, ruled on its merits, (*see id.* at 2–3).

res judicata doctrine barred a claim where "[t]he underlying factual setting [was] identical, involving the precise claims of overcharging . . . that underlie all of the other claims").

Conceptually, it is possible that, index-number reference notwithstanding, Plaintiff *also* claims improper rent calculation for *subsequent* conduct, at least inasmuch as he alleges that Defendants indicated on approximately July 8, 2014 "that they would not be utilizing [Plaintiff's] medical expenses in the calculation of his rent," (TAC, at unnumbered 7 ¶ 31), and that date comes not much earlier than the August 4, 2014 decision of the Supreme Court, (*see* Gilbride Decl. Ex. F, at 3). There is, however, nothing else in the Third Amended Complaint to suggest that Plaintiff intends to bring such a claim, and, of note, "[t]he Second Circuit has held that the 'key to Rule 8(a)'s requirements is whether adequate notice is given,' and that 'fair notice' is," among other things, "'that which will . . . allow the application of res judicata . . . .'" *Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13-CV-7639, 2015 WL 4040882, at *3 (S.D.N.Y. July 2, 2015) (quoting *Wydner v. McMahon,* 360 F.3d 73, 79 (2d Cir. 2004)). Therefore, because one cannot even be sure whether Plaintiff indeed intends to bring a claim over Defendants' rent charges that is not barred by the doctrine of res judicata, Rule 8(a)'s notice requirement has been flouted, and dismissal is therefore appropriate.[34]

### 6. Does a Federal Question Remain?

Having dismissed Plaintiff's FHA, ADA, Rehabilitation Act, and ABA claims, the presence of a federal question in this case is no longer quite so clear. Plaintiff makes three allegations that tread near issues of federal law; however, none is sufficient to create a federal question. First, Plaintiff persists in claiming that Defendants failed to comply with certain

---

[34] This is assuming there is even a federal cause of action to be maintained on the basis of Defendants' alleged rent miscalculations, which the Court is not at all prepared to hold.

federal housing regulations, (*see* TAC, at unnumbered 2 ¶ 7; *id.* at unnumbered 8–9 ¶ 4; *id.* at unnumbered 11 ¶ 11(g)); however, as noted in the last Opinion, "there is generally no private right of action to enforce HUD regulations."  *Logan*, 57 F. Supp. 3d at 274 (citing *Taylor ex rel. Wazyluk v*, 645 F.3d at 153).   Second, Plaintiff also purports to bring a claim for "[i]mproper handling of [his] private and personal information," which he describes as "sale of personal information that was to be safe[]guarded under the Rights to Privacy within the boundaries of the Fair Housing Act."  (TAC, at unnumbered 12 ¶ 14.)  This misfires, however, because, simply put, there is no FHA "Right[] to Privacy."  Finally, Plaintiff stresses that he was "coerc[ed]" apparently into signing an agreement for an apartment that he otherwise would not have signed if not for Defendants' intransigence in providing him what he refers to as a "reasonable accommodation."  (*See* TAC, at unnumbered 11 ¶ 11(h); *id.*, at unnumbered 13 ¶ 16(c).)  To be sure, the FHA and ADA both have anti-coercion provisions.[35]  Plaintiff, however, offers nothing by way of factual support to establish that he was indeed so coerced.  *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by

---

[35] The FHA's provision reads:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617.

The ADA's analogous provision reads:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C § 12203(b).

factual allegations."); *see also United States v. Weisz*, 914 F. Supp. 1050, 1053 (S.D.N.Y. 1996)
(rejecting as "entirely conclusory" the allegation that "[the defendant] 'has coerced, intimidated,
threatened, and interfered with the [neighbors'] enjoyment of their dwelling because of the [the
neighbors'] religion,' which tracks the language of the FHA").  Likewise, the same logic
forecloses any argument that Plaintiff was the subject of undescribed
"[h]arassments/[r]etaliation" under a variety of sources of law, some federal.  (*See* TAC, at
unnumbered 10–11 ¶ 11.)

      The remaining claims in Plaintiff's TAC—to the extent they are claims at all—pose no
federal question.  Indeed, Plaintiff's remaining grievances have to do with violations of various
local codes, (*see id.*, at unnumbered 11 ¶¶ 11(h)–11(i)), Defendants terminating Plaintiff's lease
and/or evicting him, (*see id.*, at unnumbered 5 ¶¶ 21–22; *id.*, at unnumbered 7 ¶ 30; *id.*, at
unnumbered 12 ¶ 13(a); *id.*, at unnumbered 12 ¶ 14(a); *id.* at unnumbered 12–13 ¶ 15; *id.*, at
unnumbered 13 ¶ 16(b)), calling the police, (*see id.*, at unnumbered 3 ¶ 12; *id.*, at unnumbered 6
¶ 27; *id.*, at unnumbered 12 ¶ 13(b); *id.*, at unnumbered 12 ¶ 14(a)), calling HUD and/or the
Department of Homeland Security to claim that Plaintiff was housing a pedophile, (*see id.*, at
unnumbered 4 ¶ 16; *id.*, at unnumbered 12 ¶ 13(c); *id.*, at unnumbered 13 ¶ 16(a); *id.*, at
unnumbered 14 ¶ 17), calling the Elder Abuse Hotline, (*see id.*, at unnumbered 8 ¶ 37; *id.*, at
unnumbered 12 ¶ 13(d); *id.*, at unnumbered 14 ¶ 17), putting stress on and/or otherwise attacking
Plaintiff's family, (*see id.*, at unnumbered 4–5 ¶ 17; *id.*, at unnumbered 12 ¶ 14(a); *id.*, at
unnumbered 12–13 ¶ 15), violations of the "Real Property Laws, The Apartment Law," (*see id.*,
at unnumbered 11 ¶ 11(e); *id.*, at unnumbered 13–14 ¶ 16(f)), interfering with Plaintiff's "rights
as a tenant to have equal enjoyment" to his apartment, (*see id.*, at unnumbered 13 ¶ 16), and
negligence, (*see id.*, at unnumbered 10 ¶ 9; *id.*, at unnumbered 14).  Plaintiff has provided no

basis to conclude that these allegations implicate a federal question, and, indeed, they at best state a claim for relief under state law.  In such circumstances, the Court may decline jurisdiction over the remaining state claims, as the Court opts now to do.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Westchester Cty. Indep. Party v. Astorino*, —F. Supp. 3d—, 2015 WL 5883718, at *27 (S.D.N.Y. Oct. 8, 2015) ("Because the Court dismisses all of [the] [p]laintiffs' federal claims, it declines to exercise supplemental jurisdiction over [the] [p]laintiffs' state law claims.").

## III.  Conclusion

For the foregoing reasons, Plaintiff's TAC is dismissed in its entirety.  Because this is Plaintiff's Third Amended Complaint, the dismissal is with prejudice.  *See, e.g.*, *Denny v. Barber,* 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Anthony v. Brockway*, No. 15-CV-451, 2015 WL 5773402, at *3 (N.D.N.Y. Sept. 30, 2015) (dismissing amended complaint with prejudice where the "[p]laintiff has already been given one opportunity to amend his complaint . . . , and there is nothing in his second amended complaint suggesting that [he] could do better given another opportunity"); *Al-Qadaffi v. Servs. for the Underserved (SUS)*, No. 13-CV-8193, 2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where "[the plaintiff] has already had one chance to amend his [c]omplaint, and there is still no indication that a valid claim might be stated if given a second chance"), *aff'd*, —F. App'x—, 2016 WL 320938 (2d Cir. Jan. 27, 2016); *Bui v. Indus. Enters. of Am., Inc.*, 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (dismissing an amended complaint with prejudice where the plaintiff failed to cure the deficiencies identified in his complaint despite "being given ample opportunity to do so"); *cf. Treppel v. Biovail Corp.,* No. 03-CV-3002, 2005

WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) (declining to grant leave to amend upon

dismissing a complaint, "because [the] plaintiff has already had two bites at the apple[,] and they

have proven fruitless").

The Clerk of the Court is respectfully directed to terminate the pending Motion, (see Dkt.

No. 111) and to close this case.

SO ORDERED.

Dated:        March 30 2016
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE